**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **H.P., E.V., G.G., R.L., J.B., J.M., O.L., and M.P, by their parents and next friends, VICTORIA G., HECTOR P., AIXIA H., CARLOS V., ASENCION G., MIREYA L., MIRIAM B., ROSALBA C., XI LONG L., and IZABELA P., for themselves and all others similarly situated;** | ) ) ) ) ) ) ) ) ) | |
| **VICTORIA G., HECTOR P., AIXIA H., CARLOS V., ASENCION G., MIREYA L., MIRIAM B., ROSALBA C., XI LONG L., and IZABELA P., for themselves and all others similarly situated,** | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CLASS ACTION** |
| **v.** | ) ) | **Case No. 1:18-cv-00621** |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO; DR. JANICE JACKSON, Chief Executive Officer of Chicago Public Schools, in her official capacity; ILLINOIS STATE BOARD OF EDUCATION; and DR. TONY SMITH, State Superintendent of Education, in his official capacity.** | ) ) ) ) ) ) ) ) ) | **Hon. Judge Sara Ellis Hon. Magistrate Judge Maria Valdez** |
| Defendants. | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

1.     Chicago Public Schools ("CPS[1]") and the Illinois State Board of Education

("ISBE[2]") systemically fail to provide a large and distinct subset of children with disabilities the

free appropriate public education ("FAPE") they are entitled to under Federal law. The children

---

[1]   As used herein, CPS refers to defendants the Board of Education of the City of Chicago and Dr. Janice Jackson. Chief Executive Officer of Chicago Public Schools, in her official capacity.

[2]   As used herein, ISBE refers to the Illinois State Board of Education and Dr. Tony Smith, State Superintendent of Education, in his official capacity.

harmed by Defendants' conduct live in families whose native language is not English and have parents with limited English proficiency. Defendants fail to meet their legal obligation to these limited English proficient parents and their children with disabilities by failing, on a systemic basis, to translate vital documents and provide competent interpretation in the process used to determine what special education services these children require.

2.     This case is filed on behalf of (1) tens of thousands of students with disabilities who, like the named plaintiff students, have parents who are Limited English Proficient ("LEP[3]") and (2) their LEP parents. To meaningfully participate in the special education process, and effectively advocate on behalf of their children with disabilities, these LEP parents need oral interpretation services and written translation services from English to their native languages. Yet, despite the overwhelming evidence of need for these provisions and the harm to children with disabilities if they are not provided, and long-standing legal mandates, CPS and ISBE systemically and with deliberate indifference deny essential translation and interpretation services to LEP parents of children with disabilities to the significant detriment of the students.

3.     By law, meeting the educational needs of children with disabilities requires a process of written notice, parent consent, a non-discriminatory evaluation, creation and review of documents, development of a plan, and meetings with school staff and parents—all of which is outlined in the Individuals with Disabilities Education Act ("IDEA") and is referred to as the Individualized Education Program ("IEP") process. LEP parents and their children with disabilities have been deprived of meaningful participation in the IEP process because (1) CPS does not have

---

[3]     "Limited English proficient" is the terminology used in both the Elementary and Secondary Education Act, § 9101(25) and the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(184). The term "English Language Learner" ("ELL") is now preferred for students, but the term LEP remains applicable to parents in the context of identifying and addressing language barriers to ensure parent participation. The term "native language," when used with respect to an individual who is limited English proficient, means the language normally used by the individual or, in the case of a child, the language normally used by the parents of the child. 20 U.S.C. § 1401(20).

a policy, process or practice to provide translated vital IEP process documents[4] to LEP parents and (2) CPS does not have a process to train or hire competent interpreters, with the requisite language skills and the appropriate substantive and process knowledge to understand the IEP process, and who are impartial. Instead, CPS refuses to provide translated documents and, on an ad hoc basis, provides insufficient and incompetent oral interpretation services, often provided by a member of the schools' staff or faculty, to some LEP parents.

4.     ISBE's liability to these children with disabilities and their LEP parents is twofold. First, ISBE failed to oversee the Chicago Public Schools to ensure CPS' compliance with federal law and to prevent the illegal conduct by CPS set forth above and alleged in this Complaint. Second, ISBE failed to meet its direct legal obligations to LEP parents and their children with disabilities in the dispute resolution process. In administering appeals, which may expressly allege that the children with disabilities were denied a FAPE because their LEP parents could not understand the IEP proceedings and, thus, could not meaningfully participate, ISBE continued the illegal action and exacerbated the problem by failing to provide translated documents regarding the due process hearing and mediation process and failing to ensure that LEP parents are provided with competent interpretation at mediation.

5.     Named Plaintiffs, on behalf of themselves and the tens of thousands of members of the "Parent Class" and the "Student Class," defined below, file this action seeking declaratory and injunctive relief to stop and to remedy Defendants' systemic and continuing violations of the IDEA, 20 U.S.C. §§ 1400 *et.seq.* Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d

---

[4]   These documents include, but are not limited to, the IEP, Notification of Conference, Conference Recommendations, Procedural Safeguards Notice, Consent for Initial Evaluation, Consent for Reevaluation, Evaluation Reports, Eligibility Determination, Manifestation Determination, IEP Progress Reports, and Medicaid Consent Forms (referred to collectively as "vital IEP process documents").

*et seq,* the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. §§ 1701 *et seq,* and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq* ("Section 504").

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over these federal law claims pursuant to 28 U.S.C. § 1331 and 20 U.S.C. §§ 1415(i)(2) and 1415(i)(3)(A).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts complained of occurred in and the parties reside in or do business in the Northern District of Illinois.

## EXHAUSTION

8.     The exhaustion requirements of the IDEA, 20 U.S.C. §§ 1415(i)(2) and 1415(i)(3)(A), do not deprive this Court of jurisdiction to hear plaintiffs' systemic claims and to award systemic relief. Neither the named plaintiffs nor the class members are required to exhaust their administrative remedies before proceeding with this class action under the IDEA.

9.     Plaintiffs, for themselves and on behalf of the classes, allege structural and systemic failures by CPS and ISBE and seek system-wide reforms. As CPS successfully argued in administrative hearings, hearing officers lack jurisdiction to hear systemic claims and grant systemic relief. Requiring plaintiffs and class members to exhaust their claims through due process hearings would be futile and inadequate.

10.     Nonetheless, in two separate proceedings, some of the named plaintiffs did attempt to litigate their systemic claims and seek systemic relief before the Illinois State Board of Education in a due process hearing. These claims were stricken by the administrative hearing officers as being outside of their jurisdiction.

11.     In their due process complaint, H.P. and his parents, Victoria G. and Hector P., alleged that CPS "failed to provide all LEP parents who speak Spanish with qualified interpreters at special education meetings and key special education documents so that they can meaningfully participate in the education planning process of their children with disabilities" and requested that the "Hearing Officer grant relief to all LEP Parents who speak Spanish with children with disabilities." *H.P.* v. *City of Chicago SD 299,* Case No: 2017-0370 (May 2, 2017), attached hereto as Exhibit A. In response, CPS argued that the Hearing Officer did not have the requisite jurisdiction to adjudicate this issue pursuant to IDEA. *Id.* The Hearing Officer determined that she did not possess the requisite jurisdiction under IDEA to adjudicate this issue or to award the relief sought. *Id.* Therefore, the issue and relief were stricken from the complaint as they pertain to all LEP Parents of children with disabilities who speak Spanish. *Id.*

12.     After their systemic claims and requests for systemic relief were stricken, H.P. and his parents proceeded with the due process hearing as to their claims only, specifically that H.P. was denied a FAPE when CPS significantly impeded his parents' opportunity to participate in the decision-making process by not providing them with competent Spanish/English interpreters at IEP meetings and not providing them with Spanish translation of vital IEP process documents.

13.     In this action, H.P. and his parents Victoria G. and Hector P. are pursuing only the systemic claims that were stricken from their due process complaint. Indeed, the systemic relief they seek is necessary to consistently provide the individual relief they were granted, but still have not received. Without systemic relief ordering Defendants to implement policies, practices and procedures to train competent, impartial interpreters and translate vital IEP process documents, Victoria G. and Hector P. will continue to be denied meaningful participation at H.P.'s future IEP meetings, impeding H.P.'s right to a FAPE..

14.     E.V. and his parents, Aixia H. and Carlos V. also raised systemic failures by CPS and sought systemic relief in their due process hearing. In a pre-hearing order, the Hearing Officer held that the "hearing officer does not have jurisdiction over systemic failures. Accordingly, the systemic failure issue and relief requested were stricken from this matter." *EV* v. *City of Chicago SD 299,* Case No: 2017-0501 (August 27, 2017) at 2, attached hereto as Exhibit B.

15.     After their systemic claims and requests for systemic relief were stricken, E.V. and his parents proceeded with the due process hearing as to their claims only, specifically that E.V. was denied a FAPE when CPS significantly impeded his parents' opportunity to participate in the decision-making process by not providing them with competent Spanish/English interpreters at IEP meetings and not providing them with Spanish translation of vital IEP process documents.

16.     The Hearing Officer denied E.V. and his parents' request for an order requiring CPS to provide specifically trained interpreters and translated documents.

17.     Although not a jurisdictional requirement, plaintiffs H.P., Victoria G., Hector P., E.V., Aixia H. and Carlos V. exhausted their administrative remedies under the IDEA. These plaintiffs completed the IDEA administrative hearing process and received Final Determinations and Orders; attached hereto as Exhibits C and D.

18.     To the extent that exhaustion is required by IDEA, 20 U.S.C. §§ 1415(i)(2) and 1415(i)(3)(A), plaintiffs H.P., Victoria G., Hector P., E.V., Aixia H. and Carlos V. completed the IDEA hearing process, received a due process hearing decision and exhausted their administrative remedies. Under the doctrine of vicarious exhaustion, only one named plaintiff needs to have exhausted his administrative remedies. The remaining named plaintiffs and the class members need not individually exhaust their administrative remedies.

19.     Title VI, the EEOA and Section 504 have no exhaustion requirement. 42 U.S.C. §§ 2000d *et seq.*; 42 U.S.C. § 12133; 29 U.S.C. § 794a..

## PARTIES

**Plaintiffs**

20.     H.P. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

21.     Victoria G. and Hector P., the parents of H P., are LEP and speak, read and write in Spanish.

22.     E.V. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

23.     Aixia H. and Carlos V., the parents of E.V., are LEP and speak, read and write in Spanish.

24.     G.G. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

25.     Asencion G., the parent of G.G., is LEP and speaks, reads and writes in Spanish.

26.     R.L. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

27.     Mireya L., the parent of R.L., is LEP and speaks, reads and writes in Spanish.

28.     J.B. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

29.     Miriam B., the parent of J.B., is LEP and speaks, reads and writes in Spanish.

30.     J.M. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

31.     Rosalba C., the parent of J.M., is LEP and speaks, reads and writes in Spanish.

7

32. O.L. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

33. Xi Long L., the parent of O.L., is LEP and speaks Mandarin Chinese and reads and writes in Chinese Simplified.

34. M.P. is a CPS student, a child with a disability as defined by the IDEA, and a qualified individual with a disability as defined by Section 504.

