# Exhibit C

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

H_____ P_____,

     Student,

                                     Case No:  2017-0370

v.

                                     Janet Maxwell-Wickett, Impartial Hearing
Officer

City of Chicago SD 299,

     School District.

## <u>FINAL DETERMINATION AND ORDER</u>

### <u>JURISDICTION</u>

The undersigned has jurisdiction over this matter pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C §1400 *et seq.* and the Illinois School Code, 105 ILCS 5/14-8.02a *et seq.*

### <u>BACKGROUND</u>

The Student is a 12-year-old male who is a seventh grade student in a District elementary school.  He qualifies for special education services under the disability categories of Autism Spectrum Disorder (ASD) and other health impairment (OHI), pursuant to an eligibility and IEP meeting held on June 9 & 19, 2017.  The Student has received special education services throughout his educational career.  The Student has educational needs in the areas of:  reading fluency, math (beyond basic computational skills), inattention, work completion, following directions, and social skills.  The Student also struggles with appropriate behavior skills as he engages in sensory seeking behaviors specifically talking/humming to himself, screaming, falling to the floor and spinning

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

around thereon, staring out the window, making inappropriate noises and comments to himself and others, work refusal, arguments with others. For his seventh grade year, the Student is enrolled in a general education seventh grade classroom with push in services in the areas of independent functioning, social work, and language arts. He receives pull out services in an instructional classroom for mathematics and social work. Parents objected to the District's denial of transportation services for the Student for the 2016-2017 school year, the Student's sixth grade year, and denial of behavioral intervention services and supports from May 11, 2016 to the present. Parents also allege that they are unable to meaningfully participate in the Student's IEP process, as both are native Spanish speakers with limited English language abilities, as the District has not provided interpretation services from qualified interpreters and has not provided translated special education documents specifically IEPs, evaluation reports, notices, consents, and excusal forms from May 11, 2016 to the present.

The Parents filed a due process hearing request on April 5, 2017. (IHO #1.) The District filed its response on April 14, 2017. (IHO #3.) The parties participated in resolution session on May 5th and 17th, 2017. However, they were unable to resolve the outstanding issues.

The Parties jointly requested continuances of the 45-day deadline on May 18, 2017 and July 18, 2017. (IHO #12, 18.) The May 18, 2017 continuance was requested in order to accommodate the requested prehearing conference and due process hearing dates. The July 18, 2017 continuance was requested due to issues with witness availability for the August due process hearing dates. The Due Process Hearing dates were set by agreement for August 7, 8, 10, and 14, 2017 and the decision due date was reset to August 24, 2017. Due to lack of witness availability for several of the witnesses, the August 14th hearing

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

date was stricken and replaced with the September 22nd hearing date and the 45-day deadline was reset to October 2, 2017. The requested continuances were granted for good cause shown pursuant to this Hearing Officer's orders dated May 19, 2017 and July 21, 2017. (IHO #12, 18.)

The Parent opted for an closed hearing. The Due Process Hearing was held as scheduled on August 7, 8, and 10, 2017 and September 22, 2017. Parents' native language is Spanish. Therefore, simultaneous Spanish language interpretation was provided for the Parents during the entirety of the hearing. Mr. James Boland and Ms. Katie Ilijic of Chicago Public Schools represented the District. Ms. Margie Wakelin and Ms. Melanie Grant of Equip for Equality represented the Parents. The parties presented the following Joint Exhibits: Joint Exhibits (JE) #1-16, 18, 20-24, 26-34, 37, and 56, which were admitted into evidence. The District presented the following Exhibits: District Exhibits (DE) #1-5, which were admitted into evidence. The Parent presented the following Exhibits: Parent Exhibits (PE) #1-2, 4-6, 9, 13, 15-18, 20-22, which were admitted into evidence. The Hearing Officer's Exhibits were: IHO Exhibits # 1-26. Both parties submitted oral closing statements with a written outline of their respective arguments, and copies of the case law each relied upon.

## **ISSUES**

The issues raised by the Parents are as follows:

(a)     Whether the Parents were provided with qualified Spanish interpreters allowing them to meaningfully participate in the Student's IEP process from May 11, 2016 to the present.

Parents maintain that the District failed to provide them with qualified Spanish language interpreters thus denying them the opportunity to meaningfully participate in the Student's IEP process. The District maintains that, at all times in question, the Student's Parents were provided with qualified Spanish language interpreters allowing them to meaningfully participate in the Student's IEP process.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

Remedy: Parents request that this Hearing Officer order the District to provide Parents with qualified Spanish interpreter services, with said interpreters having training specific to interpretation at IEP meetings, at future IEP meetings.

(b)     Whether the Parents were provided with translated special education documents including IEPs, evaluation reports, notices, consents, and excusal forms, translated in to the Spanish language, allowing them to meaningfully participate in the Student's IEP process from May 11, 2016 to present.

The Parents maintain that the District failed to provide the Parents with the listed documents, translated into the Spanish language, thus denying them an opportunity to meaningfully participate in the Student's IEP process. The District maintains that at all times in questions, the Parents were provided with the listed documents, translated into Spanish, thus allowing them meaningfully participation in the Student's IEP process.

Remedy: Parents request that this Hearing Officer order the District to provide to Parents Spanish translation of the Student's key special education documents, specifically, IEPs, evaluation reports, notices, consent forms, and progress reports.

(c)     Whether the Student was provided with appropriate related services, specifically transportation services, from September 6, 2016 to June 19, 2017.

Parents maintain that the District failed to provide the Student with transportation as a related service from September 6, 2016 to June 19, 2017. The District maintains that at all times in question, it provided the Student with appropriate related services in the area of transportation.

Remedy: Parents request that this Hearing Officer find that the District failed to provide required transportation services and award Parents reimbursement for the Student's transportation costs from September 6, 2016 to the end of the 2016-2017 school year at the federal reimbursement rate.

(d)     Whether the District provided the Student with appropriate positive behavioral intervention services and supports, including a systematic, data-driven behavior program from May 11, 2016 to the present.

Parents maintain that the District failed to provide the Student with appropriate behavioral intervention services and supports from May 11, 2016 to present. The District maintains that, at all times in question, the Student was provided with appropriate behavioral intervention services and supports.

Remedy: Parents request that this Hearing Officer find that the District failed to provide the Student with appropriate behavioral intervention supports and services. Parents request that this Hearing Officer order compensatory education as follows:

1.     Reimbursement for Parents' independent educational evaluation including a psychological assessment and functional behavior assessment;

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

2.      Order the District to provide the Student with appropriate behavior intervention services and supports to address off task, refusal, non-compliance, and sensory stimuli-related behaviors; and

3.      Order the District to provide the Student with sixty (60) minutes per week of social work services, within the school setting, to address his social emotional deficits.

## **FINDINGS OF FACT**

This Hearing Officer did not have a transcript of the August 7, 8, and 10, 2017 and September 22, 2017 hearing testimony when writing this decision. Therefore, the following is based upon this Hearing Officer's personal notes, recording of the hearing, and recollection. This Hearing Officer carefully considered the testimony of all witnesses presented and all documents introduced and admitted into evidence whether or not specifically referred to or cited when making her final determination. After considering all the evidence, as well as the arguments of both District counsel and the Parents' counsel, this Hearing Officer's Findings of Fact are as follows:

1.  The Student is a 12-year old male who has just started seventh grade at a District elementary school. He qualifies for special education services under the disability categories of Autism Spectrum Disorder (ASD) other health impairment (OHI), pursuant to eligibility and IEP meetings held on June 9 and 19, 2017. (JE #4, 8.)

2.  The Student has received special education services and supports since early childhood and throughout his educational career. (JE #4, 27, 33, 37, 41, 47, 49, 51, 54.)

3.  In the educational setting, the Student experiences difficulties in the following areas: reading fluency, math (beyond basic computational skills), inattention, work completion, following directions, and social skills. (JE #4; Testimony of GE, PARA, PSY, Dr. M.)

4. In June 2017, the Student's triennial reassessments were completed with the District conducting a social work reevaluation, psychological reevaluation, and a functional behavior assessment. (JE #8-11; Testimony of PSY, SW, BCBA1.)

5. Parents were notified of the reevaluation and consented to it. The Consent form was provided to Parents in English only. (Testimony of Father; PE #20.)

**Interpretation & Translation Services**

6. Mother's native language is Spanish. She speaks, reads, and writes only in Spanish. Mother does not speak English. This was uncontroverted at hearing.(Testimony of Mother; JE #4, 27, 33, 37, 41, 47.)

7. Father's native language is Spanish. He speaks, reads and writes in Spanish. Father has some ability to understand English. However, his ability is limited and he cannot read or write in English. (Testimony of Father, CM1, PARA; JE #4, 27, 33, 37, 41, 47.)

8. Father attended all of the Student's IEP meetings and Mother attended all but two of the Student's IEP meetings. (Testimony of Father, Mother; JE # 4, 27, 33, 37, 41, 47.)

9. Both Mother and Father appeared at the due process hearing and testified. Both testified in Spanish. (Testimony of Father, Mother.)

10. Simultaneous English/Spanish language interpretation was provided to both parents for the entirety of the due process hearing.

11. GE and CM1 communicated with Father in English. However, neither was sure that Father was able to understand the message being conveyed. (Testimony of GE, CM1.) CM1 used a staff member to interpret when he wanted to ensure that Father understood the discussion. (Testimony of CM1, PARA.)

12. PARA did the best she could attempting to interpret for CM1 and Father. However, she was not a trained interpreter. She did not translate the Consent for Reevaluation document for Father. (Testimony of PARA; JE #20.)