35. Izabela P., the parent of M.P., is LEP and speaks, reads and writes in Polish.

36. H P., E.V., G.G., R.L., J.B., J.M., O.L. and M.P. are collectively referred to as the Student Plaintiffs.

37. Victoria G. Hector P., Aixia H, Carlos V. Asencion G., Mireya L., Miriam B., Rosalba C., Xi Long L., and Izabela P. are collectively referred to as the Parent Plaintiffs.

**Defendants**

38. Defendant the Board of Education of the City of Chicago is the legal entity for Chicago Public School District 299, which is a school district located in the Northern District of Illinois, organized pursuant to the Illinois School Code. CPS is responsible for ensuring that students with disabilities are provided a FAPE in the least restrictive environment ("LRE") under the IDEA. 20 U.S.C. § 1412(a)(1)(A). CPS is the local educational authority ("LEA") within the meaning of the IDEA. As a recipient of federal funds under the IDEA, CPS must also comply with Title VI of the Civil Rights Act of 1964, the Equal Educational Opportunities Act, and Section 504 of the Rehabilitation Act.

39. Defendant, Dr. Janice Jackson is named in her official capacity as the Chief Executive Officer of CPS. Dr. Jackson is charged with overall administrative responsibility for CPS pursuant to 105 ILCS 5/1-1 *et seq.*

40.     Defendant the Illinois State Board of Education is a recipient of federal funds under the IDEA and is mandated by the IDEA to ensure that all children with disabilities in Illinois between the ages of three and twenty-one receive a FAPE. 20 U.S.C. § 1412(a)(l 1). This mandate includes supervision of CPS to ensure that the requirements of the IDEA are met. ISBE is the state educational agency ("SEA") within the meaning of the IDEA. ISBE is also responsible for maintaining and administering the dispute resolution system, including due process hearings and mediation. As a recipient of federal funds under the IDEA, ISBE must also comply with Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act.

41.     Defendant, Dr. Tony Smith is named in his official capacity as the State Superintendent of Education for the Illinois State Board of Education. Dr. Smith is responsible with ensuring that school districts comply with the IDEA.

## STATUTORY FRAMEWORK

42.     Defendants' legal obligations to children with disabilities and their LEP parents are set forth in and enforced by multiple federal statues and regulations, including the IDEA, Title VI of the Civil Rights Act of 1964, Section 1703(f) of the Equal Educational Opportunities Act and Section 504 of the Rehabilitation Act. The provisions of these statutes set forth a framework to guarantee a FAPE to all children by guaranteeing their LEP parents' right to meaningfully participate in the process that determines their children's educational placement and services.

### The IDEA

43.     The IDEA requires an LEA, such as CPS, to provide a FAPE to all children with disabilities ages 3 to 21. By definition, a FAPE requires adherence to state agency educational standards. The IDEA seeks to prepare students with disabilities for further education, employment, and independent living, and specifically delineates the rights of children with disabilities and their parents in the special education IEP process. *See* 20 U.S.C. §§ 1401, 1402, 1412(a)(1)(A), 1414(d),

9

1415; 34 C.F.R. Part 300. An IEP is the primary vehicle for implementing the IDEA and is to be developed jointly with the parent, the student, and the school staff.

44.     The IDEA requires each state to establish policies and procedures to ensure that it provides a FAPE to all children with disabilities ages 3 to 21 residing within the State. *See* 20 U.S.C. §§ 1412(a). Within Illinois, the State attempts to fulfill this requirement through Article 14 of the Illinois School Code, 105 ILCS 5/14, and Part 226 of the Illinois Administrative Code, 23 HI. Admin. Code 226, which lay out the state specific requirements to provide a FAPE to each child with a disability.

45.     The IDEA further requires that each SEA, such as ISBE, be responsible for overall supervision of the LEAs, such as CPS, to ensure: (1) the requirements of the IDEA are met; and (2) the educational programs for children with disabilities meet State standards and are administered by qualified staff members. 20 U.S.C. § 1412(11)(A).

46.     The informed involvement of parents is critical to the functioning of the IDEA. The IDEA requires that educational decisions about a child's evaluation, educational program, and school placement be made through the IEP team process with the parent's meaningful involvement. 20 U.S.C. § 1414; *see also* 20 U.S.C. § 1415; 34 C.F.R. § 300.327. The educational program is then detailed in the IEP document, which is legally defined as "a written statement for each child with a disability that is developed, reviewed and revised" through the mandated notice and meeting process. 20 U.S.C. § 1414(d)(l)(A)(i). CPS must give the parent a copy of the child's IEP at no cost to the parent. *Id.* § 1414(d)(l)(B)(i); 34 C.F.R. § 300.322. If changes are made to the IEP, and upon request, the parent must be provided with a revised copy of the IEP with the amendments incorporated. 20 U.S.C. §1414(d)(3)(F).

47. The IDEA expressly includes certain procedural safeguards, requirements, and duties of the LEA to ensure meaningful parental participation, notification, and consent throughout the special education process, including protections for parents whose native language is not English. 20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. Part 300.

48. CPS must obtain informed written parental consent in order to support an initial evaluation of a student and initial provision of special education services. Parental consent is required to continue to provide special education services and re-evaluations. Parental consent means the parent has been "fully informed of all information relevant to the activity for which consent is sought, *in his or her native language,* or through other mode of communication" and that the parent "understands and agrees" in writing to the carrying out of the activity for which his or her consent is sought. *See* 20 U.S.C. § 1414(a)(1)(D); 34 C.F.R. § 300.9 (emphasis added).

49. CPS must ensure that the parents of a child with a disability are invited to each IEP team meeting to decide the program and placement of a child and that the parents are afforded the opportunity to participate, including: (1) notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; (2) providing information to parents; and (3) affording parents the opportunity to know the purpose of the meeting, who will participate, and to identify other representatives who should be invited. 20 U.S.C. §§ 1400, 1412(a), 1414, 1415; *see also* 34 C.F.R. §§ 300.321, 300.327, 300.501(c).

50. CPS must take *"whatever action is necessary* to ensure that the parent understands the proceedings of the IEP team meeting, including arranging for an interpreter at the IEP team meeting for parents with deafness or whose native language is other than English." *See* 34 C.F.R. § 300.322(e) (emphasis added); *see also* 23 111. Admin. 226.530.

51.     The IDEA also requires that parents of a child with a disability receive prior written notice within a reasonable time before the public agency (1) proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or (2) refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child. *See* 20 U.S.C. 1415(b)(3).

52.     Such required prior written notice must be (1) written in language understandable to the general public; and (2) "*provided in the native language of the parent or other mode of communication used by the parent,* unless it is clearly not feasible to do so." *See* 20 U.S.C. § 1415(d)(2); 34 C.F.R. § 300.503(c) (emphasis added).

53.     The IDEA also requires ISBE to ensure that parents receive their procedural safeguards, including the right to file a due process hearing complaint and to participate in mediation. 20 U.S.C. 1415(a).

54.     ISBE is responsible for establishing procedures and implementing the mediation process, which parents and school districts may use to resolve complaints regarding IEP determinations. 20 U.S.C. 1415(e)(1). When a resolution is reached, the parties execute a written, legally binding agreement. 20 U.S.C. 1415(e)(2)(F); 23 111. Admin. Code 226.670.

55.     The IDEA further tasks ISBE with administering the impartial due process hearing system, which is the primary vehicle for challenging decisions made with respect to the identification, evaluation, educational placement, and the provision of a FAPE to a child with a disability. 20 U.S.C. 1415(f)(1)(A). At the conclusion of the hearing, the hearing officer who is contracted by ISBE, issues a written decision of the findings. 20 U.S.C. 1415(f)(3)(G). The decision may be appealed to any state court of competent jurisdiction or federal district court. 20 U.S.C. 1415(i)(2).

56. The decision shall be translated into the native language of the parents if their primary language is not English. 23 Ill. Admin. Code 226.670.

**Title VI**

57. Title VI of the Civil Rights Act of 1964 ("Title VI") prohibits discrimination within any program or activity receiving federal financial assistance. It states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

58. Title VI's prohibition against national origin discrimination covers discrimination against individuals who have limited English proficiency on account of their national origin, including their ancestry.

59. Title VI's prohibition against national origin discrimination protects LEP parents' rights to meaningfully participate in education programs for their children on the same basis as English-speaking parents.

60. For decades, the U.S. Department of Justice ("DOJ") and U.S. Department of Education ("DOE") have provided specific guidance to school districts on their obligations under Title VI to LEP parents and how school districts should meet those obligations.

61. The DOJ is responsible for coordinating federal agency compliance and enforcement under Title VI. For over 40 years, DOJ regulations have required that federal funding recipients take reasonable steps to communicate with LEP persons in languages other than English to ensure *meaningful access* to their programs and activities. 28 C.F.R. § 42.405(d)(1) (1976).

62. In 2002, the DOJ issued a guide ("2002 Guidance") intended to assist recipients of federal funding, such as Defendants here, in fulfilling their responsibilities to provide meaningful access to LEP persons under existing laws. The 2002 Guidance provides an analytical framework

that recipients may use to determine how best to comply with statutory and regulatory obligations to provide meaningful access to the benefits, services, information and other important portions of their programs and activities for individuals who are LEP. *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons,* 67 Fed. Reg, No. 117, June 18, 2002.

63.     The Office for Civil Rights ("OCR") at the DOE and the Civil Rights Division at the DOJ share authority for enforcing Title VI in the education context.

64.     In January, 2015, the DOJ and DOE issued a Dear Colleague letter ("Dear Colleague Letter") regarding English Learner Students and LEP Parents. *Dear Colleague Letter: English Learner Students and Limited English Proficient Parents*, Dept, of Justice & Dept, of Educ., Jan. 7, 2015. The Dear Colleague Letter adds to the 2002 Guidance and specifically addresses the obligations of federal recipients to LEP parents of students in federally funded schools. The Dear Colleague Letter provides further specific guidance to assist SEAs, school districts and all public schools in meeting their legal obligations to ensure that LEP parents and their children have meaningful access to programs and information, including compliance with the IDEA and ensuring a FAPE for children with disabilities.

65.     For example, the Dear Colleague Letter reiterates that SEAs and school districts must provide language assistance to LEP parents effectively with appropriate, competent staff— or appropriate and competent outside resources. It is not sufficient for the staff merely to be bilingual. School districts should ensure that interpreters are competent to translate in and out of English (e.g., consecutive or simultaneous interpreting) and that interpreters and translators are trained on the role of an interpreter and translator, the ethics of interpreting and translating and the need to maintain confidentiality.

66.     The DOJ and DOE caution school districts that utilization of web-based automated translation to translate documents is appropriate only if the translated document accurately conveys the meaning of the source document, including accurately translating technical vocabulary. Machine translated documents must be reviewed and edited as needed by an individual qualified to do so. Translations that are inaccurate are inconsistent with the school district's obligation to communicate effectively with LEP parents.

67.     In the special education context, Title VI provides an additional cause of action and legal basis to enforce compliance with IDEA. In cases of intentional discrimination, violations of the IDEA'S requirements regarding LEP parents can also be the basis for a national origin discrimination claim under Title VI.