13. The District has a policy that requires provision of interpretation services to parents so that they are able to participate in IEP meetings. The policy provides that a parent, student, or staff member cannot be relied upon to provide interpretations services. (Testimony of DR2; PE #15, 18.)

14. For interpretation services, the District provided various bilingual staff members to interpret at IEP meetings. Staff were selected based upon the fact that they are bilingual. There is no District list of qualified interpreters. (Testimony of PARA, CM1, BC, DR2.)

15. Bilingual staff members used to interpret at IEP meetings are not provided with any training in how to interpret and their proficiency as an interpreter is not assessed. (Testimony of PSY, BC, CM1, CM2.)

16. PSY presented her evaluation report findings in Spanish at the IEP meetings on June 9 & 19, 2017. However, she is not a trained, certified interpreter. (Testimony of PSY.)

17. When asked to interpret at IEP meetings, BC did not understand many of the technical terms and had to ask clinicians to explain the meaning of the terms to her before she was able to interpret for the parents. (Testimony of BC.)

18. BC attended the Student's IEP meetings as interpreter and also in her role of bilingual coordinator. (Testimony of BC.)

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

19. SW2[1] provided interpretation services for IEP meetings. However, it is unknown whether she is a trained interpreter. She did not appear to testify at hearing. (Testimony of CM2.)

20. SW2 attended IEP meetings as interpreter and also in her role as the school social worker. (Testimony of CM2.)

21. Training is essential for interpreters to be qualified so that standards of practice can be ensured, including confidentiality, accuracy, respect, impartiality, and role boundaries. (Testimony of LL[2].)

22. Interpreters must understand common errors that untrained individuals make, including omitting words they do not know, adding phrases, polishing words. (Testimony of LL.)

23. A trained interpreter must be neutral and impartial. The interpreter's role is to repeat everything that is said, regardless of who says it. (Testimony of LL.)

24. The essentials for training a qualified interpreter are a proficiency assessment, training on the code of conduct and standards of practice, common errors made by untrained interpreters, the importance of a pre-encounter session with the person for whom you are interpreting, and the necessary vocabulary and terminology required for the setting in which you are interpreting. (Testimony of LL.)

---

[1] SW2 was subpoenaed to appear at the due process hearing on two different dates, August 7th and September 22nd. For the September 22nd date, SW2 was served with the subpoena by a private process server. SW2 failed to appear to testify at hearing on either date. She did not make contact with counsel for either party.

[2] LL is the Associate Executive Director of the DuPage Federation on Human Services Reform. She oversees coordination and delivery of interpretation and translation services to hospitals, medical groups, schools, law firms, businesses, etc. She conducts language proficiency assessments of bilingual individuals seeking to become interpreters and interpreter training. (Testimony of LL; PE #20.) LL's testimony was offered by Parent as an expert in the training and supervision of interpreters for educational settings. The District did not object and this Hearing Officer accepted her testimony in that capacity.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

25. It is not appropriate for an IEP team member to serve in the role of interpreter because the role boundaries become confused. The interpreter is there to be the voice of the message only, not to be a participant. (Testimony of LL; PE #18.)

26. The State of Illinois does not have a certification for interpreters. (Testimony of LL.)

27. Significant parts of the IEP team meetings at issue were missed by Mother. She knew this because she could hear continuing discussion in English while someone else was attempting to interpret for her in Spanish. (Testimony of Mother.)

28. Both Mother and Father were present at the Student's May 11, 2016 IEP meeting. Termination of the Student's transportation services were discussed at that meeting. The Student's return to his neighborhood elementary school, GES, was discussed at that meeting. Parents left that meeting having voiced concerns and their objection to termination of the Student's transportation services and his return to his neighborhood elementary school. At the conclusion of the meeting, Parents understood that the Student would remain at his current elementary school, FES, and that a decision to terminate his transportation services had not been made. (Testimony of Mother, Father; JE# 33; PE # 6, 9.)

29. Parents did not receive any notification that the Student's transportation services had been terminated for the 2016-2017 school year. Parents did not receive any notification that the Student would be unenrolled from FES and enrolled in his neighborhood elementary school, GES, for the 2016-2017 school year. (Testimony of Mother, Father.)

30. On May 11, 2016, Father signed an "Agreement to Proceed with IEP Meeting" document provided to him only in English. Said document provided Father's consent

for the District to complete the Student's IEP and provide parents with a copy the next day. (Testimony of Father; JE #28.)

31. Father did not receive a copy of the May 11, 2016 IEP the next day. He did not review the finalized IEP and the final IEP was only in English. The finalized IEP was not provided to parents in Spanish, the changes to the IEP were not explained to Father, and the IEP was not translated into Spanish for him. (Testimony of Father; JE #28, 33.)

32. Several days prior to the start of the 2016-2017 school year, Parents went to FES to obtain a copy of the school supply list. At that time, they were advised by office staff that the Student was no longer enrolled at FES and was enrolled at GES. (Testimony of Father, Mother, PRIN.)

33. At that time, Father discussed the situation with the principal of FES. However, the Student's enrollment status of FES was not changed. (Testimony of Father, Mother, PRIN.)

34. On September 3, 2016, Father filed a request for due process and mediation to resolve the issue of the Student's attendance at FES. (Testimony of Father; PE #13.)

35. The Student missed the first week of school during the 2016-2017 school year while Parents' complaint was pending. (Testimony of Father.)

36. The Student was re-enrolled at FES for the 2016-2017 school year. (Testimony of Father.)

37. Parents did not receive any IEPs or related documents translated into their native language of Spanish. Parents did not receive consents to evaluate, IEPs, evaluation reports, excusal of IEP team member documents, or IEP progress reports in Spanish

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

as the District does not provide these documents in languages other than English.[3]
(Testimony of Father, Mother, PSY, CM1, CM2, DR1, PARA, GE, DR1, DR2; JE #20, 21, 28, 29, 30, 32.)

38. Father did not feel like a member of the IEP team as discussions were held in English, documents were provided in English, and decisions regarding the Student were predetermined prior to the meeting. (Testimony of Father.)

39. The Parents received the Procedural Safeguards translated into their native language of Spanish. (Testimony of Father; JE#31.)

40. Father signed consent for reevaluation, agreement to proceed with IEP meeting, excusal of IEP team member, and consent for state reimbursement of health related services documents all of which were provided only in English. He could not read the documents and did not know what they said. The documents were not translated into Spanish. He signed these documents after being told by the individual staff member assigned to translate that the documents pertained to the meeting, were needed for the reevaluation, were needed to show that he was at the meeting, or that there was no problem with signing the documents. (Testimony of Father; JE #20, 28, 29, 30.)

**Transportation Services**

41. The Student was provided with transportation services for his fifth grade year 2015-2016 pursuant to his IEP dated May 18, 2015 as he struggled with awareness of safety concerns relating to street signs and following the rules of the road and because he was placed at a school other than his attendance area school. (JE #37; Testimony of CM2.)

---

[3] This Hearing Officer takes judicial notice that these documents are provided on ISBE's website translated into Spanish and several other languages for use by Illinois School Districts. *See https://www.isbe.net/Pages/Special-Education-Individualized-Education-Program.aspx.*

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

42. The Student was provided with transportation services for his seventh grade year 2017-2018 pursuant to his IEP dated June 19, 2017 due to his documented deficit in assessing risk and advocating for his personal safety, autism, and sensory needs. (JE #4; Testimony of CM2, DR2.)

43. The Student's transportation services were terminated for his sixth grade year 2016-2017 without explanation. Father drove the Student to and from school each day for the duration of the 2016-2017 school year. (JE # 33; Testimony of Father.)

44. The Student's May 11, 2016 IEP, which provided the educational programming for his sixth grade year, stated that the Student had difficulty with transitions and required prompting and support to move from class to class throughout the school. It also stated that he struggled with impulse control in less structured environments. He did not handle transitions well. He lacked control of his body and spatial awareness. He bounced off walls and spun around when walking in the halls, he would scream, shout out, and mimic inappropriate behaviors seen in peers. (JE #4; Testimony of CM2.) The Student's parents expressed their concerns regarding his ability to safely transport himself to and from school. (JE #4, PE #9; Testimony of Father.)

45. CM2 received a letter from the Student's therapist indicating that the Student needed transportation services due to his emotional dysregulation and maladaptive behaviors that compromised his safety. An IEP meeting was not convened to review this document. (Testimony of CM2; PE #9.)

46. The District has a written guideline for transportation services. (Testimony of CM2; DE #3.)

47. At the time the IEP team terminated the Student's transportation services, it had no data to indicate that the Student no longer had safety concerns related to street signs and following the rules of the road.  (Testimony of CM2.)

48. The Student has documented difficulties with self-management and self-control and can be impulsive related to his diagnosed autism spectrum disorder.  He may be able to develop the skills to self-transport to school with appropriate well-evaluated training, however, he is currently unable to do so.  (Testimony of Dr. M; PE #1.)

49. The Student had an abnormal interest in and was preoccupied by trains and buses to the extent that examining same jeopardized his safety.  (PE #6; Testimony of CM2, Dr. M.)

50. The Parents were not provided with written notice of the decision to terminate the Student's transportation services.  A discussion of transportation services was held at the May 11, 2016 IEP meeting.  However, the transportation services were not terminated at that time.  (Testimony of Father, CM2; JE #33; PE #6, 9.)