**EEOA**

68.     Section 1703(f) of the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. § 1701 *et seq,* is yet another statute intended to secure language assistance for LEP persons and prohibits denials of education opportunities based on national origin.

69.     Section 1703(f) expressly prohibits state and local educational agencies from denying "equal educational opportunity to an individual on account of his or her ... national origin" by failing to take "appropriate action to overcome language barriers that impede equal participation by students in instructional programs." 20 U.S.C. § 1703(f).

70.     National origin discrimination includes, but is not limited to, the denial of equal opportunities due to an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group, including limited English proficiency

71.     Intent to discriminate is not a required element of an EEOA claim.

72.     The EEOA requirement that a school district take "appropriate action to overcome language barriers that impede equal participation of its students in instructional programs" is not limited to language barriers of students only. Instead, Section 1703 covers the language barriers of students and parents because both impact student participation.

73.     Because parents play a vital role in ensuring education opportunities for their children, the school district's duty under the EEOA to take "appropriate action" includes providing LEP parents access to information sufficient to enable them to ensure their children's equal participation in instructional programs, which includes translations and interpretation services for LEP parents.

**<u>Section 504</u>**

74.     Section 504 of the Rehabilitation Act ("Section 504") prohibits disability discrimination in federally funded programs. It mandates that "[n]o otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). CPS is a federal funds recipients within the meaning of 29 U.S.C. § 794(b)(2)(B).

75.     Intent to discriminate is not a required element of a Section 504 claim.

76.     Section 504 requires that school districts provide students who qualify as "handicapped persons" with a FAPE. *See* 34 C.F.R. § 104.33. Implementation of an IEP developed in accordance with the IDEA is one way to satisfy Section 504's requirement for a FAPE. 34 C.F.R. § 104.33(b)(2).

77.     To fulfill its obligation to provide a FAPE under Section 504, school districts must provide annual notice to students and parents regarding their duty under Section 504. *See* 34 C.F.R. § 104.32 (b); 34 C.F.R. § 104.36. Beyond notice, school districts must provide students and parents

the right to examine relevant records, to participate in an impartial hearing, and to be provided with a review procedure. 34 C.F.R. § 104.36.

78.     Section 504 requires that school districts provide each student with a group of persons knowledgeable about the student to make educational placement decisions for the child. *See* 34 C.F.R. § 104.35(c).

79.     Because parent participation is essential to the provision of a FAPE under Section 504, school districts must provide parents with access to the information that is necessary to participate, including translations and interpretation services for LEP parents.

80.     When LEP parents are denied access to information in their native language, LEP parents are unable to participate in the IEP process. As a consequence, school districts fail to provide their children with a FAPE, in violation of Section 504.

## CLASS ALLEGATIONS

81.     Plaintiffs bring this suit individually and as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all similarly situated individuals. The classes that Plaintiffs seek to represent are composed of:

A.     All parents as defined by 34 C.F.R. § 300.30(a) with limited English proficiency whose children (1 )are now enrolled or in the future will be enrolled in Chicago Public Schools and (2) are identified or eligible to be identified as children with a disability within the meaning of the IDEA and qualified individuals with a disability within the meaning of Section 504 ("Parent Class"); and

B.     All students who are now enrolled or in the future will be enrolled in Chicago Public Schools who are identified or eligible to be identified as children with a disability within the meaning of the IDEA and qualified individuals with a disability within the meaning of Section 504, whether or not they are classified as English language learners, whose parents, as defined by 34 C.F.R. § 300.30(a), are persons with limited English proficiency ("Student Class").

82.     Each class is so numerous that joinder of all members is impracticable. During the 2016-2017 school year, CPS reported a total of 52,093 students enrolled in CPS with IEPs. Of

those students, 42 percent have parents for whom English is not their native language. The exact number of members of each class can be best ascertained by CPS.

83.    There are many questions of law common to each class including, but not limited to, the following:

    a.    Whether CPS' systemic refusal to translate vital IEP process documents for LEP parents of students with disabilities violates any or all of the following statutes: the IDEA, Title VI, the EEOA and Section 504;

    b.    Whether CPS' systemic refusal to provide competent interpretation services during the IEP process to LEP parents of children with disabilities violates any or all of the following statutes: the IDEA, Title VI, the EEOA, and Section 504;

    c.    Whether ISBE's failure to oversee CPS to ensure compliance with the legal duties alleged in this Complaint violates any or all of the following statutes: the IDEA, Title VI, and the EEOA;

    d.    Whether ISBE's failure to maintain a dispute resolution system consistent with the legal duties alleged in this Complaint violates any or all of the following statutes: the IDEA, Title VI, and the EEOA;

84.    There are questions of fact common to each class including, but not limited to, the following:

    a.    What policies, procedures or practices, if any, CPS implemented regarding interpretation services during the IEP process for LEP parents of children with disabilities;

b.      What policies, procedures or practices, if any, CPS implemented regarding timely provision of translated documents to LEP parents of children with disabilities prior to and following the IEP meeting;

c.      What policies, procedures or practices, if any, ISBE implemented to oversee CPS' compliance with the requirements of the IDEA, Title VI, and the EEOA;

d.      What policies, procedures or practices, if any, ISBE implemented regarding interpretation services to LEP parents of children with disabilities during the dispute resolution process.

e.      What policies, procedures and practices, if any, ISBE implemented regarding translation to LEP parents of children with disabilities during the dispute resolution process.

85.     Plaintiffs' claims are typical of the claims of the classes as all members are similarly treated and affected by CPS and ISBE's refusal to translate vital IEP process documents and to provide competent interpretation services to students with disabilities and their LEP parents throughout the IEP and dispute resolution process and the failure of ISBE to provide the required oversight of CPS.

86.     Plaintiffs seek common declaratory and injunctive relief from the Court finding violations of the relevant laws and requiring CPS to: (1) institute an express written policy and consistent practice of providing interpretation services from competent interpreters at IEP meetings and timely written translations of vital IEP process documents to LEP parents of students with disabilities and (2) develop a protocol to identify those LEP parents who may need these services. Plaintiffs also seek common declaratory and injunctive relief from the Court finding violations of the relevant laws and ordering ISBE to develop protocols to oversee CPS and ensure

CPS' compliance with the legal duties alleged in this Complaint and to order ISBE to institute and express written policy and consistent practice of providing interpretation services from competent interpreters for the mediations and due process hearings and to provide timely written translations of vital IEP process documents to LEP parents of students with disabilities.

87.    Plaintiffs will fairly and adequately protect the interests of the classes. Student Plaintiffs each qualify as a "child with a disability" under the IDEA, and must be provided an IEP that governs his or her education. 20 U.S.C. §§ 1401(3), 1414(d), 1415. Student Plaintiffs each qualify as an "individual with a disability" under Section 504. 29 U.S.C. § 794(a); 34 C.F.R. § 104.3(j). Parent Plaintiffs are all LEP and qualify as "parents" of a child with a disability. 20 U.S.C. § 1401(23). All individually named Plaintiffs have experienced a common harm and seek a common remedy. CPS' and ISBE's failure to provide timely and completely translated documents and competent interpretation services to LEP parents extends to all foreign languages and is not limited to LEP parents whose native language is Spanish, Polish or Mandarin.

88.    Counsel for Plaintiffs are experienced in handling federal class action litigation and will fairly and adequately represent the interests of the classes. Equip for Equality has litigated numerous civil rights claims on behalf of persons and children with disabilities. Kirkland & Ellis LLP is experienced in complex federal litigation and class action litigation.

89.    Defendants have acted or refused to act on grounds that apply generally to the classes, so that final relief and the corresponding declaratory relief are appropriate respecting the classes as a whole.

## FACTS

### CPS' Systemic Violations

90.    During the 2016-2017 school year, 42 percent of the 52,903 CPS students with IEPs lived in households where English is not spoken at home. Within this population, over 19,000

households communicate in Spanish, over 300 communicate in Polish, nearly 300 communicate in Arabic, and nearly 200 communicate in Chinese. CPS systemically fails to provide LEP parents of these students with interpretation services from competent interpreters at IEP meetings and written translations of vital IEP process documents.

91.    CPS does not have a policy or practice to provide written translation of vital IEP process documents to LEP parents. On a systemic basis, CPS fails to provide LEP parents with written translations of vital IEP process documents including, but not limited to, the IEP, Notification of Conference, Conference Recommendations, Procedural Safeguards Notice, Consent for Initial Evaluation, Consent for Reevaluation, Evaluation Reports, Eligibility Determination, Manifestation Determination, IEP Progress Reports, and Medicaid Consent Forms.

92.    CPS has no policy or practice to determine the competence of the CPS personnel who sometimes serve as interpreters at IEP meetings and other special education meetings. CPS does not determine whether the interpreters it uses on an ad hoc basis: (1) demonstrate proficiency in and the ability to communicate information accurately in English and in the other language; (2) have knowledge in both languages of the specialized terms and vocabulary used at IEP meetings; or (3) understand and adhere to their roles as interpreters without deviating to another role.

93.    CPS has no policy or practice to provide training or guidance regarding the standards of interpretation to CPS personnel who sometimes serve as interpreters at IEP meetings and other special education meetings.

94.    As a result of CPS' failure to develop and implement such policies and practices, CPS systemically fails to provide competent interpretation services to LEP parents.

95.     CPS personnel who intermittently serve as interpreters for LEP parents in IEP meetings receive no training on interpretation and fail to understand the complicated information about a student's educational, emotional, and psychological needs.

96.     Untrained CPS personnel who intermittently serve as interpreters for LEP parents in IEP meetings do not follow the basic standards and ethical expectations of professional interpretation: reports are summarized rather than provided in full; conversations are wholly omitted from interpretation; interpreters editorialize on reports provided; parents' statements are not interpreted fully or accurately; technical vocabulary related to special education laws and the relevant disabilities is not interpreted or understood by the interpreter; and interpreters, who are also school staff members, do not interpret or accurately convey important information due to partiality concerns.

97.     The denial of access to a competent interpreter prevents LEP parents from understanding how the IEP meeting proceeds and participating in the creation of an appropriate educational plan for their children with disabilities.

98.     Because the LEP parents of children with disabilities cannot effectively communicate with school administrators, they are unable to give and receive information that is necessary for placing their children in the proper programs and providing them with the proper services. The purpose of an IEP meeting is to engage in a collaborative process between the school district and parent, including the mutual sharing of information about the student's strengths and needs, in order to design an appropriate educational program for the student. The necessity of good communication between school administrators and the parents of children with disabilities is a cornerstone of the IDEA.

99.    On information and belief, CPS was a recipient of the 2015 Dear Colleague Letter, reiterating their obligations under Title VI and the EEOA and providing guidance on how to comply.

100.    CPS collects data regarding the household language of all students in the district through a Home Language Survey. In addition, the IEP of each child with a disability notes the parents' primary language and whether an interpreter is required for communication with the parent.

101.    Despite this knowledge about the language needs of LEP parents within CPS and the federal government's repeated guidance about compliance measures under Title VI and the EEOA, CPS systemically fails to provide translated vital IEP process documents into the LEP parents' native language and fails to provide competent interpreters.