51. The Internal Revenue Serviced mileage reimbursement rate for business purposes for 2017 is 53.5 cents per mile.[4]

52. It is 2.8 miles one-way from the Student's home to FES.[5]

53. ISBE requires the District to provide 176 student attendance days per school year.

54. This Hearing Officer finds, based upon the testimony and documentary evidence presented at hearing that the Student was eligible for transportation services, as a related service, for the 2016-2017 school year.  The Student had documented difficulties with self-control and spatial awareness, was impulsive in less structured

---

[4] This Hearing Officer took judicial notice of the IRS mileage reimbursement rate in effect at the time of this hearing.
[5] This Hearing Officer took judicial notice of the average of the mileage of all possible direct routes between the Student's home and FES as listed on Google Maps and MapQuest in arriving at this determination.

environments and did not handle transitions around the school buildings well. He
interests and impulsive behaviors related to his diagnosed autism spectrum disorder
jeopardized his safety and ability to self-transport during the 2016-2017 school year.

55. Parents were unaware that the Student's Behavioral Intervention Plan (BIP) was
removed for the 2016-2017 school year. (Testimony of Father; JE #33.)

56. The Student's May 11, 2016 IEP documented concerns with his behavior including
impulse control, inability to handle transitions well, bouncing off walls and spinning
around when walking in the halls, screaming and shouting out to seek and mimic
inappropriate behaviors seen by peers to seek out attention. This happened four to
five times per day. The Student made rude comments to peers and talked back to
teachers. These behaviors were impeding the Student's learning or that of others.
(Testimony of GE, CM1, CM2; JE #33.)

57. The Student's May 18, 2015 IEP contained a Behavior Intervention Plan (BIP).
However, no data related to this BIP was presented at the May 11, 2016 IEP meeting,
the data was not shared with Parents, and the data was not made a part of the May 11,
2016 IEP. The Student's BIP was removed for the 2016-2017 school year.
(Testimony of CM2; JE #33, 37.)

58. The Student had difficulty with work completion during the 2016-2017 school year.
PARA worked with him in a small group setting of three students during the 2016-
2017 school year. No one told her what she needed to do to support the Student. She
assisted him with completing math. She developed her own incentive program in
order to encourage him to complete his school work. She provided him with rewards
for work completion. However, he would never complete all of his work. She did

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

not participate in the Student's IEP meetings or provide feedback to the team, as she

was never asked to do so.  (Testimony of GE, PARA.)

59. The Student believed that no one liked him and that he had no friends.  He

perseverated on that thought and it impeded his ability to learn.  The Student would

come to PARA crying on a daily basis due to negative peer interactions.  She worked

with him to attempt to model appropriate behaviors with peers.  She was not provided

with any training on how to model appropriate behaviors.  (Testimony of PARA.)

**Psychological Evaluation**

60. PSY[6] performed the June 9, 2017 psychological reevaluation of the Student.

(Testimony of PSY; JE #10.)

61. PSY has not received any training specific to students with autism since she

completed her Master's Degree program in the late 1990s.  (Testimony of PSY.)

62. PSY is not trained to administer the Autism Diagnostic Observation Schedule

(ADOS).  (Testimony of PSY.)

63. The Autism Diagnostic Observation Schedule (ADOS) is the "gold standard" of

assessment in regards to autism. It has a significant amount of research data.  It is a

standardization that allows a diagnosis with a good degree of certainty and validity.

(Testimony of Dr. M.)

64. At the time of her assessment, the Student shared with her that he felt angry; he did

not have any friends; and he felt invisible.  He did not like coming to school.  He felt

that other students did not like him, even though he tried to be nice, and that the

teachers "picked on him."  (Testimony of PSY; JE #10.)

---

[6] PSY is employed by the District as a school psychologist and has been so employed for 25 years.  She holds a Master's Degree in school psychology.  She is licensed by the State of Illinois as a school psychologist and also holds a bilingual endorsement for special education.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

65. PSY administered the KTEA-III. The Student scored in the average range for letter and word recognition, reading comprehension and spelling. He scored below average in math concepts and application and low in math computation. These scores were significant because the Student was in a sixth grade general education math class. These scores were significantly below what would be expected of a student in an inclusion setting and this Student would struggle greatly. The Student scored low in written language composite, and very low in written expression. At the time, he was in a sixth grade general education language arts class. His written expression was significantly low as he functions at not even a first grade level and is placed in a sixth grade language arts class. (Testimony of PSY; JE #10.)

66. Although the Student's KTEA-III assessment results reflected significant deficits in his math and written expression abilities, PSY testified that he received passing class grades and she thought he might be successful in his classes. (Testimony of PSY.)

67. PSY provided the rating scales for the BASC-3 to Parents, Student, and three of the Student's teachers. The scores from all sources, in all areas, including externalizing problems, internalizing problems, school problems, behavioral symptoms index, and adaptive skills, were either in the At-Risk or Clinically Significant range indicating a high level of maladjustment. (Testimony of PSY; JE #10.)

68. The BASC-3 protocols indicated that parent's rating of the Student produced a Consistency Index Score that fell within the Extreme Caution range. This may have indicated that the parent experienced an unusual amount of difficulty when completing the rating form. Caution was recommended when interpreting these scores and a follow up with the parent was recommended. However, PSY did not follow up. (Testimony of PSY; JE #10.)

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

69. The Student had thirty (30) documented incidents of misbehavior during the 2016-2017 school year.  (Testimony of PSY; JE #10.)

70. PSY observed the Student in his math and language arts classes.  She observed the Student talking to the student next to him, making sounds, rocking, and not actively engaged.  (Testimony of PSY; JE #10.)

71. PSY administered the GARS-3 and concluded that, despite results of the GARS-3 indicating a very likely probability of the Student having Autism Spectrum Disorder (ASD), she believed that the Student's behaviors were reflective of social-emotional issues rather than autism.  (Testimony of PSY; JE #10.)

72. PSY conceded that she struggled with her recommendations in this case because it was "not very clear cut" to her.  (Testimony of PSY.)

73. PSY conceded that there were concerns about the Student's behavior.  However, she did not conduct any other assessments related to the Student's behavior.  (Testimony of PSY; JE #10.)

74. PSY concluded that the Student did not have ASD and recommended that the Student would benefit from relaxation training, problem-solving training, replacement behavior training, social skills training, contingency management, and behavior modeling.  She also recommended that the Student participate in small group social skills training with peers which would be conducted by the school social worker. (Testimony of PSY; JE #10.)

75. PSY's conclusions and recommendations led the Parents to seek an Independent Educational Evaluation (IEE) at their own expense by Dr. M.  (Testimony of Father; PE #1.)

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

76. This Hearing Officer finds that PSY was a licensed, experienced school psychologist. However, she had no current training relative to working with Student's with ASD. While she administered assessments to the Student, she was not qualified to administer the ADOS which is the "gold standard" relative to diagnosing and understanding a student with Autism Spectrum Disorder. Further, while PSY administered the BASC-3, she did not follow the published instructions which recommended follow up with the Parents based up the scores. PSY conceded that "this was a difficult case" and "not very clear cut" to her. This led to confusion regarding her conclusions and recommendations.

77. It is further found, based upon the testimony and documentary evidence presented at hearing that PSY fundamentally misunderstood the Student's disability and how it impacted him in the educational setting. PSY's recommendations were high-level, non-specific, and insufficient to address the Student's unique educational needs which resulted in generalized, inadequate educational programming. Documented behavioral difficulties continued to go unstudied and unaddressed.

**Social Work Evaluation**

78. SW[7] is the school social worker. She has been the school social worker since April 2017. (Testimony of SW.)

79. SW performed the Student's social work reevaluation in May 2017. She conducted interviews with the Parents, the Student, the Student's teachers. She also provided the Strengths and Difficulties Questionnaire (SDQ) to GE and Father. As part of her assessment, she observed the Student in the classroom and at lunch. (Testimony of SW; JE #9.)

---

[7] SW became a licensed school social worker in October 2016 and began working for the District in that capacity in March 2017.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

80. SW has no specific training related to working with students with autism and has no specific training regarding behavioral supports for students with autism. (Testimony of SW.)

81. SW did not know how the Student's autism disability affected him in the school setting. (Testimony of SW.)

82. The Student exhibited off task behaviors and social emotional difficulties as he had trouble making friends. SW did not believe that these factors affected his ability to function in the classroom. (Testimony of SW.)

83. SW did not provide any direct social work service minutes to the Student although his IEP required twenty (20) minutes per week of direct services in a separate class and she was the only school social worker at the Student's elementary school. The Student did not receive any social work services from February 6, 2017 through the end of the school year. (Testimony of SW; JE #33.)

84. The Student had difficulties with focus and work completion. However, SW did not collect any behavior data. (Testimony of SW.)

85. SW provided the Strengths and Difficulties Questionnaire (SDQ) to GE. The Student's total difficulties score was in the abnormal range. However, SW did not know what that meant. (Testimony of SW; JE #9.)

86. The Student's May 11, 2016 IEP provided a social work goal to assist the Student with learning to make friends. There is no evidence that this goal was implemented and the IEP report card does not provide any progress reports. (Testimony of SW; JE #33, 9.)

87. SW participated in the Student's June 9 & 19, 2017 IEP meetings. She recommended that the Student participate in a peer social skills group to increase his interaction with

other students.  His June 2017 IEP contains a social work goal to increase his abilities

to interact effectively with peers.  This goal does not include the Student's present

levels of performance relative to this goal.  (Testimony of SW; JE #4.)

88. The June 19, 2017 IEP does not provide for a peer social skills group.  (Testimony of

SW; JE #4.)