**ISBE's Systemic Violations**

102.    ISBE is responsible for ensuring that all children with disabilities in Illinois' school districts receive a FAPE. In addition, ISBE administers a dispute resolution system, which includes mediation, under its obligation to ensure that children with disabilities and their parents are guaranteed the procedural safeguards of the IDEA. During the 2015-2016 school year, ISBE reported that it received 252 requests for due process hearings and 252 requests for state-sponsored mediation.

103.    ISBE systemically fails to oversee CPS' provision of interpretation services and translation of vital IEP process documents to LEP parents. ISBE does not have a policy or practice of oversight regarding CPS' competent interpretation services or translation of vital IEP process documents. As a result, LEP parents are unable to meaningfully participate in the educational planning of their children and their children with disabilities lose educational benefits.

104.     ISBE systemically fails to provide written translations of vital dispute resolution documents to LEP parents. ISBE does not have a policy or practice to provide timely written translation of vital dispute resolution documents. Consistently, LEP parents do not receive written translations of due process hearing documents, including rights of the parties, status orders, continuance notices, prehearing conference orders, and decisions (referred to collectively as "vital dispute resolution documents").

105.     Rather than meet its obligation to provide translated documents related to the dispute resolution process to the LEP parent, ISBE has suggested that LEP parents use Google Translate, a web-based automated translation.

106.     ISBE systemically fails to provide competent interpretation services to LEP parents. ISBE does not have a policy or practice to determine the competence of interpretation services provided at mediation, status conference calls, or prehearing conferences. ISBE does not determine whether its interpreters: (1) demonstrate proficiency in and the ability to communicate information accurately in English and in the other language; (2) have knowledge in both languages of the specialized terms and vocabulary used in dispute resolution proceedings; or (3) understand and adhere to their roles as interpreters without deviating to another role, such as counselor or advisor.

107.     ISBE defers its role to school districts to provide competent interpreters in order for LEP parents to participate in mediation and due process hearings. However, ISBE does not have a policy or practice to determine that competent interpretation services are provided.

108.     As a result of ISBE's failure to provide written translations of vital dispute resolution documents and competent interpretation services, LEP parents are unable to access the

procedural safeguards that are essential to ensure their children's rights are upheld and that they receive an appropriate education.

109.    On information and belief, ISBE was a recipient of the 2015 Dear Colleague Letter, reiterating its obligations under Title VI and the EEOA and providing guidance on how to comply.

110.    Despite this knowledge about the needs of LEP parents of students with disabilities and the compliance measures required under Title VI and the EEOA, ISBE systemically failed to provide translated vital dispute resolution documents and competent interpretation services during the dispute resolution process.

**Plaintiffs' Experiences**

i.      **H.P., Victoria G. and Hector P.'s Experience**

111.    Plaintiff H.P. is a 12-year-old seventh grade student enrolled at Finkl Elementary School ("Finkl"). H.P. qualifies for special education services under the disability categories of autism and other health impairment. H.P. is a qualified individual with a disability under Section 504.

112.    Plaintiffs Victoria G. and Hector P. are H.P.'s parents. Their native language is Spanish and they are LEP. They speak, read and write in Spanish.

113.    H.P.'s IEPs all indicate that Spanish is the primary language spoken in the home and that an interpreter is necessary for communication.

114.    Prior to the commencement of the IEP meeting on May 11, 2016, CPS knew that Victoria G. and Hector P. are LEP, that they cannot read in English, and that an interpreter was necessary for H.P.'s parents to meaningfully participate in the IEP meeting.

115.    Both Victoria G. and Hector P. attended a May 11, 2016 IEP meeting at Finkl Elementary School to plan for the following year for H.P. H.P.'s school social worker served as the interpreter in the meeting, as well as serving in the role of social worker. The social worker did

25

not receive training as an interpreter. As evidenced by the misunderstanding of H.P.'s parents as to the proceedings and the outcome of the IEP meeting, the social worker was not a competent interpreter.

116.    At the meeting, the IEP team discussed removing H.P.'s bus transportation to school, as well as H.P.'s transfer to his neighborhood school. Victoria G. and Hector P. thought that they had voiced their disagreement with each of these proposals to the English-speaking members of the IEP team through the interpreter. Based on information from the interpreter, at the end of the discussion, H.P.'s parents believed that they had effectively advocated for their son and that H.P. would remain at Finkl and that no decision regarding transportation had been made. This was wrong. Victoria G. and Hector P. misunderstood because the interpretation provided was not competent. They were unaware that the major changes they thought they had successfully argued against, instead had been implemented.

117.    At the end of the meeting, Hector P. signed an "Agreement to Proceed with IEP Meeting" document provided to him only in English. The document provided Hector P.'s consent for CPS to complete HP.'s IEP and provide parents with a copy the next day. Hector P. did not understand this document when he signed it.

118.    Victoria G. and Hector P. did not receive the finalized IEP the following day. When they did receive the IEP, it was provided to them only in English. The changes were not explained to them in Spanish and the IEP was not translated orally or in writing in Spanish. As a result, Victoria G. and Hector P. were not aware that the finalized IEP returned H.P. to his neighborhood school and removed transportation and behavioral support services for H.P.

119.    CPS provided no notice in Spanish that HP.'s transportation and behavioral support services were removed and that H.P would be returned to his neighborhood school.

120.     Several days prior to the start of the 2016-2017 school year, Victoria G. and Hector P. went to Finkl to get a supply list. They learned then that H.P. was no longer enrolled there.

121.     On September 3, 2016, Victoria G. and Hector P. requested mediation to resolve the issue of H.P.'s unenrollment from Finkl. H.P. missed the first week of school while the complaint was pending. H.P. was allowed to return to Finkl, but he was not provided with bus transportation services and behavioral support services.

122.     On April 5, 2017, Victoria G. and Hector P. filed a Due Process Complaint Notice alleging that CPS' failure to provide translated vital IEP process documents and competent interpreters for special education meetings denied H.P. a FAPE.

123.     The Due Process Complaint Notice expressly stated that the denial of FAPE resulted from HP.'s parents' inability to meaningfully participate in the IEP meeting and inability to understand the IEP and documents provided to them only in English. Knowing these facts and their consequences, CPS continued to send Victoria G. and Hector P. vital IEP process documents solely in English, often without an explanation.

124.     Even after Victoria G. and Hector P. requested the due process hearing, CPS continued to fail to provide them with translated vital IEP process documents and competent interpreters. CPS sent a document solely in English, which sought consent, as is required under the IDEA, for psychological and other evaluations of HP. No one provided an explanation in Spanish of this form and Hector P. signed it not knowing what it said. He would sign documents such as this one because he believed that vital special education services would stop for his son if he did not sign the documents.

125.     In a pre-hearing ruling, the Hearing Officer struck all of H.P.'s systemic requests for relief for lack of jurisdiction. *See* Janet K. Maxwell-Wickett, STATUS CALL ORDER FOR CASE

No: 2017-0370 (entered May 2, 2017). The Hearing Officer concluded that she did not have jurisdiction to adjudicate a systemic issue or grant a systemic, district-wide remedy.

126.    During the pre-hearing resolution period, on June 9, 2017 and June 19, 2017, Victoria G. and Hector P. participated in an eligibility meeting and IEP meeting for H.P. During the meeting, the school's bilingual specialist served as the interpreter, in addition to serving in her role as bilingual specialist. She does not have any training in interpretation and stated she is confused by special education terminology. Despite multiple requests, none of the vital IEP process documents, including the evaluation reports, eligibility determination, and IEP were provided in Spanish. Victoria G. and Hector P. did not fully understand the discussion during the meeting.

127.    After a four day hearing in September 2017, the Hearing Officer ruled in H.P.'s favor finding that CPS' failure to provide required qualified translators and translated documents violated H.P.'s and his parents' legal rights under the IDEA. *See* Ex. C.

128.    As to the provision of translation services, the Hearing Officer found:

> The bilingual staff members performing services at the Student's IEP meetings from May 11, 2016 to the present were not qualified to do so and do not meet the IDEA'S requirement of ensuring meaningful participation by the Parents.
>
> ... [HP's] Parents' native language is Spanish. Neither Mother nor Father is fluent in English. Technical IEP meetings, conducted in English, with summarized information provided by untrained bilingual staff members, were incomprehensible to the Student's Parents. Father did not feel like a member of the IEP team as discussions were held in English and decisions were predetermined. [Cite omitted] The fact the Parents' [sic] were unaware that the Student's transportation services were terminated and he was reassigned to his neighborhood school, GES, for the 2016-2017 school year [cite omitted] serves to further illustrate that Parents were not able to meaningfully participate in the Student's IEP process. Additional support is Father's credible testimony that Parents were unaware that the Student's Behavioral Intervention Plan had been removed despite the Student's on-going, documented behavioral difficulties.

*Id.* at 31.

129.     As a remedy for CPS' denial of FAPE to HP by failing to provide his parents with

qualified interpreter services at IEP meetings, the Hearing Officer ordered CPS:

> to provide qualified Spanish/English language interpreter services to
> Parents at all future IEP meetings. Interpreters provided during this period
> must undergo a proficiency assessment, be trained and be certified in
> Spanish/English interpretation. Interpreters must be trained on the code of
> conduct and standards of practice, common errors made by untrained
> interpreters, the importance of a pre-encounter session with the person for
> whom he or she is interpreting, and the necessary vocabulary and
> terminology required for the IEP educational setting. The interpreters must
> be neutral and impartial, must play no other role at the IEP meetings, and
> must ensure confidentiality, accuracy, respect, impartiality, and role
> boundaries. This is quite simply what IDEA requires.

> *Id.* at 32-33.

130.     As to translated documents, the Hearing Officer found:

> the testimony and documentary evidence is overwhelming and
> uncontroverted. Mother and Father did not receive any IEPs or related
> documents translated into their native language. . . Based upon Father's
> demeanor at hearing, this Hearing Officer finds that he was candid and
> credible when he testified that he signed documents in English not knowing
> what those documents said after being advised by the staff member assigned
> to translate that there was no problem with the documents. [Cite omitted]
> The Hearing Officer finds that this did not constitute fully informed consent
> and resulted in the Student's enrollment in a different elementary school
> than the one he had attended since second grade, denial of transportation
> services, elimination of the Student's BIP, despite documented behavioral
> difficulties, and uninformed consent for the Student's triennial reevaluation.
> For these reasons, this Hearing Officer finds that the District [CPS] denied
> FAPE to the Student when it failed to provide vital IEP process documents
> including consents to evaluate, IEPs, evaluation reports, excusal of IEP
> team member documents or IEP progress reports in Spanish from May 11,
> 2016 to present.

> *Id.* at 33-34.

131.     As a remedy for CPS' denial of FAPE to HP by failing to provide his parents with

translated IEP documents, the Hearing Officer ordered CPS:

> To provide the Student's vital IEP process documents, including consents to evaluate, IEPs, evaluation reports, excusal of IEP team member documents and IEP progress reports translated into Spanish. . . . The documents must be translated into Spanish by a certified Spanish/English translation service. This is quite simply what the IDEA requires.

> *Id.* at 35.