89.  The June 19, 2017 IEP, documented that the Student has difficulty regulating his

emotions and this is negatively impacting him in the educational setting.  However,

no goals were set to address this.  (Testimony of SW; JE #4.)

90. The June 2017 IEP reflects that the Student is able to perform at grade level.

However, the KTEA-III scores do not reflect this.  (JE #4.)

91. This Hearing Officer finds that SW is a licensed school social worker.  However, she

is clearly inexperienced and untrained.  She performed a reevaluation of the Student

in June 2017.  However, she lacked training relative to students with ASD and was

unable to interpret and explain the results of the assessments she administered.  SW

did not understand the Student's disability and how it impacted him in the educational

setting and was unable to competently recommend educational programming to

address the Student's documented deficits.  Further, SW did not provide the Student

with the required weekly social work service minutes from February 6, 2017 through

the end of the school year.

**Independent Psychological Evaluation**

92. Dr. M performed a psychological evaluation in July 2017.  Dr. M is a licensed clinical

psychologist.  He holds a license in clinical psychology, a license or certificate in

school psychology, and a license as an early intervention specialist in the State of

Illinois.  He holds a Master's Degree in special education with a focus on emotionally

disturbed children. He is in private practice and also works as a consultant at the Pediatric Developmental Center at Advocate Illinois Masonic Medical Center. He has received training in the evaluation of children with autism and has taught courses on psychology and cultural diversity issues in children with disabilities. Dr. M is an expert in the evaluation of and educational planning for culturally diverse children with disabilities. This is uncontroverted by the District. (Testimony of Dr. M; PE #1, 21.)

93. The following methods of assessment were used with the Student: clinical interviews of Mother, Father, and Student; school records review; Autism Diagnostic Observation Scale-2 (ADOS-2); Social Communication Questionnaire Lifetime and Situational forms (SCQ); Adaptive Behavior Assessment System (ABAS-3); Behavior Assessment for Children-3 (BASC-3); Woodcock-Johnson Achievement Test-III. (Testimony of Dr. M; PE #1.)

94. The ADOS-2 and SCQ are gold standard assessments in the diagnosis and evaluation of autism. SCQ is a multifaceted valid assessment. It is a standardized measure of autism that is done directly with the child, and is the most valid and most reliable questionnaire. (Testimony of Dr. M; PE #1.)

95. The Student has a primary diagnosis of autism. It is fundamental to understand this because it means that he is able to speak and is fluent, however, he does not fully understand. He is unable to understand nuances, both receptive as well as expressive. Receptively, he may not always understand what is said to him or what the class assignment specifically may be. Expressively, it may be misleading to go by the words the Student uses because he may not have the emotional connection or meaning attached to it, or because he may be meaning something else, in terms of

social communication. Another element of autism is the pattern of restricted and repetitive behaviors. His rigidity and difficulty with transitions creates potential behavioral concerns in the classroom situation and social situations. (Testimony of Dr. M; PE #1.)

96. The ABAS-3 scores reflect that he is not demonstrating or showing the social skills that are necessary to be functional in daily living. (Testimony of Dr. M; PE #1.)

97. The BASC-3 allows comparisons, across reporters, of clinical behavioral and adaptive behavioral concerns. It is a widely-used, highly regarded instrument. It reflects an elevated "F" score for the Student which indicates that the Student does not feel very good about himself. He has experienced a great deal of failure and frustration and feels very inadequate. He does not seem to feel safe or accepted at school. This is consistent with the interview of the Student, observations of the Student, school reports and the Parents' reports. (Testimony of Dr. M; PE #1.)

98. The Woodcock-Johnson is a standardized measure of academic achievement. The Student has average intellectual abilities. However, the academic achievement results reflect that the Student's reading is at a 4th grade equivalency. His math scores are at a 2nd grade level reflecting difficulty with calculation and math fluency. His written language scores are at a 4th grade level. This illustrates that his autism and emotional behavioral concerns are impacting his academic functioning in the classroom. (Testimony of Dr. M; PE #1.)

99. The Student has significant impairment in social functioning. He has trouble getting along with others and does not have friends, although he would very much like to have friends. He feels that he is hated and disliked by others and does not have any same-age peers. He also has very limited insight as to why these issues are issues and

what his role may be in social conflict. This is typical of autism. (Testimony of Dr. M; PE #1.)

100. The Student has Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD).

101. Based upon his assessments and evaluation, Dr. M recommended a functional behavior assessment and implementation of a behavior intervention plan; structured social skills group; parent training in order modify and improve behaviors and to achieve consistency across the home and school settings; attention, math, study and adaptive recommendations. The structured socials skills group would be for 45 to 60 minutes per week. (Testimony of Dr. M; PE #1.)

102. The cost to Parents of Dr. M's evaluation was $4,000.00. (Testimony of Dr. M; PE #2.)

103. This Hearing Officer finds the testimony of Dr. M to be credible and persuasive. Dr. M's academic background, training, and extensive experience working with culturally diverse students with social-emotional difficulties and autism, combined with his direct observations of the Student, establish him as a highly qualified, credible and persuasive witness.

**Behavior Interventions**

104. The Student's May 15, 2015 IEP provided for a Behavior Intervention Plan (BIP). The Student's May 11, 2016 IEP removed the Behavior Intervention Plan and instead provided for accommodations and modifications and paraprofessional support to assist the Student with his behavioral difficulties. (Testimony of BCBA1, BCBA2; JE #33.)

105.    The Student did not receive the following behavior supports required by his May 11, 2016 IEP:  (1) a daily, positive behavior system with an incentive related to trains; (2) a check in/check out system; (3) an aide to redirect him and keep him on task during transitions and during class; (4) implementation of his social work goal related to remaining on task and developing appropriate relationships; (5) implementation of his goal to attend to teacher directed, non-preferred tasks.  (Testimony of GE, CM1, PARA, SW, BCBA1, BCBA2; JE #33.)

106.    On June 19, 2017, the IEP team met and created a BIP.  However, the BIP was created without data regarding target behaviors, as target behaviors were not identified.  Additionally, the information used to develop the BIP was inaccurate. The Functional Behavior Assessment (FBA) identified non-compliance as a target behavior which occurred 100% of the time, in the general education classroom.  This information was inaccurate.  (Testimony of CM1, GE, BCBA1, BCBA2; JE #4.)

107.    An FBA requires data so that a function of the behavior can be developed.  A BIP that does not identify target behaviors and does not use data collected relative to those target behaviors is fundamentally flawed.  (Testimony of BCBA1, BCBA2.)

108.    The Student's May 11, 2016 IEP provided paraprofessional support in the general education setting; special education setting; in gym, music, art classes; in the hallways and throughout the school setting.  (JE #33.)

109.    PARA did not provide support to the Student in the general education setting or during transitions.  She supported the Student in his special education math class only.  (Testimony of PARA, BCBA2.)

110.    Based upon the testimony and documentary evidence presented at hearing, this Hearing Officer finds that the Student was not provided with the following behavior

supports required by his May 11, 2016 IEP: (1) a daily, positive behavior system with an incentive related to trains; (2) a check in/check out system; (3) an aide to redirect him and keep him on task during transitions and during class; (4) implementation of his social work goal related to remaining on task and developing appropriate relationships; (5) implementation of his goal to attend to teacher directed, non-preferred tasks. It is further found that the Student was not provided with the paraprofessional support required by his May 11, 2016 IEP, as PARA only provided support during his special education math class.

111.    The Student's June 19, 2017 IEP reflects the Student's need for paraprofessional support. However, paraprofessional support is not provided as no data had been collected related to this need. (Testimony of JE #4.)

112.    BCBA1[8] completed a functional behavior assessment in June 2017. She conducted records reviews, direct observation of the Student for six (6) hours, interviews with staff who work directly with the Student, and an analysis of behavior observation data which she collected. BCBA1 ultimately concluded that the Student did not require a BIP. She based her conclusions on reports from staff indicating that the Student had difficulty staying focused to complete tasks but was able to be successful with adult redirection and prompts; observed behaviors of the Student; and records review including a letter from the Student's outside psychiatrist which indicated that the Student was emotionally dysregulated, had deficits with emotional reciprocity, and had an inability to share emotions, and had inflexible adherence to routines. (Testimony of BCBA1; JE #11.)

---

[8] BCBA1 is employed by the District. She is the manager of the Autism and Behavioral Health Support Team and is a Board Certified Behavior Analyst. She holds a Master's Degree in Special Education and Communication Disorders.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

113.    BCBA1 concluded from her observations that she believed that the Student was

being bullied by peers.  She recorded twenty-three (23) comments made to the

Student by peers within a twenty-eight (28) minute lunch period.  She did not provide

this data to the IEP team or to Parents and she did not include it in her report.

(Testimony of BCBA1.)

114.    During her observations, BCBA1 observed the Student talking to peers, raising a

hand to respond to a question, and completing work in class.  (Testimony of BCBA1;

JE#11.)

115.    During her testimony at hearing BCBA1 repeatedly stated that she required more

information regarding the Student's behaviors and conceded that additional data

needed to be collected with regard to these behaviors.  (Testimony of BCBA1.)