132. To date, CPS has not complied with this Order. Despite the Hearing Officer's Order, CPS has failed to provide a translated IEP document from the November 7, 2017 IEP meeting and H.P.'s IEP progress report. H.P., Victoria G., and Hector P. need systemic relief to address their claims and provide the requisite relief.

133. The Due Process Complaint that was submitted to ISBE expressly stated that the denial of FAPE resulted from H.P.'s parents' inability to meaningfully participate in the IEP meeting and inability to understand the IEP and documents provided to them only in English, yet the violations continued.

134. Despite knowledge that Victoria G. and Hector P. are LEP and the consequences for H.P. of CPS' failure to translate documents and provide a competent interpreter, H.P. and his parents still have not received a copy of the Hearing Officer's Order from October 2, 2017 in Spanish. In addition, ISBE did not provide any of the documents related to the due process hearing, including the Initial Hearing Information Packet, Initial Status Call Order, Continuance Orders, Notice of Prehearing Conference, or Prehearing Conference Report in Spanish.

135. Hector P. participated in state-sponsored mediation in an attempt to resolve a subsequent dispute regarding H.P.'s placement on January 9, 2018. The initial interpreter for the mediation was a CPS aide. On information and belief, she has not received training in interpretation. She did not interpret significant portions of the initial statements during the mediation and summarized key information. Because he could not understand the content of the

mediation, Hector P. requested a new interpreter. H.P.'s case manager from Finkl then served as the interpreter. On information and belief, she has not received training in interpretation.

136.    Based on Hector P.'s lack of understanding of the mediation, he was not able to participate fully in the dispute resolution process. The parties did not reach a resolution. As evidenced by Hector P.'s lack of understanding, the interpreters for the mediation were not competent interpreters.

137.    H.P., Victoria G. and Hector P file this action within 120 days of the Hearing Officer's Order.

### ii.    E.V., Carlos V., and Aixia H.'s Experience

138.    Plaintiff E.V. is a 12-year-old seventh grade student enrolled in the cluster program at Talcott Elementary School. He qualifies for special education services under the disability category of autism. E.V. is a qualified individual with a disability under Section 504.

139.    Aixia H. and Carlos V. are E.V.'s parents. Their native language is Spanish and they are LEP. Carlos V. and Aixia H. speak, read and write in Spanish.

140.    E.V.'s IEPs have indicated that Spanish is the primary language spoken in the home and that an interpreter is necessary for communication.

141.    Prior to the commencement of the March 7, 2016 IEP meeting, CPS knew that Carlos V. and Aixia H. can read very little in English and primarily read in Spanish, and that they required an interpreter to meaningfully participate in the IEP meeting.

142.    CPS nonetheless failed to provide them with vital IEP process documents translated into Spanish.

143.    When CPS failed to provide her with translated documents, Aixia H. resorted to web-based automated translations, such as Google Translate, in order to understand E.V.'s vital IEP process documents. This process can take hours and is not a completely accurate translation.

31

144.    Both Carlos V. and Aixia H. attended an IEP meeting for E.V. on March 7, 2016 to plan for the following year. At the meeting, CPS did not provide an interpreter.

145.    Without an interpreter, Carlos V. understood very little of what was being said by others during the meeting. In addition, without an interpreter Carlos V. could not convey important information to the IEP team regarding E.V.'s behavior when he was arriving at school and the school's failure to address this behavior.

146.    Similarly, without an interpreter, Aixia H. understood very little of what others were saying during the IEP meeting and was not able to explain important information to the IEP team regarding E.V. Aixia H. attempted to raise concerns about E.V.'s transition difficulties throughout the school day, sensitivity to light, audiology deficits, and his need to remain inside on cold days due to his asthma. Those concerns were not reflected in E.V.'s IEP and they went unaddressed due to the lack of an interpreter.

147.    After the IEP Meeting, CPS provided the IEP to Carlos V. and Aixia H. solely in English. Aixia H. used Google Translate to translate portions of the document into Spanish. This took several hours and was not a completely accurate translation. However, Aixia H. was able to then determine that some of the services E.V. needed were not in the IEP. Aixia wrote a letter, using Google Translate to translate it into English, expressing concerns about services that were not included in the IEP.

148.    After CPS received Aixia H.'s letter, it requested that she sign an IEP Revision document, provided in English, to revise E.V.'s IEP. Aixia H. did not understand what revisions were being made. She signed it because she believed that E.V. would not get the IEP unless she signed it.

149.    Despite Carlos V. and Aixia H.'s concerns about E.V.'s behaviors transitioning to school and other behavioral concerns, the IEP team did not develop a plan to address them. The IEP team reduced E.V.'s social work support and repeated the same behavior intervention plan that had been in place previously.

150.    In a telephone call on February 14, 2017 with E.V.'s social worker at his school, Aixia H. requested that further communication proceed in Spanish. However, CPS continued to send documents, such as IEP meeting notices, a consent for assessment, and other vital IEP process documents solely in English.

151.    Because Carlos V. and Aixia H. did not understand these documents, they did not understand that CPS was initiating a reevaluation of E.V. In addition, Carlos V. and Aixia H. were not aware that CPS was attempting to schedule an IEP meeting in March of 2017. The meeting never occurred.

152.    Because she believed that an IEP meeting was necessary for E.V., and was unaware of CPS scheduling an IEP meeting, Aixia H. wrote a letter in Spanish requesting an IEP meeting on March 7, 2017. CPS received the letter but did not respond to it.

153.    E.V.'s IEP team did not meet again until November 27, 2017 to review and revise E.V.'s IEP.

154.    On June 29, 2017, Carlos V. and Aixia H. filed a Due Process Complaint Notice alleging that CPS' failure to provide translated vital IEP process documents and interpreters for special education meetings denied E.V. a FAPE.

155.    The Due Process Complaint Notice expressly stated that the denial of FAPE resulted from E.V.'s parents' inability to meaningfully participate in the IEP meeting and inability to understand the IEP and documents provided to them only in English. Knowing these facts and

their consequences, CPS continued to send Carlos V. and Aixia H. vital IEP process documents solely in English, oftentimes without an explanation.

156.     In a prehearing ruling, the Hearing Officer struck all of E.V.'s systemic requests for relief for lack of jurisdiction. *See* Ex. B. The Hearing Officer concluded that she did not have jurisdiction to adjudicate a systemic issue or grant a systemic, city-wide remedy.

157.     After a five day hearing, the Hearing Officer issued a Decision and Order on November 24, 2017. The Hearing Officer found that CPS' failure to provide interpreters or translation of vital IEP process documents did not deny E.V. a FAPE.

158.     The Due Process Complaint Notice submitted to ISBE expressly stated that the denial of FAPE resulted from E.V.'s parents' inability to meaningfully participate in the IEP meeting and inability to understand the IEP and documents provided to them only in English, yet the violations continued.

159.     After receiving the Hearing Officer's Decision and Order, CPS convened a domain meeting to plan for E.V.'s reevaluation on November 27, 2017, which Aixia H. and Carlos V. attended. Despite a request for written translation of the Consent for Reevaluation and the Assessment Plan, CPS did not provide these documents in Spanish either before or at the meeting. During the meeting, the principal served as the interpreter. Carlos V. and Aixia H. could not understand significant portions of the IEP meeting because the principal did not interpret much of the proceeding. Multiple times, the principal had to be prompted to interpret the discussion. The principal was not a competent interpreter.

160.     CPS convened an eligibility and IEP meeting on December 4, 2017. The IEP team discussed evaluation reports, but the reports were not provided in Spanish to Carlos V. and Aixia H. During the meeting, the principal and assistant principal served as the interpreters. The

interpreters again failed to interpret significant portions of the IEP meeting. Despite the parents' requests, CPS did not provide the Evaluation Reports, IEP, and Conference Recommendations in Spanish after the meeting.

161.    On January 3, 2018, forty days after ISBE issued the decision in English and after CPS convened two meetings to follow up on the decision, E.V. and his parents finally received a copy of the Hearing Officer's decision in Spanish. ISBE still has not provided any of the documents related to the due process hearing, including the Initial Hearing Information Packet, Initial Status Call Order, Continuance Orders, Notice of Prehearing Conference, or Prehearing Conference Report to Carlos V. and Aixia H. in Spanish.

162.    E.V., Carlos V. and Aixia H. file this action within 120 days of the Hearing Officer's Order.

### iii.    R.L. and Mireya L.'s Experience

163.    Plaintiff R.L. is a 19-year-old post-twelfth grade student attending Whitney Young High School. He qualifies for special education services under the disability categories of visual impairment, intellectual disability, and other health impairment. R.L. is a qualified individual with a disability under Section 504.

164.    Plaintiff Mireya L. is R.L.'s mother. Her native language is Spanish and she is LEP. She speaks, reads and writes in Spanish.

165.    R.L.'s IEPs indicate that Spanish is the primary language spoken in the home and that an interpreter is needed for parent communication.

166.    Prior to the commencement of the IEP meeting on January 12, 2017, CPS knew that Mireya L. is LEP, reads primarily in Spanish and needs an interpreter to meaningfully participate in the IEP meeting.

167.     Despite this knowledge, CPS never provided her with vital IEP process documents translated into Spanish nor competent interpretation services at R.L.'s IEP meetings.

168.     When interpretation services were provided to Mireya L. at IEP meetings, the interpretations were so poor that she could not understand the proceedings. The interpreters wrongly summarized information, added their own opinions, answered questions themselves rather than allowing the IEP team to answer, and misinterpreted critical vocabulary. The substance of the meetings was completely lost through the poor interpretation services. As evidenced by Mireya L.'s misunderstanding of the outcome of the IEP meetings, she did not have competent interpreters.

169.     On January 12, 2017, Mireya L. attended an IEP meeting to plan her son's educational services for the upcoming 2017-2018 school year. CPS notified Mireya L. that it had invited a school staff member to the IEP meeting to fulfill the role of interpreter. No interpreter attended. The meeting proceeded anyway, solely in English. At the end of the meeting, which she did not understand, Mireya L., received a copy of R.L.'s IEP solely in English.

170.     At the conclusion of the meeting, Mireya L. thought that R.L. would continue to attend Whitney Young High School, and receive vision itinerant services, transportation, speech therapy, and orientation and mobility services for the following 2017-2018 school year. Her understanding was wrong. With no interpreter to assist her, Mireya L. misunderstood critical decisions that adversely impacted her son. Significantly, Mireya L. did not understand that her son was scheduled to graduate or that his special education eligibility would be terminated. With no interpreter to assist her, Mireya L. was unable to meaningfully participate in the meeting and advocate for retention of these needed services for her son.

171.     Following the meeting, Mireya L. did not receive a copy of the IEP in Spanish. In addition, Mireya L. did not receive any notice in Spanish that R.L.'s education services were changing.

172.     At the start of the 2017-2018 school year, the school informed Mireya L. that R.L. had graduated and was ineligible to receive special educations services. After three months without critical educational services, CPS reversed R.L.'s graduation and reinstated him in school. If CPS had provided Mireya L. with an interpreter and the IEP team had included her and considered her views the first time, the proper decision would have been made initially, without need for a later reversal.