116.    This Hearing Officer finds BCBA1's findings to be contrary to the evidence

presented at hearing and therefore, not credible.  BCBA1's assertion that staff found

him to be successful with adult redirection is not supported by the testimony of the

staff who worked with the Student on a daily basis including GE, PARA, CM1.  In

addition, BCBA1's noted behavioral observations failed to include the off task

behaviors, inattention, work refusal, and work completion issues frequently raised by

teachers and staff, and her conclusion that these behavioral difficulties did not impede

his learning are contrary to the overwhelming testimony of the teachers and staff who

worked with the Student on a daily basis.  BCBA1 repeatedly stated that she needed

more information regarding the Student's behaviors and conceded that additional data

needed to be collected.

117.    SC provided interventions in response to the Student's incidents of misbehavior

during the 2016-2017 school year.  He met with the Student every day and would talk

to the Student about his behavior and would work with him to model appropriate behaviors with peers. SC did not record any data related to these interventions with the Student. He provided interventions frequently. However, the Student made very little progress despite the interventions. (Testimony of SC; JE #14.)

118. SC investigated the incidents of alleged bullying related to the Student and did not believe that the Student was being bullied by peers. (Testimony of SC.)

119. Conflicting testimony was presented at hearing regarding the bullying of the Student by peers. This Hearing Officer finds that the Student's perceptions and behavior deficits related to his ASD diagnosis and the school staff's fundamental misunderstanding of his disability impeded his ability to make educational progress.

120. BCBA1's conclusions prompted Parents to seek an outside evaluation from BCBA2. (Testimony of Father; PE #5, 22.)

121. BCBA2[9] evaluated the Student in June 2017. As part of her evaluation she reviewed the Student's educational records, observed him in the classroom, and interviewed CM1.

122. During her observations of the Student, BCBA2 observed the Student's off task behaviors and further noted that it appeared that the Student did not know how to proceed with the instruction elicited by the teacher. She further observed mild rocking behavior for a short duration of time. The Student's behaviors impeded his learning. (Testimony of BCBA2; PE #5.)

123. CM1 had enacted a point earning system in May 2017. However, it had not worked as it was impossible for the Student to earn the reward at the end of the week.

---

[9] BCBA2 is employed by The Autism Therapy Group as a Board Certified Behavior Analyst. She has been employed working with students with autism for five years. (Testimony of BCBA; PE #22.)

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

The number of points needed was too high, ratings were subjective per the teachers and varied too much between instructors. (Testimony of BCBA2; PE #5.)

124.    The Student's off task behaviors need to be further defined and additional data needs to be collected regarding these off task behaviors. (Testimony of BCBA1, BCBA2.)

125.    BCBA2 recommended additional data collection, a behavior intervention plan, and the need for a social skills group and peer model for the Student. (Testimony of BCBA2.)

126.    This Hearing Officer finds the testimony of BCBA2 to be credible and persuasive. Based upon her education, training and experience, BCBA2 is a qualified, licensed BCBA. Her observations were consistent with the overwhelming testimony of the teachers and staff members who worked with the Student on a daily basis. Her recommendations were based upon her knowledge, training and experience and were consistent with the recommendations provided by Dr. M.

127.    The cost to Parents of BCBA2's evaluation was $975.00. (Testimony of BCBA2; PE#4.)

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact, the arguments of Parent and counsel, as well as this Hearing Officer's own legal research, the Conclusions of Law of this Hearing Officer are as follows:

### Free Appropriate Public Education (FAPE)

The Individuals with Disabilities Education Act ("IDEA") guarantees children with disabilities the right to a free, appropriate, public education ("FAPE"). 20 U.S.C. §1412(a)(1). In order to determine whether a school district has provided a FAPE

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

requires the determination of whether the school district: (1) complied with the procedural requirement(s) of IDEA, and (2) developed an Individualized Education Program ("IEP") that is "reasonably calculated to enable the child to received educational benefits." *Board of Education of the Hendrick Hudson Central School District, Westchester County et. al. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034 (1982).

**Procedural Violation:**

A procedural violation does not result in a denial of FAPE unless (1) it impeded the student's right to a FAPE, (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE, or (3) caused the deprivation of educational benefit. 34 C.F.R. 300.315(a)(2).

In the instant matter, Parents allege that the Student was denied FAPE when the District significantly impeded the Parents' opportunity to participate in the decision-making process by not providing them with qualified Spanish/English interpreters at IEP meetings and not providing them with Spanish translation of key special education documents including IEPs, evaluation reports, notices, consents, and IEP team member excusal forms from May 11, 2016 to the present.

"[T]he informed involvement of parents" is central to the IEP process. *Winkelman v. Parma City School Dist.* (2007) 550 U.S. 516, 524 [127 S.Ct. 1994]. IDEA requires school districts to develop an IEP for each child with a disability, with parents playing a "significant role" in this process. *Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528. The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child; and the provision of FAPE to the child. 34 C.F.R. §300.501(a). To that end, the federal regulations of the IDEA require a public agency to "take steps to ensure that one or

both parents of a child with a disability are present at each IEP team meeting, or are afforded the opportunity to participate." 34 C.F.R. §300.322(a). The IEP is developed by a team that must include the parents. 34 CFR §300.321(a)(1). The regulations contain procedural safeguards that require that the public agency "take whatever action is necessary to ensure that the parent understands the proceedings of the IEP meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. §300.322(e). The explicit naming of an interpreter in the IDEA indicates the importance of this role. The interpreter must be someone qualified to provide accurate interpretation services "to ensure that the parent understands the proceedings." 34 C.F.R. §300.322(e).

In the instant matter, the testimony clearly illustrated that Parents communicate and are fluent in Spanish. Mother speaks, reads, and writes in Spanish only. This was uncontroverted at hearing. (FF # 6.) Father speaks primarily Spanish and reads and writes only in Spanish. Father has some ability to understand English. (FF #7.) However, the witnesses who testified that they spoke to him in English testified that they were not sure if he understood them and would use a bilingual staff member to interpret if there was important information to convey. (FF #11-12.) Both Parents participated at hearing, in Spanish, with the assistance of simultaneous Spanish/English interpreter services. (FF #9-10.) This Hearing Officer observed that Father, occasionally, during his hearing testimony, would begin to answer a question before the English to Spanish interpretation was complete. When he did so, Father always provided his answers in Spanish. From these observations, along with the testimony presented at hearing, this Hearing Officer finds that Father has some ability to understand English. However, he is far from fluent and is clearly more comfortable communicating his message in Spanish.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

While the District maintains that it provided interpretation services to the Parents at IEP meetings, this Hearing Officer finds to the contrary. The testimony and documentary evidence presented at hearing clearly illustrates that the District uses bilingual staff members as interpreters at IEP meetings. (FF #14.) These staff members are not trained or certified language interpreters and often perform a dual role at IEP meetings, that of clinician in a specific area and that of interpreter. (FF #15-16, 20.) These bilingual staff members are not trained in the specific terminology and vocabulary needed to interpret at IEP meetings. (FF #17-18.) Information was often summarized for Mother and Father while the IEP meeting conversation continued in English causing Parents to miss portions of the information. (FF #27.) These practices were contrary to the District's own written policy and that of the United States Department of Education. (FF #13.)

This Hearing Officer finds it significant that the IDEA specifically states that "[t]he public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness and whose native language is other than English." 34 C.F.R. §300.322(e). This Hearing Officer interprets this specific language of the IDEA to require the use of a qualified interpreter. The IDEA does not state that any bilingual individual will suffice and the District has failed to provide any case law or other points of authority to support its position that any bilingual staff member is in fact a qualified interpreter. This Hearing Officer finds that to be a qualified interpreter, a bilingual individual must have a proficiency assessment and training on the code of conduct and standards of practice, common errors made by untrained interpreters, the importance of a pre-encounter session with the person for whom he/she is interpreting, and the necessary vocabulary and terminology required for the setting in which he/she is interpreting. A qualified interpreter must be neutral and impartial and must be the voice of the message only. (FF #21-25.) The bilingual staff

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

members performing interpreter services at the Student's IEP meetings from May 11, 2016 to the present were not qualified to do so and do not meet the IDEA's requirement of ensuring meaningful participation by the Parents.

Based upon the above, this Hearing Officer finds that the District denied the Student FAPE when it significantly impeded the Parents' opportunity to participate in the decision-making process, i.e. the Student's IEP meetings from May 11, 2016 to the present, by failing to provide trained, certified Spanish/English language interpreters. The testimony is clear. Parents' native language is Spanish. Neither Mother nor Father is fluent in English. Technical IEP meetings, conducted in English, with summarized information provided by untrained bilingual staff members, were incomprehensible to the Student's Parents. Father did not feel like a member of the IEP team as discussions were held in English and decisions were predetermined. (FF #38.) The fact the Parents' were unaware that the Student's transportation services were terminated and he was reassigned to his neighborhood school, GES, for the 2016-2017 school year (FF # 28, 32) serves to further illustrate that Parents were not able to meaningfully participate in the Student's IEP process. Additional support is Father's credible testimony that Parents were unaware that the Student's Behavioral Intervention Plan had been removed despite the Student's on-going, documented behavioral difficulties. (FF #55.)