173.     Without competent interpretation services and written translation of vital IEP process documents, Mireya L. could not meaningfully participate in R.L.'s education, which resulted in a loss of an educational benefit her son needed and was entitled to receive.

**v.     O.L. and Xi Long L.'s Experience**

174.     Plaintiff O.L. is a nine year old, fourth grade student enrolled at Finkl Elementary School. O.L. qualifies for special education services under the category of autism. O.L. is a qualified individual with a disability under Section 504.

175.     Plaintiff Xi Long L. is O.L.'s father and he is LEP. His native spoken language is Mandarin and he reads and writes Chinese Simplified.

176.     O.L.'s IEPs indicate that Mandarin is the primary language spoken in the home and that an interpreter is needed for parent communication.

177.     When Xi Long L. completed CPS' Home Language Survey, which is provided in English, he believed that he was requesting documents translated into Chinese Simplified and interpretation services.

178. Prior to the commencement of the IEP meeting on October 3, 2017, CPS knew that Xi Long L. does not read English and reads only Chinese Simplified, and that he required an interpreter to meaningfully participate in the IEP meeting.

179. Despite this awareness, CPS never provided him with vital IEP process documents translated into Chinese Simplified or with an interpreter.

180. On October 3, 2017, Xi Long L. attended an IEP meeting for O.L. CPS did not provide an interpreter. Xi Long L. requested that they provide at least a teleinterpreter. The school denied his request and stated that it could not find a Mandarin interpreter. The school used web-based automated translation, Google Translate, to communicate with Xi Long L. Google Translate is not an adequate substitute for a competent interpreter and did nothing to improve communication with Xi Long L. Xi Long L. did not have an effective way to communicate with the other members of the IEP team to ask questions or convey information.

181. Xi Long L. does not believe that O.L. is receiving the services necessary for her to make academic, communication or functional progress. At the IEP meeting, Xi Long L. attempted to use his limited English to request additional speech and occupational therapy services, as well as use of an augmentative communication device, as recommended by private evaluations outside of CPS. During the meeting, he did not understand if his request was understood or would be granted.

182. Xi Long L. wanted to ask several more questions about O.L.'s academic program, such as the instructional methodology used, her lack of progress for the past two years, and what strategies he could use at home to support O.L.'s progress. Because no competent interpreter was present at the meeting, Xi Long L. could not ask these and other questions during the IEP meeting and was denied his ability to participate meaningfully.

183.    At the end of the meeting, Xi Long did not understand what had been discussed, whether he had been able to advocate in even a limited way for his daughter, or what had been decided.

184.    After the IEP meeting, Xi Long L. took O.L.'s IEP to her private speech pathologist to see if the changes recommended by O.L.'s private therapists were incorporated into O.L.'s IEP. He learned that none of his requests were incorporated.

185.    In December 2017, Xi Long L. found an assistive technology evaluation referral in English in O.L's backpack. Because it was in English, he did not understand what the document was. Once explained to him by O.L.'s private speech pathologist, through an interpreter, Xi Long L. believed that the information on the referral was incomplete and desired to discuss it more fully with the IEP team. No meeting was held to discuss the referral.

### vi.    J.M. and Rosalba C.'s Experience

186.    Plaintiff J.M. is a 7-year-old second grade student enrolled at Octavio Paz, a public charter school within CPS. He qualifies for special education services under the disability categories of specific learning disability and speech and language delay. J.M. is a qualified individual with a disability under Section 504.

187.    Plaintiff Rosalba C. is J.M.'s mother. Her native language is Spanish and she is LEP. She speaks, reads and writes in Spanish.

188.    J.M.'s IEP indicates that the primary language spoken in his home is Spanish and that an interpreter is needed for parent communication.

189.    Prior to the commencement of the IEP meeting on November 10, 2016, CPS knew that Rosalba C. is LEP, does not read English, and that an interpreter is necessary for her to meaningfully participate in the IEP meeting.

190. On November 10, 2016, Rosalba C. attended an eligibility meeting for J.M. to discuss a recent speech evaluation. No interpreter was present at the meeting, and the meeting proceeded in English. During this meeting, the IEP team reviewed an evaluation for J.M.. Rosalba C. did not receive a copy of the evaluation report in Spanish and no one orally interpreted the evaluation results to Rosalba C. during the meeting. Rosalba C. was precluded from participation by this failure to translate or interpret the evaluation being discussed and the failure to interpret the discussion.

191. At the end of the meeting, the IEP team informed Rosalba C., in English, that J.M. would be exited fully from special education services. Without an interpreter, Rosalba C. did not understand why J.M. was being exited from special education and could not explain her disagreement to the IEP team. Without obtaining a written translation of the evaluation reports, Rosalba C. could not review the data that the IEP team relied upon to justify exiting J.M. from special education.

192. Rosalba C. requested additional evaluations on November 16, 2016 and January 10, 2017. CPS responded to her written requests solely in English and denied additional evaluations.

193. After J.M. obtained legal representation, CPS reevaluated him and found him eligible once again for special education services on December 7, 2017. The evaluation found that J.M. had significant speech delays, a specific learning disability, and need for other related services including occupational therapy and social work services.

194. Without competent interpretation services and written translations of vital IEP process documents, Rosalba C. was not able to meaningfully participate in J.M.'s educational planning. As a result, CPS denied J.M. special education services for more than a year.

### vii. J.B. and Miriam B.'s Experience

195.    Plaintiff J.B. is an 8-year-old third grade student enrolled at Mozart Elementary School. She qualifies for special education services under the disability categories of developmental delay and other health impairment. J.B. is a qualified individual with a disability under Section 504.

196.    Plaintiff Miriam B. is J.B.'s mother. Her native language is Spanish and she is LEP. Miriam B. speaks, reads and writes in Spanish.

197.    J.B.'s IEPs indicate that Spanish is the primary language spoken in the home and have also indicated that an interpreter is necessary for communication.

198.    Prior to the commencement of the IEP meeting on March 24, 2016, CPS knew that Miriam B. is LEP, she does not read English, and that an interpreter is necessary for her to meaningfully participate in the IEP meeting.

199.    On March 24, 2016, Miriam B. participated in a domain meeting to discuss which assessments would be conducted and which clinicians would conduct J.B.'s reevaluation for special education services. The school special education case manager served as the interpreter at this meeting, as well as serving in her role as the case manager. Miriam B. attempted to convey information about J.B.'s behaviors at school and her need for additional social-emotional services to address these behaviors. To address these concerns, a social worker will typically conduct an assessment during a reevaluation.

200.    The case manager failed to interpret the entire conversation and did not fully explain the evaluation process. Miriam B. did not receive written translations of the Consent for Reevaluation or Assessment Plan documentation describing the assessments to be conducted. Despite not understanding it, Miriam B. signed the Consent for Reevaluation provided to her in English to permit the reevaluation to begin.

201.    When she signed the Consent for Reevaluation, Miriam B. did not know that the Assessment Plan stated that a reevaluation would be done, but the social worker would not conduct an assessment of J.B. Miriam B. also did not understand that an assessment by a social worker was necessary for J.B. to obtain the exact services that Miriam B. attempted to request during the meeting, through the interpreter, to address behavioral concerns at school. Without a competent interpreter Miriam B was unable to request and obtain the evaluation necessary to obtain the services she believed her daughter was entitled to receive.

202.    On June 9, 2016, Miriam B. attended an eligibility meeting to discuss the results of the evaluations described at the March 24, 2016 domain meeting. Miriam B. did not receive written translations of the evaluation reports in Spanish prior to or during the meeting. The IEP team found J.B. ineligible for social work services, since the social work evaluation had not been conducted. Miriam B. disagreed with this conclusion and believed that the proper evaluations had been discussed at the March 24, 2016 meeting, as she raised her concerns regarding inappropriate behaviors at school. CPS' failure to provide translated documents and competent interpretation services to Miriam B. unnecessarily created a Catch-22 situation in which J.B. could not receive services she needed because the proper evaluation was not done.

203.    The IEP team agreed to conduct the additional assessments, but during this period, J.B. did not receive the critical social-emotional services she needed.

204.    After a six month delay, the IEP team found J.B eligible for social work services on December 15, 2016. Without competent interpretation services and written translation of the Consent for Reevaluation and Assessment Plan, Miriam B. was unable to meaningfully participate in J.B.'s educational planning and J.B. was denied educational benefit to which she was entitled.

viii.      G.G. and Asencion G.'s Experience

205.    Plaintiff G.G. is a 16-year-old tenth grade student enrolled at Acacia Academy, a therapeutic day school with which CPS contracts. G.G. qualifies for special education services under the disability categories of hearing impairment, specific learning disability, and speech language impairment. G.G. is a qualified individual with a disability under Section 504.

206.    Plaintiff Asencion G. is G.G.'s mother. Her native language is Spanish and she is LEP. Asencion G. speaks, reads and writes in Spanish.

207.    G.G.'s IEP indicates that Spanish is the primary language spoken in the home and that an interpreter is needed for parent communication.

208.    Asencion G. consistently requested, both orally and in writing, that she be provided with written translations of IEP documents so that she could understand them. Despite these multiple requests, CPS failed to provide Asencion G. with Spanish translation of vital IEP process documents. Throughout G.G.'s sixth grade school year, her school refused to translate any IEP process documents other than G.G.'s IEP progress reports.

209.    Prior to the commencement of the IEP meeting on February 16, 2016, CPS knew that Asencion G. is LEP, does not read English, and that an interpreter is necessary for her to meaningfully participate in the IEP meeting.

210.    Despite this awareness, CPS failed to provide competent interpreters at G.G.'s IEP meetings. As a result, Asencion G. has been unable to meaningfully participate in her daughter's IEP process. She requires someone outside the school, such as a bilingual advocate or bilingual attorney, to review the information listed in the IEPs with her in order to comprehend it.

211.    On February 16, 2016, Asencion G. attended an IEP meeting for G.G. where CPS changed her placement to a therapeutic day school. The person who served in the role of interpreter, also served in another role at the IEP meeting. Asencion G. did not understand the

meeting because much of the conversation was not accurately interpreted. Asencion G. requested that CPS translate the resulting IEP into Spanish so Asencion G. could understand it and CPS denied her request. As a result, she could not review and understand the IEP.

212.    Asencion G. requested information on therapeutic day schools to visit and was not provided with any information in Spanish. After the IEP meeting, there was a significant delay in obtaining appropriate educational services for G.G. because no information was provided to Asencion G. in Spanish.

213.    On or about March 23, 2016, Asencion G. received a placement letter assigning G.G. to Acacia Academy. Asencion G. sought legal help from a bilingual attorney to understand the document because it was provided solely in English. Once she understood the placement letter, Asencion G. immediately visited the placement and started the intake process.

214.    The February 16, 2016 IEP should have been implemented within 10 days. However, CPS' failure to interpret the IEP meeting and translate the IEP document caused a significant delay. G.G. was not able to attend Acacia Academy, an appropriate therapeutic day school, until April 4, 2016, nearly a seven-week delay in services.