As a remedy for the District's denial of FAPE to the Student by failing to provide Mother and Father with qualified interpreter services at IEP meetings, this Hearing Officer orders the District to provide qualified Spanish/English language interpreter services to the Parents at all future IEP meetings. Interpreters provided during this period must undergo a proficiency assessment, be trained and be certified in Spanish/English interpretation. Interpreters must be trained on the code of conduct and standards of practice, common errors made by untrained interpreters, the importance of a pre-encounter session with the person for

whom he or she is interpreting, and the necessary vocabulary and terminology required for the IEP educational setting. The interpreters must be neutral and impartial, must perform no other role at the IEP meetings, and must ensure confidentiality, accuracy, respect, impartiality, and role boundaries. This is quite simply what IDEA requires. Parents also allege that the Student was denied FAPE when the District significantly impeded the parents' opportunity to participate in the decision-making process by not providing them with Spanish translation of key special education documents including IEPs, evaluation reports, notices, consents, and IEP team member excusal forms from May 11, 2016 to the present. IDEA provides the parents of a child with a disability the right to inspect and review all education records with respect to the identification, evaluation, or educational placement of the child, and the provision of a free appropriate public education to the child. 34 C.F.R. §300.501(a). Further, the IDEA and regulations make a clear connection between the ability to participate in special education meetings and the ability to review school documents. The regulations further provide that the school "must give the parent a copy of the child's IEP at no cost to the parent." 34 C.F.R. §300.322(f). In addition to providing access to certain documents, the IDEA explicitly requires that certain documents must be translated and that procedures must be implemented for the translation of those documents. The IDEA requires that "written prior notice" be provided to the parents of a child with a disability whenever a change is proposed or refused regarding the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3)(A-B); 34 C.F.R. §300.503(a)(1). This written prior notice must be provided "in the native language of the parents, unless it clearly is not feasible to do so." 20 U.S.C. § 1415(b)(4); 34 C.F.R. §300.503(c)(1)(ii). The Supreme Court explained in *Schaffer v. Weast* that parents must be provided written prior notice of any changes in the IEP. 546 U.S. 49, 53 (2005).

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

IDEA regulations also require that all information relevant to activities for which parental consent is sought for children with disabilities be provided in the parents' native language. 34 C.F.R. §300.9(a),(b). Parental consent is not valid unless "the parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language." 34 C.F.R. §300.9(a),(b). In *Letter to Boswell,* OSEP explains that districts have an obligation to ensure that parents understand IEP team meetings and are fully informed at any time consent is required. 49 IDELR 196 (2007). OSEP explains that "[f]or parents who read in their native language, providing the parents with written translations of the IEP documents may be one way for a school district to demonstrate that the parent has been fully informed of their child's educational program." *Id*. at 2. However, if a parent does not read in her native language, a written translation would fail to demonstrate that a parent is fully informed. *Id*. *Letter to Boswell* clarifies that a school district must demonstrate that it ensures meaningful parental participation in the development of the student's IEP.

In the instant matter, the testimony and documentary evidence is overwhelming and uncontroverted. Mother and Father did not receive any IEPs or related documents translated into their native language. They did not receive consents to evaluate, IEPs, evaluation reports, excusal of IEP team member documents, or IEP progress reports in Spanish. (FF#37.) The only document ever received by Parents in Spanish was the procedural safeguards. (FF#39.) Based upon Father's demeanor at hearing, this Hearing Officer finds that he was candid and credible when he testified that he signed documents in English not knowing what those documents said and after being advised by the staff member assigned to translate that there was no problem with the documents. (FF #40.) This Hearing Officer finds that this did not constitute fully informed consent and resulted in the Student's enrollment in a different elementary school than the one he had attended since second grade, denial of transportation services, elimination of the Student's BIP

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

despite documented behavioral difficulties, and uninformed consent for the Student's triennial reevaluation. For these reasons, this Hearing Officer finds that the District denied FAPE to the Student when it failed to provide key special education documents including consents to evaluate, IEPs, evaluation reports, excusal of IEP team member documents, or IEP progress reports in Spanish from May 11, 2016 to the present. Further, this Hearing Officer has taken judicial notice of the fact that many of the form special education documents including consents and excusal of IEP team members are available on ISBE's website for use by all Illinois school districts.

As a remedy for the District's denial of FAPE to the Student by failing to provide Mother and Father with translated IEP documents, this Hearing Officer orders the District to provide the Student's key special education documents, including consents to evaluate, IEPs, evaluation reports, excusal of IEP team member documents, and IEP progress reports translated into Spanish. This includes the specific contents of the Student's IEP and IEP progress reports, related to his disability, his complete educational programming, and his documented progress. The documents must be translated into Spanish by a certified, qualified Spanish/English translation service. This is quite simply what the IDEA requires.

**<u>Related Services</u>**

The IDEA "defines a 'free appropriate public education,' pursuant to an IEP to be an educational instruction specially designed . . . to meet the unique needs of a child with a disability 20 U.S.C. §1401(29), coupled with any additional 'related services' that are 'required to assist a child with a disability to benefit from [that instruction],'" 20 U.S.C. §1401(26)(A). *Winkelman v. Parma City School Dist.*(2007), 550 U.S. 516, 524[127 S.Ct. 1994]. Under the IDEA, "related services means transportation and such

developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education . . ." 34 C.F.R. 300.34(a). Transportation is defined under the IDEA and can include travel to and from school and between schools; travel in and around school buildings; and specialized equipment such as special or adapted buses, lifts, and ramps. 34 C.F.R. 300.34(c)(16). A child's IEP team is responsible for determining both if transportation is required to assist a child with a disability to benefit from special education and related services, and how the transportation services should be implemented. *Questions and Answers on Serving Children with Disabilities Eligible for Transportation*, 53 IDELR 268 (OSERS 2009). "If a child's disabilities create unique needs that make it especially problematic to get the child to school in the same manner that a nondisabled child would get to school in the same circumstances, then transportation may be an appropriate related service." *Letter to Hamilton,* 25 IDELR 520 (OSEP Sept. 12, 1996).

In the instant matter, the Student was approved for and provided with transportation services for 2015-2016 school year and for the 2017-2018 school year based upon his documented deficit in assessing risk and advocating for his personal safety, his autism diagnosis, and his sensory needs. (FF # 41-42.) The Student was unable to safely transport himself to and from school unaided due to difficulties with self-management and self-control and difficulty controlling impulses related to his disability. (FF #44, 48.) The Student's transportation services were terminated for the 2016-2017 school year despite the fact that the IEP team had no data to indicate that the Student no longer had safety concerns navigating to and from school. On the contrary, documented concerns were raised by Parents and the Student's treating therapist that the Student's disability prevented him from safely transporting himself to and from school. (FF #43-45.) The

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

Student's Father transported him to and from school daily for the 2016-2017 school year. (FF#43.)

This Hearing Officer finds that based upon the testimony and documentary evidence presented at hearing that the Student was eligible for transportation services, as a related service, for the 2016-2017 school year. The Student had documented difficulties with self-control and spatial awareness, was impulsive in less structured environments and did not handle transitions around the school buildings well. (FF #44.) His interests and impulsive behaviors related to his diagnosed autism spectrum disorder jeopardized his safety and ability to self-transport during the 2016-2017 school year. (FF # 45,48.) It is further found that Father transported the Student to and from school for the 2016-2017 school year. (FF #43.) Therefore, Father is entitled to reimbursement for the daily round trip mileage between the Student's home and school, 11.2 total miles each day, for the 176 student attendance days required by the State of Illinois, at the Internal Revenue Service business mileage reimbursement rate of 53.5 cents per mile. This is a total sum of $1,054.59. The District may provide proof that a lesser reimbursement amount is due based upon documented Student absences and non-attendance days during the 2016-2017 school year. Said proof of documented Student absences and non-attendance days must be provided to Parents' counsel and ISBE within thirty (30) days of entry of this Order.

## Standards for Evaluations

The District has the burden of proof for the appropriateness of its evaluations. 105 ILCS 5/14-8.02(b); *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1167, 1169 (7th Cir. 1994). A parent has the right to an independent educational evaluation (IEE) paid for at public

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

expense if the District is unable to show that its evaluation is appropriate. 34 C.F.R. 300.502(b)(2)(i). An appropriate evaluation is one which complies with the pertinent federal and state regulations. *Krista P. v. Manhattan School District*, 255 F. Supp. 2d873, 887 (N.D. Ill. 2003).

An evaluation must assess a student in all areas related to the suspected disability, and be sufficiently comprehensive to identify all of the Student's special education and related service needs, whether or not linked to the disability category in which the child has been classified. 34 C.F.R §300.304(c). When conducting an evaluation, the District must use a variety of assessment tools and strategies to gather relevant functional, developmental and academic information about the child. 34 C.F.R. §300.304(b)(1). The evaluation process must not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child. 34 C.F.R. §300.304(b)(2). The evaluator must use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors. 34 C.F.R. §300.304(b)(3). In addition, the District must ensure that the assessments and other evaluation criteria are selected and administered so as not to be discriminatory on a racial or cultural basis; are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer; are used for the purposes for which the assessments or measures are valid and reliable; are administered by trained and knowledgeable personnel; and are administered in accordance with any instructions provided by the producer of such assessments. 34 C.F.R. §300.304(c). The Illinois School Code identifies a "qualified professional" as an

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

individual who holds credentials to evaluate the child in the domain or domains for which an evaluation is being sought. 105 ILCS 5/14-8.02(g-5). In addition, the Illinois School Code sets the standard of "a carefully completed case study." 105 ILCS 5/14-8.02(6).

**Psychological Evaluation**

Parents contend that the District's psychological evaluation failed to assess the Student in all areas of suspected disability and this contention is supported by the hearing record.

Evaluations must be administered by "trained and knowledgeable personnel," pursuant to 34 C.F.R. 300.304(c)(1)(iv). PSY performed the testing and evaluations of the Student. PSY administered the KTEA-III, BASC-3 and GARS-3 which are all standardized instruments widely used in the field of school psychology. PSY was not trained to administer the ADOS which is the "gold standard" assessment for autism. (FF#62-63, 65-68, 71.) PSY also performed classroom observations of the Student and reviewed current and past Student records. She completed the Psychological Report, and attended the IEP Team meeting on June 19, 2017. (FF#60.) While PSY was an experienced school psychologist and possessed the requisite credentials to conduct the evaluations that she administered (FF #60), she lacked specific training related to students with autism and was not qualified to administer the ADOS, a standardized, researched based assessment used to identify students with autism. (FF #61-63.)