215.    Without competent interpretation services and written translation of the placement documents, Asencion G. was unable to meaningfully participate in G.G.'s educational planning and G.G. was denied an educational benefit to which she is entitled.

ix.    **M.P. and Izabela P.'s Experience**

216.    Plaintiff M.P. is an 18-year-old student enrolled at New Horizon Center for the Developmentally Delayed, a therapeutic day school with which CPS contracts. M.P. qualifies for special education services under the disability categories of autism and intellectual disability-severe. M.P. is a qualified individual with a disability under Section 504.

217.    Plaintiff Izabela P. is M.P.'s parent. Her native language is Polish and she is LEP. Izabela P. speaks, reads and writes in Polish.

218.    M.P.'s IEP indicates that Polish is the primary language spoken in the home and that an interpreter is needed for parent communication.

219.    Despite this knowledge, CPS failed to provide written translations into Polish of vital IEP process documents. As a result, Izabela P. has been unable to meaningfully participate in her son's IEP process.

220.    Prior to convening an IEP meeting on March 1, 2017, CPS knew that Izabela P. does not read English and reads only in Polish. However, when Izabela P. attended the IEP meeting where the IEP team discussed reports regarding M.P.'s disability and progress, CPS did not provide a written translation of the reports in Polish. Izabela P. was unable to review the reports and thus could not fully understand M.P.'s progress. As a result, she could not meaningfully participate in the discussion. After the IEP meeting, Izabela P. did not receive a written translation of the IEP that was developed.

221.    Because Izabela P. does not receive vital IEP process documents in Polish, she cannot meaningfully participate in M.P.'s educational planning. She defers many educational decisions to her daughter, who does speak English, and relies upon her daughter to understand the vital IEP process documents.

222.    Because Izabela P. cannot read the documents regarding M.P.'s progress, he has not progressed. As a result of Izabela P.'s inability to meaningfully participate, M.P. has experienced a loss of an educational benefit to which he is entitled.

## LEGAL CLAIMS

### COUNT ONE: VIOLATION OF THE INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT: FAILURE TO PROVIDE MEANINGFUL PARENTAL PARTICIPATION ("IDEA")
### (Against CPS and ISBE On Behalf of the Parent Class and Student Class)

223. Plaintiffs incorporate paragraphs 1 - 222 of this Complaint as if set forth in full herein.

224. Student Plaintiffs and members of the Student Class qualify as "child[ren] with a disability" under the IDEA statute, and each therefore must be provided with an IEP that governs his or her education and afforded meaningful participation in the IEP process. *See* 20 U.S.C. §§ 1401(3), 1414(d), 1415.

225. Parent Plaintiffs and the Parent Class qualify as "parents" of a child with a disability as defined by 20 U.S.C. § 1401(23), which includes a natural, adoptive, foster parent, legal guardian or person acting as a parent in the absence of a parent with whom the child lives or individual assigned as a surrogate parent.

226. Parent Plaintiffs and the Parent class are LEP.

227. On a systemic basis, CPS fails to provide vital IEP process documents to LEP parents in their native language. CPS has no written policy or practice which requires that LEP parents receive vital IEP process documents translated into their native language regarding their children's education, including but not limited to the IEP, Notification of Conference, Conference Recommendations, Procedural Safeguards Notice, Consent for Initial Evaluation, Consent for Reevaluation, Evaluation Reports, Eligibility Determination, Manifestation Determination, IEP Progress Reports, and Medicaid Consent Forms (referred to collectively as "vital IEP process documents").

228.    Parent Plaintiffs and the Parent Class did not receive vital IEP process documents regarding their children's education in their native language that they needed to meaningfully participate in the IEP process for their children.

229.    CPS has no written policy or practice which requires that a competent and impartial interpreter attend every IEP meeting or other meetings of the IEP team (collectively referred to as "IEP meetings") to ensure that LEP parents are able to meaningfully participate. On a systemic basis, CPS fails to provide competent interpretation services to LEP parents during the IEP meeting and other special education meetings. CPS has no policy or practice to determine the competence of the CPS personnel who serve as interpreters at IEP meetings and other special education meetings and CPS personnel who serve as interpreters in IEP meetings do not follow the basic standards of professional interpretation.

230.    The systemic denial of access to a competent interpreter prevents LEP parents from understanding how the IEP meeting proceeds, prevents them from providing information regarding their children to other members of the IEP team, and prevents them from understanding the facts and opinions presented by other members of the IEP team. The systemic denial of access to a competent interpreter during the IEP meetings denied the Parent Plaintiffs and Parent Class their legal right to meaningful participation in the creation of the IEP for their children with disabilities.

231.    Because their LEP parents were denied their right to meaningfully participate in the creation of the IEP for their children with disabilities, the Student Plaintiffs and Student Class were denied special education services designed to enable them to make progress, such as specially designed instruction, transition planning services, related services, and proper school placement to meet the students' academic needs.

232.     CPS' systemic refusal to translate vital IEP process documents and to provide competent and impartial interpreters to their LEP parents denied Student Plaintiffs and the Student Class the FAPE guaranteed to them under the IDEA.

233.     ISBE failed to meet its obligation to oversee CPS in order to ensure compliance with the legal duties alleged above. 20 U.S.C. §1412(a)(1)(A); 23 HI. Admin. Code 226.710.

234.     Neither named plaintiffs nor any class members need to exhaust administrative remedies before proceeding with their IDEA claims in this Court. Plaintiffs allege systemic failure by CPS and seek system-wide reforms that cannot be addressed or remedied through individual due process hearings. Requiring plaintiffs to exhaust their claims through a due process hearing would be futile and inadequate.

235.     Nonetheless, plaintiffs H.P., Victoria G., Hector P., E.V., Aixia H. and Carlos V. completed the IDEA hearing process, received a due process hearing decision and exhausted their administrative remedies. If exhaustion of administrative remedies is required, this requirement is satisfied for the classes through vicarious exhaustion.

236.     As a result of (1) CPS' systemic failure to translate vital IEP process documents and provide competent interpretation services to Parent Plaintiffs and the Parent Class, and (2) ISBE's failure to ensure CPS' compliance with its legal obligations, Parent Plaintiffs and the Parent Class were denied their right to meaningfully participate in the IEP process and Student Plaintiffs and the Student Class were denied the FAPE they are entitled to under the IDEA.

237.     CPS and ISBE's actions violate the IDEA. *See* 20 U.S.C. §§ 1412(a), 1415(f)(3 )(E)(ii)(II), 1412(11)(A).

**COUNT TWO: VIOLATION OF THE INDIVIDUALS WITH DISABILITIES
EDUCATION IMPROVEMENT ACT: FAILURE TO PROVIDE MEANINGFUL
PARENTAL PARTICIPATION ("IDEA")
(Against ISBE On Behalf of the Parent Class and Student Class)**

238.     Plaintiffs incorporate paragraphs 1 - 237 of this Complaint as if set forth in fully herein.

239.     ISBE administers a dispute resolution system, which includes mediation, under its obligation to ensure that children with disabilities and their parents are guaranteed the procedural safeguards of the IDEA.

240.     ISBE systemically fails to provide written translations of vital dispute resolution documents to LEP parents.

241.     ISBE systemically fails to provide competent interpretation services to LEP parents during the dispute resolution process.

242.     As a result of ISBE's systemic failure to provide written translations of vital dispute resolution documents and competent interpretation services, LEP parents are unable to access the procedural safeguards that are essential to ensure their children's rights are upheld and they receive an appropriate education.

243.     ISBE's systemic failure to provide written translations of vital dispute resolution documents and competent interpretation services denies the Parent Plaintiffs and the Parent Class parents their legal right to meaningfully participate in the decision-making process regarding the provision of a FAPE to their children.

244.     ISBE's systemic failure to provide written translations of vital dispute resolution documents and competent interpretation services denied educational benefits to children with disabilities who have LEP parents.

245. ISBE's systemic failure to provide written translations of vital dispute resolution documents and competent interpretation services denies the Student Plaintiffs and the Student Class their right to a FAPE.

246. ISBE's actions violate the IDEA. 20 U.S.C. §§ 1412(11), 1415(e)(1), 1415(f)(1)(A).

**COUNT THREE: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(Against CPS and ISBE On Behalf of the Parent Class and Student Class)**

247. Plaintiffs incorporate the allegations of paragraphs 1 - 246 of this Complaint as if set forth in full herein.

248. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 200(d) prohibits discrimination based on race, color or national origin in any program or activity receiving federal financial assistance.

249. CPS and ISBE receive federal funding.

250. Language-based discrimination constitutes national origin discrimination prohibited by Title VI.

251. Federal regulations promulgated pursuant to Section 602 of Title VI forbid recipients of federal funds from utilizing methods of administration which subject individuals to discrimination because of race and/or national origin or that have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect to individuals of a particular race, color, or national origin. These regulations provide in part that no person shall, on the ground of race or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program; be denied a benefit which is different, or is provided in a different manner, from that provided to others under the program; or

restrict an individual from receiving any service, financial aid, or other benefit under the program. 34 C.F.R. § 100.3.

252.     In addition to these prohibitions, Title VI requires CPS and ISBE to take affirmative steps to prevent discrimination. Because language-based discrimination is a form of national origin discrimination under Title VI, federally funded recipients must take "reasonable steps" to ensure LEP persons' "meaningful access" to their programs and activities. 28 C.F.R. § 42.405(d)(1); 2002 Guidance, 67 Fed. Reg. at 41,459.

253.     The portion of children with disabilities enrolled in CPS with IEPs who have LEP parents is significant. During the 2016-2017 school year, CPS reported that 42 percent of the 52,093 students with IEPs have LEP parents. The absolute number of these children and parents is also significant, over 21,000 children with disabilities and a greater number of parents.

254.     IEP meetings must be held for each child with a disability at least annually, but they may be held more frequently depending on the needs of the child. When an IEP meeting is held, the IEP is reviewed and a new IEP document is produced reflecting the changes.

255.     The importance of the IDEA in the lives of these children with disabilities and their LEP parents cannot be overstated. Providing their children with disabilities with a FAPE is of critical importance in the lives of LEP parents, many of whom lack the resources to supplement their children's education. The IEP process is how the IDEA is effectuated and provides FAPE to children with disabilities. Receiving a FAPE is one of the most important factors in a child's growth, development, future success and life. The meaningful participation of parents in this process is so important that the DOJ and DOE have repeatedly, through regulations, notices and letters, emphasized the obligations of school districts to ensure meaningful communication with

LEP parents, including in IEP meetings, and informed school districts of steps they should take to comply with Title VI in this regard.

256.     CPS has the resources necessary to ensure its compliance with Title VI and the provision of FAPE to the tens of thousands of children with disabilities enrolled in CPS.

257.     CPS and ISBE have been aware of the widespread need of LEP parents to obtain timely and complete translations of vital documents and the assistance of a competent interpreter in order to meaningfully participate in the IEP process to assure FAPE for their children with disabilities on the same basis as children with disabilities whose parents speak and read English.

258.     On information and belief, CPS and ISBE are aware of the 2002 Guidance and 2015 Dear Colleague Letter.

259.     Despite this knowledge, intentionally and with deliberate indifference, CPS failed to take reasonable steps to develop and implement policies (1) requiring the provision of translated documents and competent interpreters to LEP parents in the IEP process and (2) setting standards and practices for the provision of these vital services.