An evaluation must assess a student in all areas related to the suspected disability, and be sufficiently comprehensive to identify all of the Student's special education and related service needs, whether or not linked to the disability category in which the child has been classified. 34 C.F.R §300.304(c). PSY assessed the Student in the areas of academic achievement and social emotional functioning. (FF#65-68.) However, the

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

Student's academic functioning reflected by the KTEA-III scores raised concerns and was inconsistent with the grades he received. However, PSY failed to obtain information regarding the reasons for the inconsistencies. (FF#65-66.) There were noted concerns and behavioral deficits that PSY conceded she failed to assess. (FF#73.) Further, the Parent's scores on the BASC-3 indicated that they should be viewed with extreme caution and recommended follow up with the Parent. PSY failed to follow up. (FF #67-68.) PSY concluded that she did not believe that the Student had ASD. (FF#74.) She conceded that she struggled with her recommendation and that the case was "not very clear cut" to her. (FF #72.) Further PSY's recommendations were high-level and non-specific. PSY fundamentally misunderstood the Student's disability and failed to provide specific recommendations which addressed the Student's unique educational needs and deficits. (FF#76-77.) Based upon the testimony and documentary evidence presented at hearing, the Hearing Officer finds that the District Psychological Evaluation conducted on June 9, 2017 was inappropriate. It failed to assess this Student in all areas related to the suspected disability, and failed to be sufficiently comprehensive to identify all of the Student's special education and related service needs. It was simply not a "carefully completed case study."

**Social Work Evaluation**

Evaluations must be administered by "trained and knowledgeable personnel," pursuant to 34 C.F.R. 300.304(c)(1)(iv). Based upon the findings (FF# 78, 91) above, SW is a licensed school social worker. However, she is inexperienced and untrained. Further, she had no specific training related to working with students with autism or relating to behavior supports for students with autism. She did not know how the Student's disability affected his ability to function in the classroom. (FF #79-81.) Based

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

upon her lack of experience and training, SW does not qualify as "trained and knowledgeable personnel" pursuant to 34 C.F.R. 300-304(c)(1)(iv).

In conducting the evaluation, the District must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child to assist in determining the content of the IEP including information provided by the parents of the child and current classroom based observations. 34 C.F.R. 300.304(b)(1)(ii) and 34 C.F.R. 300.305(a)(1)(ii). SW provided the Strengths and Difficulties Questionnaire, however she did not know how to interpret the results of said assessment. (FF# 79, 85.) SW did not understand the Student's disability and how it impacted him in the educational setting. She knew the Student had difficulty with focus and work completion, however, she did not collect any behavior data. She was unable to competently recommend educational programming to address the Student's documented deficits. (FF#81-84, 87.) Further, SW did not provide the Student with the required weekly social work service minutes from February 6, 2017 through the end of the school year. (FF#83, 87.)

Based upon the testimony of SW and the documentary evidence presented at hearing, this Hearing Officer finds that SW was not sufficiently trained and knowledgeable to conduct the assessments she utilized in this matter. She further failed to craft a social work goal designed to assist the Student to make educational progress, as the June 2017 IEP social work goal does not contain an indication of the Student's present levels of performance. (FF#87.) This Hearing Officer finds that the District Social Work Evaluation was not appropriate for those reasons.

In contrast this Hearing Officer finds the psychological evaluation conducted by Dr. M to be appropriate in all areas. Dr. M is a licensed clinical psychologist with

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

extensive experience working with culturally diverse students with autism. (FF#92.) He qualifies as "trained and knowledgeable personnel," pursuant to 34 C.F.R. 300.304(c)(1)(iv). This was undisputed by the District at hearing. Dr. M used a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child including the ADOS-2 to assist in developing a clear picture of the Student, his disability and his unique educational needs as required by 34 C.F.R. 300.304(b)(1)(ii) and 34 C.F.R. 300.305(a)(1)(ii). (FF#93-100.) Dr. M's evaluation contained specific recommendations designed to address the Student's unique educational needs and to enable him to make educational progress. (FF #101-103.) This Hearing Officer finds the psychological evaluation of Dr. M to be "a carefully completed case study" and to be appropriate in all areas.

As a remedy for the District's failure to provide appropriate psychological and social work evaluations, this Hearing Officer hereby orders the District to reimburse the Parents for the cost of Dr. M's evaluation, in the amount of $4,000.00. (FF #102.) Said reimbursement to be paid within 30 days of entry of this Order. Further, and in consideration of the denial of social work services to the Student from February 6, 2017 through the end of the 2016-2017 school year, this Hearing Officer hereby amends the Student's June 19, 2017 IEP to include sixty (60) minutes per week of social work instruction to include a social skills group[10] to establish positive peer relationships, peer acceptance, and recognizing and responding to bullying consistent with Dr. M's evaluation.

**Functional Behavior Assessment**

---

[10] PSY and SW also recommended that the Student participate in a structured social skills group. However, these recommendations were not incorporated into the Student's current IEP. (JE#4.)

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

The Student was evaluated by BCBA1 are part of his triennial reassessment. She completed a functional behavior assessment (FBA) and concluded that the Student did not require a BIP. (FF#112-113.) However, this Hearing Officer determined BCBA1's findings to be contrary to the evidence presented at hearing and therefore, not credible. BCBA1's assertion that staff found him to be successful with adult redirection was not supported by the testimony of the staff who worked with the Student on a daily basis including GE, PARA, CM1. In addition, BCBA1's noted behavioral observations failed to include the off task behaviors, inattention, work refusal, and work completion issues frequently raised by teachers and staff. Her conclusion that these behavioral difficulties did not impede his learning are contrary to the overwhelming testimony of the teachers and staff who worked with the Student on a daily basis and Dr. M. Further, BCBA1 repeatedly stated that she needed more information regarding the Student's behaviors and conceded that additional data needed to be collected. (FF #116.) Based upon the above, this Hearing Officer finds BCBA1's evaluation to be inappropriate.

The conclusions of BCBA1 prompted Parents to seek an independent behavioral evaluation at their own expense. (FF#120-124.) This Hearing Officer found the testimony of BCBA2 to be credible and persuasive. Based upon her education, training and experience, BCBA2 is a qualified, licensed BCBA. Her observations were consistent with the overwhelming testimony of the teachers and staff members who worked with the Student on a daily basis. Her recommendations were based upon her knowledge, training and experience and were consistent with the recommendations provided by Dr. M. Based upon the above, this Hearing Officer finds the evaluation report of BCBA2 to be appropriate as it identified the Student's behavioral needs relative to his disability and the impact on his educational programming, and provided recommendations to support the Student and allow him to make

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

educational progress.  Further, BCBA2 recommended additional data collection in order to

craft an appropriate BIP for the Student.  (FF#124.)

**Behavioral Intervention Plan**

The IDEA, federal regulations, the Illinois School Code and the Illinois Administrative

Code include requirements for behavior interventions when a student's behavior impedes

his learning or that of others.  20 U.S.C. § 1415(k)(1); 34 C.F.R. § 300.324(A)(2)(i); 34

C.F.R. § 300.530(f); 23 Ill. Admin. Code 226.230(b); 23 Ill. Admin Code 226.400.  If a

student with a disability requires a BIP under IDEA, then the BIP becomes an element of

FAPE.  In *Alex R. v. Forrestville Valley Community Unit Sch. Dist. No. 221*, 375 F.3d

603, 613 (7th Cir. 2004), the 7th Circuit stated that an IEP that does not address

disability-related actions of misbehavior and disruption in the classroom is not

"reasonably calculated to enable the child to receive educational benefits" and thereby

denies the student of a FAPE.

The starting point of designing an IEP that addresses behavioral needs is conducting a

functional behavior assessment. In *Student v. Local School District, No. 2010-0382*,

(SEA IL 2010), an Illinois hearing officer found that a school district should have

conducted an FBA for a student's behaviors that were not disruptive, but which he used

to avoid work.  When a student has repeated behavioral difficulties, a Behavior

Intervention Plan is necessary.  In *C.W. v. Jacksonville SC 117, No. 2010-0040*, (SEA IL

2010), an Illinois hearing officer found that because a student had behavior that was not

improving, the school district needed to modify the student's BIP to adapt to the student's

problematic behavior.  In *Edwardsville Cmty. Unit Sch. Dist. 7*, 113 LRP 17990 (SEA IL

2013) (citing M.M. v. Special Sch. Dist. No. 1, 512 F.3d 455 (8th Cir. 2008)), an Illinois

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

hearing officer found that an IEP team must revise a BIP "as appropriate" when it knows that the BIP is not addressing the student's behavior.