260.     Instead, CPS, intentionally and with deliberate indifference, systemically denied LEP parents timely and complete translations of vital documents and denied LEP parents the competent interpreters necessary to ensure the LEP parents' meaningful participation in the IEP process and FAPE for their children with disabilities.

261.     By refusing to completely and timely translate vital IEP process documents and to provide competent interpreters necessary for LEP parents of children with disabilities, CPS, intentionally and with deliberate indifference, denied LEP parents of children with disabilities the right to participate meaningfully in the IEP process on the same basis as parents who read and speak English proficiently.

262.    Intentionally and with deliberate indifference, CPS failed in its obligation to avoid discrimination against LEP parents on the grounds of race and/or national origin by failing to take reasonable steps to ensure that such persons have meaningful access to the programs, services and information CPS provides to English speaking parents of children with disabilities.

263.    Intentionally and with deliberate indifference, ISBE failed to ensure that CPS took reasonable steps to ensure meaningful access to the IEP process for LEP parents of children with disabilities on the same basis as it provides to parents who speak and read English proficiently.

264.    Intentionally and with deliberate indifference, ISBE failed to supervise CPS to ensure that it did not discriminate against LEP parents of children with disabilities.

265.    CPS and ISBE's intentional discrimination on the basis of national origin denies LEP parents of children with disabilities meaningful participation in the IEP process and denies their children the FAPE to which they are legally entitled.

266.    CPS and ISBE's intentional discrimination on the basis of national origin violates Title VI.

**COUNT FOUR: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(Against ISBE Related to the Dispute Resolution System On Behalf of the Parent Class and Student Class)**

267.    Plaintiffs incorporate the allegations of paragraphs 1 - 266 of this Complaint as if set forth in full herein

268.    ISBE receives federal funding to, among other tasks required by the IDEA, administer the dispute resolution system.

269.    ISBE is responsible for effectuating the policies behind the IDEA through, in relevant part, sponsoring mediation and administering due process hearings to resolve disputes.

270.    Intentionally and with deliberate indifference, ISBE failed to take reasonable steps to provide LEP parents of children with disabilities meaningful access to mediation and the due

process hearing on the same basis as ISBE provides to parents who speak and read English proficiently

271.    On the basis of national origin, ISBE intentionally and with deliberate indifference discriminates against LEP parents of children with disabilities and their children who attempt to appeal their IEP determination.

272.    By systemically failing to translate into the LEP parents' native language vital dispute resolution documents, ISBE intentionally and with deliberate indifference denies LEP parents of children with disabilities their right to participate meaningfully in mediation and the due process hearing on the same basis as parents who read and speak English proficiently.

273.    By systemically failing to provide competent interpreters for LEP parents during mediation and the due process hearing, ISBE intentionally and with deliberate indifference denies LEP parents of children with disabilities their right to participate meaningfully in mediation and the due process hearing on the same basis as parents who read and speak English proficiently.

274.    ISBE's intentional discrimination on the basis of national origin denies LEP parents of children with disabilities meaningful participation in the procedural protections of the IEP process and denies their children the FAPE to which they are legally entitled

275.    ISBE's intentional discrimination on the basis of national origin violates Title VI.

**COUNT FIVE: VIOLATION OF THE EQUAL EDUCATIONAL OPPORTUNITIES ACT**
**(Against CPS and ISBE On Behalf of the Student Class )**

276.    Plaintiffs incorporate paragraphs 1 - 275 of this Complaint as if set forth in full herein.

277.    The Equal Educational Opportunities Act ("EEOA") provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by ... the failure by an educational agency to take appropriate action to overcome

language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

278.     Language-based discrimination constitutes national origin discrimination prohibited by the EEOA.

279.     The Parent Plaintiffs are LEP. The Parent Class is limited to and defined as Parents who are LEP. The Parent Plaintiffs and Parent Class have a language barrier.

280.     The Student Plaintiffs all have parents who are LEP. The Student Class is limited to and defined as students with disabilities whose parents are LEP. The Student Plaintiffs and the Student Class have language barriers in that their parents, whose participation is critical to and required by the IDEA, are LEP.

281.     CPS failed to take appropriate action to overcome these language barriers by refusing to translate vital IEP process documents and to provide competent interpretation services.

282.     ISBE failed to oversee CPS in order to ensure that appropriate action was taken to overcome these language barriers.

283.     As a result of Defendants' failures, the Student Plaintiffs and Student Class have been impeded from equal participation in educational programs.

284.     Defendants' actions violate the EEOA.

## COUNT SIX: VIOLATION OF THE EQUAL EDUCATIONAL OPPORTUNITIES ACT
### (Against ISBE On Behalf of the Student Class )

285.     Plaintiffs incorporate the allegations of Paragraphs 1 - 284 of this Complaint as if set forth fully herein.

286.     The Equal Educational Opportunities Act ("EEOA") provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by ... the failure by an educational agency to take appropriate action to overcome

language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

287.    Language-based discrimination constitutes national origin discrimination prohibited by the EEOA.

288.    The Parent Plaintiffs are LEP. The Parent Class is limited to and defined as Parents who are LEP. The Parent Plaintiffs and Parent Class have a language barrier.

289.    The Student Plaintiffs all have parents who are LEP. The Student Class is limited to and defined as students with disabilities whose parents are LEP. The Student Plaintiffs and the Student Class have language barriers in that their parents, whose participation is critical to and required by the IDEA, are LEP.

290.    ISBE administers a dispute resolution system, which includes mediation and due process hearings, under its obligation to ensure that children with disabilities and their parents are guaranteed the procedural safeguards of the IDEA.

291.    In administering this dispute resolution system, ISBE fails to take appropriate action to overcome the language barriers of LEP parents and their children with disabilities.

292.    ISBE's actions resulted in impediments to the Student Plaintiffs' and the Student Class' equal participation in educational programs.

293.    ISBE's actions violate the EEOA.

### COUNT SEVEN: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
#### (Against CPS on Behalf of the Parent Class and Student Class)

294.    Plaintiffs incorporate paragraphs 1 - 293 of this Complaint as if set forth in full herein.

295.    Section 504 of the Rehabilitation Act ("Section 504") prohibits disability discrimination in federally funded programs and mandates that "[n]o otherwise qualified

individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

296.    Student Plaintiffs and members of the Student Class are qualified individuals with a disability pursuant to Section 504 because they are substantially limited in major life activities. 29 U.S.C. §705(20)(B).

297.    Parent Plaintiffs and members of the Parent Class qualify as "parents" as understood within the framework of Section 504's regulations. *See* 34 C.F.R. § 104.36.

298.    CPS specifically receives federal funding for participating in the IDEA, a program designed to assist students with disabilities.

299.    Section 504 requires CPS to provide a FAPE to all CPS students who qualify as individuals with a disability, which can be satisfied through implementation of an IEP. 34 C.F.R. 104.33(b)(2).

300.    Section 504 requires CPS to provide annual notice to students and parents regarding CPS' duty under Section 504 to provide a FAPE. *See* 34 C.F.R. § 104.32 (b); 34 C.F.R. § 104.36. Beyond notice, parents are entitled to examine relevant records, participate in an impartial hearing, and be provided with a review procedure. 34 C.F.R. § 104.36.

301.    Each student must be provided with a group of persons knowledgeable about the student to make educational placement decisions for the child. *See* 34 C.F.R. § 104.35(c).

302.    A parent is a person knowledgeable about the student for purposes of determining the student's educational placement.

303.    CPS does not provide to LEP parents legally mandated written information regarding their children with a disability's education translated into the LEP parents' native

language. Without timely and complete written translations of vital IEP process documents, these LEP parents cannot participate in the educational placement decisions, as they are entitled to under Section 504.

304.    On-the-fly oral interpretations of these vital IEP process documents during IEP meetings is not an adequate substitute for timely receipt of completely translated vital IEP process documents as required by Section 504.

305.    By failing to provide LEP parents with sufficient information in their native language, CPS has consistently denied the children with disabilities of the LEP parents an appropriate education, which includes the implementation of an IEP. *See* 34 C.F.R. § 104.33 (b).

306.    CPS' discrimination denies LEP parents of children with disabilities meaningful participation in the educational placement decisions of their children and denies their children with disabilities the FAPE to which they are legally entitled.

307.    CPS' actions violate Section 504.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Assert jurisdiction over this matter;

B.    Certify the Student Class and the Parent Class as defined herein;

C.    Declare that CPS' failure to provide interpretation services by competent interpreters and written translations of vital IEP process documents violates the IDEA, Title VI of the Civil Rights Act, the EEOA, and Section 504 of the Rehabilitation Act.

D.    Declare that ISBE's failure to oversee CPS' provision of interpretation services by competent interpreters and written translations of vital IEP process documents violates the IDEA, Title VI of the Civil Rights Act, and the EEOA.

E.      Declare that ISBE's failure to provide written translations of vital dispute resolution documents and competent interpretation services in the dispute resolution process violates the IDEA, Title VI of the Civil Rights Act, and EEOA.

F.      Order CPS to institute an express written policy and consistent practice of providing interpretation services by impartial and competent interpreters at IEP meetings and written translations of vital IEP process documents to LEP parents.

G.      Order that CPS develop a protocol to identify LEP parents who may need translation and interpretation services.

H.      Order that CPS timely translate all vital IEP process documents for LEP parents.

I.      Order that CPS notify all LEP parents of children with disabilities enrolled in CPS schools in writing in their native language of their right to receive translated vital IEP process documents and competent interpretation services.

J.      Order that ISBE develop protocols to oversee CPS in order to ensure compliance with the IDEA, Title VI of the Civil Rights Act and the EEOA.

K.      Order ISBE to institute an express written policy and consistent practice of providing interpretation services by impartial and competent interpreters throughout the dispute resolution process to LEP parents.

L.      Order that ISBE develop a protocol to identify LEP parents who may need translation and interpretation services in the dispute resolution process.

M.      Order that ISBE timely translate all vital dispute resolution documents to LEP parents.

N.      Order that ISBE notify all LEP parents of children with disabilities enrolled in CPS schools in writing in their native language of their right to receive translated vital dispute resolution documents and competent interpretation services.

O.      Award Plaintiffs their costs and attorneys' fees for bringing this action.

P.      Retain jurisdiction over this matter until Defendants demonstrate full compliance with the Court's order.

Q.      Grant such other relief as the Court may deem just and proper.

DATED:  November 16, 2018                    Respectfully submitted,

                                             /s/ *Donna M. Welch*

                                             Donna M. Welch, P.C.
                                             Luke C. Ruse
                                             **KIRKLAND & ELLIS LLP**
                                             300 North LaSalle
                                             Chicago, IL 60654
                                             Tel: (312) 862-2421
                                             Fax: (312) 862-2200


                                             Olga Pribyl
                                             Barry Taylor
                                             Margo Weinstein
                                             **EQUIP FOR EQUALITY, INC.**
                                             20 N Michigan, Suite 300
                                             Chicago, IL 60602
                                             (312) 341-0022


                                             *Attorneys for Plaintiffs*