In the instant matter, the Student's May 15, 2015 IEP provided a Behavior Intervention Plan (BIP). This was subsequently removed in the May 11, 2016 IEP and instead, accommodations were provided along with paraprofessional support. (FF#57, 104.) It was clear from multiple witnesses at hearing that the Student had behavioral difficulties related to off task behavior, non-compliance, work refusal, and difficulty with peer relationships. (FF#3, 56, 58-59, 64, 69-70, 82, 99, 117.) Testimony further revealed that the Student did not receive many of the required accommodations and did not receive paraprofessional support in all of the required settings. (FF#58-59, 105, 108-109.) The Student received thirty (30) misconduct reports during the 2016-2017 school year and interventions were attempted. However, data was not collected relative to the interventions attempted and the results thereof. (FF# 117.) The Student made very little progress despite those interventions. (FF#117.) Due to his disability, the Student perseverated on his difficulties with peers and that impeded his ability to make educational progress. (FF#58, 95, 99.) BCBA1, the District's BCBA, repeatedly stated that she required more information related to the Student's behaviors and conceded that additional data needed to be collected relative to those behaviors. (FF#115.) Further, BCBA1 conceded that the BIP created as part of the June 19, 2017 IEP was fundamentally flawed as it was based upon inaccurate data. (FF#106-107.) Based upon the above, the Student was denied FAPE when his BIP was removed in May 2016 and this denial continues as his current BIP in based upon inaccurate data. The Student had repeated behavioral difficulties, did not receive the accommodations and paraprofessional

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

support intended to address those difficulties, interventions in response to the behaviors were ad hoc and undocumented, and the Student was not making educational progress. As a remedy for the District's failure to provide an appropriate FBA and BIP, and the resulting denial of FAPE, this Hearing Officer hereby orders the District to reimburse the Parents for the cost of BCBA2's evaluation, in the amount of $975.00. (FF #127.) Said reimbursement to be paid within 30 days of entry of this Order. The District shall conduct a Functional Behavior Assessment that includes a period of data collection and targets off task, work refusal, non-compliance and sensory stimuli-related behaviors consistent with the evaluation reports of Dr. M and BCBA2. The District shall convene an IEP meeting within 45 days of entry of this Order to review the data collected in the functional behavior assessment and develop a Behavior Intervention Plan (BIP) consistent with the evaluation of Dr. M and BCBA2. Said BIP shall provide for Parent training to achieve consistent behavior across settings consistent with the evaluations of Dr. M and BCBA2.

### ORDER

Based upon the above Findings of Fact and Conclusions of Law, it is hereby ordered:

Parent's requested relief is granted.

The District is Ordered as follows:

1.) The District is ordered to provide the Parents with qualified Spanish/English interpretation and translation services, as set forth above, to ensure their meaningful participation in the Student's IEP process.[11]

---

[11] The IDEA **requires** that the public agency "take whatever action is necessary to ensure that the parent understands the proceedings of the IEP meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34

2.) The District shall reimburse the Parent for the Independent Psychological Evaluation of Dr. M, in the amount of $4,000.00 within 30 days of entry of this Order.

3.) The District shall reimburse the Parent for the Independent Functional Behavior Assessment of BCBA2, in the amount of $975.00 within 30 days of entry of this Order.

4.) The District shall reimburse the Parent for the cost of transporting the Student to and from FES for the 2016-2017 school year, in the amount of $1,054.59. The District may provide proof that a lesser reimbursement amount is due based upon documented Student absences and non-attendance days. Said documentation to be provided to Parents' counsel and ISBE within thirty (30) days of entry of this Order.

5.) The Student's June 19, 2017 IEP is hereby amended to include sixty (60) minutes per week of social work instruction to include a social skills group to establish positive peer relationships, peer acceptance, and recognizing and responding to bullying.

6.) The District shall conduct a Functional Behavior Assessment that includes a period of data collection and targets off task, work refusal, non-compliance and sensory stimuli-related behaviors consistent with the evaluation reports of Dr. M and BCBA2.

7.) The District shall convene an IEP meeting within 45 days of entry of this Order to review the data collected in the Functional Behavior Assessment and develop a Behavior Intervention Plan (BIP) consistent with the evaluations of Dr. M and BCBA2, including Parent training to achieve consistent behavior across settings.

8.) The District shall revise the Student's June 19, 2017 IEP, at the time the IEP team is convened pursuant to #7 above, to establish social work goals that accurately reflect

---

C.F.R. §300.322(e). It is further required that all information relevant to activities for which parental consent is sought for children with disabilities be provided in the parents' native language. 34 C.F.R. §300.9(a),(b).

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

the Student's present levels of performance and that are consistent with the evaluation reports of Dr. M and BCBA2.[12]

In accordance with 105 ILCS 5/14-8.02a(h), within **45** school days of receipt of this Order, the District shall submit proof of compliance to:

> Illinois State Board of Education
> Program Compliance Division
> 100 North First Street
> Springfield, IL 62777-0001

## NOTICE OF RIGHT TO REQUEST CLARIFICATION

Pursuant to 105 ILSC 5/14-8.02a(h) either party may request clarification of this decision by submitting a written request to the Hearing Officer within five (5) days of receipt of the decision. The request for clarification shall specify the portions of the decision for which clarification is sought. A copy of the request shall be mailed to all other parties and the Illinois State Board of Education, Program Compliance Division, 100 North First Street, Springfield, IL 62777. The right to request clarification does not permit a party to request reconsideration of the decision itself and the Hearing Officer is not authorized to entertain a request for reconsideration.

## NOTICE OF RIGHT TO APPEAL

This is the final administrative decision in this matter. Pursuant to 105 ILCS 5/14-8.02a(i), any party aggrieved by this Hearing Officer Determination may bring a

---

[12] Testimony and documentary evidence introduced at hearing provided insight into the Student's present levels of performance in academic subjects including language arts, written language, and math. (FF#65, 98.) Said information is inconsistent with that contained in the Student's June 19, 2017 IEP. While not an issue raised before this Hearing Officer, while convening the ordered IEP meeting, the IEP team is invited to review this information and reevaluate the Student's academic goals in light of said information.

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

civil action in any state court of competent jurisdiction or in a District Court of the United

States without regard to the amount in controversy within one hundred and twenty (120)

days from the date the decision is mailed to the party.


Dated: October 2, 2017           /s/: Janet K. Maxwell-Wickett
_____

                                   Janet K. Maxwell-Wickett,
Impartial Hearing Officer
350 S. Northwest Highway, Suite 300

                                   Park Ridge, IL 60068
                                   Phone: (847) 430-3789
                                   Fax: (847) 305-5897
                                   Email: janet@maxwellwickettlaw.com


## APPENDIX A

Hector Plomero v. City of Chicago SD 299
Case No: 2017-0374

| Child | H        P       |
|---|---|
| Attending School | William F. Finkl Elementary School (FES) |
| Neighborhood School | Joseph E. Gary Elementary School (GES) |
|  |  |
| Child's Parent(s)/Petitioners | Victoria        R        (Mother) |
|  | Hector P        (Father) |
| English/Spanish Interpreters: |  |
|  | Ruth Garcia |
|  | Susan Schweigert |
| Joint Witnesses: |  |
| School Psychologist | Rosalba Najera-Porte (PSY) |
| Case Manager | Marvin Irizarry (CM1) |
| School Social Worker | Jennifer Sosa (SW) |
| BCBA - District | Kylie Kosamacek (BCBA1) |
| Case Manager | Megan Harrison (CM2) |
| General Education Teacher | Tressey Pinto Zec (GE) |
| Paraprofessional | Ruth DeJesus (PARA) |
| Principal Finkl Elementary School | Denise Lynch (PRIN) |
| District Representative | Ines Castaneda (DR1) |

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

| District Representative | Kimberly Aguirre (DR2) |
|---|---|
| School Counselor | Rogelio Lopez (SC) |
| Bilingual Coordinator | Rosa Lobato (BC) |
| | |
| Subpoenaed to Testify and Not Appearing: | |
| School Social Worker | Desiree Moises (SW2) |
| | |
| Parent Witnesses: | |
| Psychologist | Dr. Hector S. Machabanski (Dr. M) |
| Professional Interpreter Trainer | Lourdes Lonergan (LL) |
| BCBA | Dana Pavlik (BCBA2) |
| | |
| | |
| | |

<u>CERTIFICATE OF SERVICE VIA REGULAR MAIL</u>

I, the undersigned Janet Maxwell-Wickett, certify that on October 2, 2017, a copy of (add list of documents here) was/were served upon the following persons via regular US Mail delivery by depositing the same in the United States Mail, in an envelope securely sealed, postage prepaid, and legibly addressed to the addresses set forth below:

<u>CERTIFICATE OF SERVICE VIA CERTIFIED MAIL</u>

I, the undersigned Janet Maxwell-Wickett, certify that on October 2, 2017, a copy of (add list of documents here) was/were served upon the following persons via certified US Mail delivery by depositing the same in the United States Mail, in an envelope securely sealed, postage prepaid, return receipt requested and legibly addressed to the addresses set forth below:

<u>CERTIFICATE OF SERVICE VIA EMAIL</u>

I, the undersigned Janet Maxwell-Wickett, certify that on October 2, 2017, a copy of (add list of documents here) was/were served upon the following persons via email transmission by attached said document(s) in pdf format to the email addresses set forth below:

**Margaret Wakelin**
**Equip For Equality**
**20 North Michigan Ave. Suite 300**
**Chicago, IL 60602**
**Margie@equipforequality.org**

**Jim Boland**

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES

**Chicago Public Schools, Due Process & Mediation**
**42 W Madison Street, 2Nd Floor**
**Chicago, IL 60602**
**jboland1@cps.edu**

**Andrew Eulass**
**Due Process Coordinator**
**Illinois State Board of Education**
**Division of Special Education Services**
**100 N. 1st Street**
**Springfield, IL 62777**

Dated:  October 2, 2017
Signed:

RECEIVED 10/2/2017 - SPECIAL EDUCATION SERVICES