# Exhibit D

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

E. V.,

       Student,

                Case No: 2017-0501

v.

                Kathleen C. Fuhrmann, Impartial Hearing Officer

City of Chicago SD 299,

       School District.

## FINAL DETERMINATION AND ORDER

### JURISDICTION

The undersigned has subject matter jurisdiction over this matter pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 *et seq.* and the Illinois School Code, 105 ILCS 5/14/8.02a *et seq.* The personal jurisdiction in this matter of the undersigned is limited to the parties to this matter, specifically Student, Mother, Father, and the City of Chicago School District 29. The standard of proof in impartial hearings under the IDEA is a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii). Under this standard, the party seeking relief must establish that the fact sought to be proved is more probable than not.

### BACKGROUND

Petitioners[1] are the parents of E.V. ("Student"), a twelve -year-old student with a disability. Student is a seventh-grade student enrolled in the cluster program at Talcott Elementary School ("Talcott") as a student eligible for special education and related services under the diagnosis of Autism. Respondent is City of Chicago Public School District 299 ("District").

---

[1] *See Appendix I for the personal identification information of all persons identified by title, role or relationship within the text of this decision.*

Currently, the March 28, 2016 IEP is in effect for Student. According to the March 28, 2016 IEP, Student receives specialized instruction in English Language Arts, Mathematics, Biological and Physical Sciences, Social Sciences as direct special education services in a separate classroom setting for 1420 minutes per week. Student receives direct social work services in a separate setting for 15 minutes per week. In addition, Student's IEP includes consultative services for the Student's special education teacher from the nurse (15 minutes per quarter), speech pathologist (30 minutes per quarter) and social worker (15 minutes per month). Student's IEP provides for accommodations and modifications in academics (English Language Arts, Mathematics, Biology and Physical Science, Social Studies, Art, Music, general education classroom and hallway, and physical education areas, including paraprofessional support, functional behavior analysis ("FBA") and behavior intervention plan ("BIP"), social emotional support and speech/language support. The Student currently attends Talcott.

The due process complaint in this matter arises out of the District's failure to respond to Student's mother's repeated requests for assistance with his increasingly escalating needs, as demonstrated by Student's struggles with communication and episodes of aggression. Parents assert that District's failed to response to Student's needs by failing to develop an appropriate individualized educational plan ("IEP") and failed to provide an appropriate educational placement. Parents assert that District failed to timely convene an IEP meeting and triennial evaluation during the 2016-2017 school year, violated procedural requirements and denied Parents participation in the development of Student's IEPs by failing to provide Spanish language interpretation and translation services. Parent Parents assert that because of these failures, the District has denied Student a free appropriate public education ("FAPE") since October 3, 2016.

The District denies these allegations and asserts that at all times relevant Student was provided a FAPE, and that the IEPs generated for Student were reasonably calculated to allow Student to make appropriate progress. District asserts that it made several attempts to contact Parents and to hold meetings and schedule evaluations, but the Parents were unresponsive to the school. After February 16, 2017, the Parents refused to return Student to school, thus hindering the District's ability to evaluate the Student. District asserts that Chopin Elementary School serves a diverse community of students and several Chopin staff members regularly serve as interpreters at meetings.

2

Parents are seeking placement of Student at Laureate Day School, a therapeutic day school at District expense, reimbursement for independent educational evaluations (psychological, social work, speech and language, assistive technology, and functional behavioral assessment) an order requiring an appropriate behavior intervention plan to address Student's aggressive and frustration behaviors and compensatory education including in-home Applied Behavior Analysis ("ABA") therapy 15 hours per week for six months, weekly speech therapy for 40 minutes per week for six months, weekly academic tutoring (two hours per week – one for reading and one for math) for six months, round-trip transportation to access ordered compensatory education services not provided in the home, and fifteen (15) sessions of parent behavioral training for Parents. Parents seek an order requiring the District to provide an interpreter with training specific to interpretation at IEP meetings and translation of Student's key special education documents including IEPS, evaluation reports, notices, consent forms and progress reports. Parents also requested any other relief deemed appropriate by the Impartial Hearing Officer.

District seeks findings that its evaluations of Student were appropriate and that they provided the Student with a FAPE at all relevant times. The District requests the denial of all relief requested by Parents.

Petitioners have been represented by Melanie Grant, Esq. and Margie Wakelin, Esq., of Equip for Equality, Inc. District has been represented by their counsel, Katie Ilijic, Esq. throughout this matter. This Hearing Officer was appointed to preside over this case on July 3, 2017.

On June 29, 2017, Petitioners filed a Due Process Compliant ("Complaint") against the Chicago Public School District #299 ("District") pursuant to the Individuals with Disabilities Education Act ("IDEA"). District filed its Response to the Parents' Due Process Complaint Notice on July 11, 2017. The Rights of Parties Related To Hearings, Preliminary Order, and Standing Order were issued on July 5, 3027 and sent to the parties with a letter of introduction and Hearing Process Guidelines memorandum by the undersigned. On July 11, 2017, during the initial status conference, the parties agreed to participate in mediation services and anticipated that the mediation session would not be completed until the week of August 14, 2107. A Status Order and Notice of Prehearing Conference were issued on July 11, 2017.

The parties participated in mediation on August 15, 2017. The parties, however, did not reach an agreement.

The parties' prehearing disclosures were timely filed in this matter (District's on August 14, 2017 and Parents' on August 21, 2017). On August 22, 2017, Parents filed a joint motion for continuance and extension of the 45-day decision deadline to October 23, 2017 enable the parties to complete the hearing as scheduled and which would allow adequate time for the hearing officer to issue a decision after the hearing. On August 22, 2017, a prehearing conference was held in the above matter. The following parties participated in the conference with the undersigned: Melanie Grant, Esq. and Margie Wakelin, Esq. for Parents/Petitioners; and, Kaitlin Ilijic, Esq. for District/Respondent. A Prehearing Report and Order was issued on August 24, 2017 and an Amended Prehearing Report and Order was issued on September 19, 2017.

On September 15, 2017, the parties filed a Joint Motion for Continuance. An order Granting Continuance was issued on September 19, 2017 which extended the 45- day decision deadline to November 24, 2017.

On October 21, 2017, District filed a Motion to Continue the Hearing. Parents' responded in writing to this motion pursuant to the briefing schedule established during a status conference call convened on October 20, 2017 to discuss the District's request for continuance of the hearing and establish a briefing schedule. On October 31, 2017, an Order Denying Continuance was issued.

The hearing in this matter was convened at Talcott Elementary School, 1840 W. Ohio Street, Chicago, Illinois on November 8, 13, and 14, 2017 and at Chopin Elementary School, 2450 W. Rice Street, Chicago, Illinois on November 9 and 10, 2017. The hearing was closed. Ms. H            was present at the hearing for all but the last half day of hearing with her attorneys, Melanie Grant, Esq. and Margie Wakelin, Esq. of Equip for Equality. In addition, Equip for Equality legal interns, Jaclyn Ellwein participated in the hearing on November 10, 2017 and Eleanor Kittilstad participated in the hearing on November 10 and 13, 2017. District was represented by Kaitlin Ilijic, Esq., with Elizabeth Wagman, Esq. and Lucille Blackburn, Esq. (on November 10, 3017 only) assisting at the hearing. Spanish interpreter services were provided by Atlas Language Services of Chicago, Illinois with Linda Azpilcueta interpreting on November 8, 13, and 14, 2017 and Sylvia Escarcega interpreting on November 9, and 10, 2017.

4

Karen Fatigato, Certified Shorthand Reporter, of McCorkle Litigation Services, Inc. of Chicago, Illinois was the court reporter for this hearing.

The following persons testified in this matter: Mother, Father, Selma Martinez, BCBA, Susan Willeford, special education teacher, Lourdes Lonergan, of DuPage Federation on Human Resources ("LL"), Bridget Squitieri, special education teacher, Calvin Hardy, paraprofessional, Holly Delgada, speech language pathologist, Della Richards, District Representative, Georgine Giankopoulos, case manager, John McNulty, former Assistant Principal, Margaret Montejano, occupational therapist, Stephanie Thompson, speech language pathologist, Nicole Preucil, school social worker, Frederick Williams, Principal, Vasiliki Bilitsis, speech language pathologist, Leticia Hernandez, school social worker, Rachel Raymond, occupational therapist, Anna Ware, speech language pathologist, Kylie Kosmacek, District Manager Autism and Behavioral Health Team, Dr. Hector Machabanski, clinical psychologist, Megan Wallace, District Representative and Noel Schecter, school psychologist. Hearing Officer Exhibits IHO A to S were admitted into evidence. Joint exhibits JE 1-1 to 25, JE 2-1 to 13, JE 3-1 to 6, JE 4- 1 to 20, JE 9-1 to 3, JE 10- 1 to, JE 11-1 to 2, JE 12 – 1, JE 13 – 1 to 3, JE 14-1, JE 1 – 1 to 5, JE 16 – 1 to 33, JE 18 – 1 to 4, JE 19- 1 to 2, JE 20-1 to 3, JE 21-1 to 4, JE 23- 1 to 5, JE 24-1 to 2, JE 25-1, JE 27-1, JE 29-1 to 2, JE 30-1 to 6, JE 31-1 to 32, JE 32- 1 to 2, JE 33-1 to 33, JE 34-1 to 22, JE 37-1 to 37, JE 40-1 to 25, JE 41-1 to 12, JE 42-1 to 11, JE 49-1 to 3, JE 52-1 to 3, JE 53-1 to 5, JE 54-1 to 8, JE 55- 1 to 2, JE 57-1 to 6, JE 58-1 to 2, JE 59-1 to 3, JE 60-1 to 10 were admitted into evidence. Parents' exhibits P 6 – 1, P 7- 1 to 4, P 8-1, P 9-1, P 10-1, P11-1 to 6, P 12- 1, P 15- 1 to 2, P 16-1 to 3, P 18-1 to 2, P 19-1, P 20-1 to 6, P 21-1 to 20, P 22-1 to 28 were admitted into evidence. District's exhibits R 1-1 to 53, R2-1 to 28, and R 3-1 to 2 were admitted into evidence. The hearing officer took judicial notice of the Chicago Public School Board Procedure manual pages 11, and 87. The parties originally planned to present oral closing arguments and presented points of authority documents in support of their respective cases, however due to time constraints the hearing closed on November 14, 2017 and the parties were given until 12:59 p.m. on November 16, 2107 to submit written closing argument and points of authority. Both parties timely provided the same and they were included in the record as Hearing Officer Exhibits T (District's closing) and U (Parents' Closing Argument and Points of Authority and Parents' Memorandum of Closing Argument). The 45-day decision deadline is November 24, 2017, which is also the decision deadline pursuant to 105 ILSC 5/14-8.02a(g-55).

No transcript was issued prior to the date of this decision. The testimony referenced below is based on the undersigned's written hearing notes and memory. In rendering this decision, the undersigned has considered all documents entered into evidence, testimony of the witnesses, the parties' written closing arguments, memorandum and points of authority.

## ISSUES TO BE DETERMINED

The issues to be determined are:

a. Whether District 299 violated E.V.'s right to a FAPE by failing to convene an IEP meeting from October 3, 2016 to the present;

b. Whether District 299 violated E.V.'s right to a FAPE by failing to conduct appropriate evaluations from October 3, 2016 to the present;

c. Whether District 299 violated E.V.'s right to a FAPE by failing to provide E.V. with an appropriate behavior intervention plan with appropriate positive behavioral interventions and supports, including a systematic data-driven behavior program from March 28, 2016 to the present;

d. Whether District 299 violated E.V.'s right to a FAPE by failing to provide E.V. with an appropriate individualized education program reasonably calculated to make meaningful progress from March 28, 2016 to the present, including specific goals, accommodations, related services, and behavioral supports;

e. Whether District 299 violated E.V.'s right to a FAPE by failing to provide E.V. with any educational services from February 16, 2017 to the present;

f. Whether District 299 violated E.V.'s right to a FAPE by failing to allow E.V.'s parents to meaningfully participate in the IEP process by failing to provide them with qualified interpreters from March 28, 2016 to the present; and

g. Whether District 299 violated E.V.'s right to a FAPE by failing to allow E.V.'s parents to participate in the IEP process by failing to provide them with translated special education documents, including IEPs, evaluation reports, notices, consents, and excusal forms from March 28, 2016 to the present.

Parents request the following as prospective relief:

1.      Order that the District place Student in an appropriate therapeutic day school setting, at District expense, which includes the program components testified by Dr. M. of a specialty school in serving children with autism, structure teaching, a highly structured behavior management program, and opportunities to learn self-regulation with round trip door-to-door transportation.  Parents are requesting placement at Laureate Day School.

2.      Order the District to provide Student with an appropriate behavior intervention plan consistent with the independent functional behavioral analysis ("FBA").

3.      Order the District to provide Student's Parents with a qualified interpreter with training specific to interpretation at IEP meetings that include a proficiency assessment, training on the code of conduct and standards of practice, common errors made by untrained interpreters, the importance of  a pre-encounter session with the person you are interpreting for and the necessary vocabulary and terminology.

4.      Order that the District translate Student's key special education documents including his IEP, eligibility, evaluation reports, notices of conference, and IEP progress reports.

Parents are requesting as compensatory education the following:

6.      Order the District to reimburse Student's Parents for their independent educational evaluation due to testimony from Dr. M, HD, and SM regarding the inappropriate evaluations conducted by the District.

7.      Order the District to provide compensatory education services, including round trip transportation, for the following services:

        a.      15 hours per week of in home applied behavior analysis therapy for six months to compensate for his inappropriate behavior interventions,

        b.      60 minutes of weekly speech therapy, as testified by HD to compensate for his inappropriate speech therapy,

        c.      Two hours per week of academic tutoring in math and reading for six months, as testified to by Dr. M to compensate for his inappropriate IEP, and

        d.      15 session of parent behavioral training for Student's Parents, as testified to by Dr. M and SM as necessary to compensate Student for the denial of a FAPE.

7

## **FINDINGS OF FACT**

After considering all the evidence, as well as the arguments of both counsel, this Hearing Officer's Findings of Fact are as follows:

### **General Background Information**

1.    Student, a twelve-year old Hispanic student who is eligible for special education and related services under the category of Autism. (JE 42.)

2.    Student has been enrolled in the District for about nine years. (Testimony of Mother.)

3.    Student is currently receiving the special education and related services required by his March 28, 2016 IEP, the most recent finalized IEP. (Testimony of SET1, SPLT, SWT, and JE 31.)

4.    Student has difficulty in social interactions, communication, and behavior (Testimony of Mother, CSW, SET1, SET2, SET3, SPsyc, and Dr. M.)

5.    Student is somewhat self-aware and can identify his wants, likes and dislikes. Student has difficulty dealing with discomfort, conceptualizing, and great difficulty transitioning from home to school. (Testimony of CSW.)

6.    Mother has attended all Student's IEP meetings. (Testimony of Mother.)

7.    Mother regularly received notes and notices from school in Student's backpack, including Notification of Conferences, and Consent forms. Mother signed and returned notes and notices to school in Student's backpack after signing them. (Testimony of Mother, CCM, SET1 and SET2. )

8.    Student receives outside counseling, behavioral therapy, sees a psychiatrist and takes medication for behavior and asthma. (Testimony of Mother.)

### **Intrepretation and Translation**

9.    Students' parents are native Spanish speakers, natives of Puerto Rico. (Testimony of Mother, and Father.)

10.    Mother attended Student's IEP meetings since kindergarten.   (Testimony of Mother.)

11.    The District provided staff to interpret at IEP meetings until the 2015-2016 school year. (Testimony of Mother, JE 41, JE 37, and JE 33.)  District offered parents interpreters at IEP meetings. (Testimony of CCM, and SET2.)

8

12.     Mother regularly communicated in English, verbally and in writing, with the schools until March 7, 2017, when she began writing to the District in Spanish. (Testimony of Mother, SET1, SET2, PARA, CCM, CSW, TSPL, CSPL, JE 27, JE 13, JE 14)

13.     Mother never asked for an interpreter or for translated documents at CES or TES prior to her March 7, 2017 requests for school records and an IEP meeting. (Testimony of Mother, SET1, SET2, PARA, CSW, TSpL, and CSpL.)

14.     Father testified that he has a very low level of comfort with spoken English. Father reads a little English and writes very little in English. Father does not communicate with the school concerning Student. He has attended one IEP meeting on March 7, 2016. (Testimony of Father, JE 33-1.)

15.     The District procedures that requires the local school district representative is responsible for arranging accommodations for parents as necessary, including interpreter or translator for IEP meetings. (Chicago Public Schools, Office of Diverse Learner Supports and Services, Procedural Manual, page 11.)

16.     Bilingual staff members are regularly used to interpret when parents request interpretation, including phone calls, and at IEP meetings. (Testimony of AP, CCM, and PRIN.)

17.     Bilingual staff member are not provided with any training in how to interpret and their proficiency as interpreters is not assessed. (Testimony of AP.)

18.     Mother and Father appeared at the due process hearing and testified. Both testified in Spanish. (Testimony of Mother and Father.)

19.     Simultaneous English/Spanish interpretation was provided to each/both parent(s) when they were present for the entirety of the due process hearing.[2]

20.     Mother and Father testified that they received the evaluation reports from the outside providers in Spanish and that these reports helped them to better understand Student. (Testimony of Mother and Father.)

21.     Interpreters/translators are needed to ensure effective communication whenever a person whose native language is other than English is uncomfortable with communication in English.

---

[2] See 105 ILCS 5/14-8.02a(l) which requires that interpreters be made available by the school district for persons whose normally spoken language is other than English at all stages of the hearing.

This applies when the person has some English, but not a full vocabulary in the setting. (Testimony of LL[3].)

22.     Untrained bilingual persons serving as interpreters/translators often have a false belief in their level of fluency in the languages, lack the setting specific additional language and are unware and unskilled in interpretation/translation techniques, such as where to position themselves to facilitate communication and maintaining accuracy with language substitutions. In addition, untrained bilingual persons who are asked to serve as interpreters are often embarrassed to give and get the correct word to use during interpretation/translation. The message is lost if inaccurate substitutions are made during interpretation/translation. (Testimony of LL and JE 15.)

23.     Basic standards for interpreters and translators include accuracy, respect, participation in ongoing professional development, role boundaries, adherence to confidentiality and Code of Ethics. (Testimony of LL.)

24.     The State of Illinois does not have a certification for interpreters or translators. (Testimony of LL.)

25.     In the educational setting an interpreter/translator must recognize the needs in the setting, including the need for accurate information exchange, and a specialized vocabulary. To be qualified as interpreter/translator persons need to obtain a minimal level of language proficiency. At LARC candidates must complete a 100 hour training course containing the components defined above[4], obtain 75% accuracy on proficiency assessments, and complete a 40 hour practicum to obtain a certificate. (Testimony of LL.)

26.     LL was not aware of any specific requirements required by the IDEA for interpreters. (Testimony of LL.)

---

[3] LL is the Associate Executive Director of the DuPage Federation on Human Service Reform, Language Access Resource Center (LARC). LL holds BS from St. Thomas Aquinas College and a certificate for Medical Interpreting from LARC. LL belongs to the National Council on Interpreting in Health Care. LL oversees the coordination and delivery of interpretation and translation service to hospitals, medical groups, schools, law firms, business and others. She provides information and training regarding to the needs of limited English proficient populations and language access requirements and available resources. LL trains prospective interpreter candidates in the role of interpreters, techniques, ethics, role of culture, the law, and medical terminology, providing a program that includes language proficiency, 100 hours of training, 40 hour practicum, drug screening, and state background check. LL has trained between 200-300 interpreters. She evaluates interpreters and translators and supervises their ongoing performance. Parents offered LL as an expert in the training and supervision of interpreters for special educational setting. The District objected to the qualification of LL as an expert in special education on the basis of lack of foundation of specialized knowledge of special education, but did not object to the offer of the witness as an expert in the training and supervision of interpreters for educational settings. This hearing officer found that LL does not have specialized knowledge concerning special education, however, the witness' testimony is accepted as an expert in the training and supervision of interpreters for educational settings. (Testimony of LL and JE 58.)
[4] *See JE 16 for LARC training Syllabus*

**2015-2016 School Year**

27.     Student was enrolled in CES cluster program in SET2's classroom as a 5th grader. (Testimony of SET2.)

28.     Student read and listened at a 2-3rd grade level and was able to answer comprehension questions. Student is able to do computations involving addition, subtraction, and multiplication. He is good with technology, especially computers. Student made progress in all academic areas (Testimony of SET2 and JE 30.)

29.     Student's challenges were behavioral, getting out of the car in the morning and work refusal. Morning transitions were very frequent at the beginning of the year but improved over the year. (Testimony of SET2.)

30.     When Student engaged in work refusal he would scream, rip paper, throw chairs and be aggressive to staff (hitting, punching and pushing). At the beginning of the year, Student engaged in work refusal and aggression approximately two times per week. Over the year the behavior decreased. (Testimony of SET2.)

31.     SET2 called Mother when Student was throwing chairs. Mother was given the choice of have SASS called or to come to school about five times during the school year. (Testimony of SET2.)

32.     Student responded well to the structure of the classroom. Student used a daily chart for the class and personal charts, the classroom had many visuals, strict routines, individualized and leveled paced instruction, breaks, visual supports and written schedules for work tasks. When Student was upset, pointing to an appropriate visual helped him. He also responded well to a reward system where he earned stars for work completion and was able use stars for open ended choices during choice time before lunch and at the end of the day. (Testimony of SET2.)

33.     Student did well on the bus during field trips. Student was eligible for transportation, but Mother never set it up. (Testimony of SET2 and JE 31-29.)

34.     Student was not able to go out for recess due to his asthma, but he had friends and eventually was able to pick a friend to stay in for recess with him. (Testimony of SET2.)

35.     Student engaged in conversations with peers and enjoyed playing Pokeman cards with them. (Testimony of SET2.)

36.     Student participated in lunch and specials in the general education setting. (JE 31-25 and Testimony of SET2.)

37.     Teacher and paraprofessionals used daily data sheet to collect data used to measure student progress toward obtaining goals. (Testimony SET2.)

38.     Mother and SET2 communicated regularly through informal conversations and notes exchanged in a communication notebook sent between home and school in Student's backpack. Mother asked questions and appeared to understand answers. All these communications were in English. (Testimony of SET2.)

39.     Student communicated with Mother in English at school. (Testimony of SET2.)

40.     Student's attendance was a problem. He was out a lot with illness and due to asthma. (SET2.) Attendance records show Student attended 128 days and was absent 48 days (*attended 73% of days)*. (IHO R-144.)

41.     On March 7, 2016, an IEP meeting was convened to review Student's annual progress and to develop a new IEP for the next year. Parents participated in the IEP meeting. (Testimony of Mother, CCM, and JE 33.)

42.     At the IEP meeting, Mother expressed her concerns about Student's behaviors, need for speech therapy, attendance problems, and her interest in Student being educated in his home. (Testimony of Mother, CSW, and JE 33-004.)

43.     The IEP Team discussed speech therapy and decreasing Student's speech therapy services because he is able to communicate in school.

44.     Mother reviewed the draft IEP and requested specific and substantial revisions to the IEP at some time between the March 7, 2016 meeting and the March 21, 2016 Waiver of IEP Revision Meeting form being signed. (JE 32.)

45.     On March 28, 2017, the District adopted and incorporated the revisions requested by Mother. (Testimony of Mother, JE 31, JE 32, and JE 33.)

46.     The IEP report card was printed on April 12, 2016 and sent home with Student. This document was provided in English. (Testimony of SET2, JE 30.)

47.     During the 2015-2016 school year, Student was absent from school 48 days and attended 128 days. Attendance records do not reflect days that Student was sent home before the end of the school day due to dysregulation and behavioral concerns. (IHO R-2, and Testimony of AP.)

**2016-2017 School Year**

48.     The parties stipulated that E.V. was placed in SET3 classroom for the 2016-2017 school year.

49.     The parties stipulated that SET3 was on maternity leave from September 4, 2016 through April 28, 2017.

50.     There was no regular substitute teacher hired to cover SET3's classroom during her leave.  During SET3's maternity leave, the paraprofessionals were often the only adults providing supervision and instruction to the students in SET3's classroom.  (Testimony of PARA and CSpL.)

51.     During the 2016-2017 school year, Student became dysregulate most frequently in the mornings, coming to school and throughout the school day, such as at recess-time or when he was redirected.  When dysregulated, Student frequently engaged in aggressive behavior, including slamming hands on the tables and walls, scratching, hitting, and kicking others including his mother.  (Testimony of PARA, TSW, and AP.)

52.     During the 2016-2017 school year, when dysregulated, Student often engaged in dangerous behaviors including running out of the school into the street, and lying on the hood of his mother's car. (Testimony of AP, PARA, CSW.)

53.     During the 2016-2017 school year, when dysregulated, Student made high pitched squeals, screaming and other noises.  (Testimony of AP, CSW, PARA.)

54.     During the 2016-2017 school year, CES staff frequently (often 2-3 times/week), called Mother to pick up Student due to his behavior after she dropped him off in the morning or later in the school day.  (Testimony of Mother, AP, and PARA.)

55.     During the 2016-2017 school year, Student's class took many field trips.  Student frequently became dysregulated during the trips.  Mother had to pick up Student from field trips when he became dysregulated.  (Testimony of Mother.)

56.     Mother spoke with CSW to discuss Student's behavior and the frequent calls to pick him up from school.  (Testimony of Mother, and CSW.)

57.     Student is able to converse without difficulty when he is not angry.  (Testimony of PARA.)

58.     On September 27, 2016, Mother dropped Student at the front of the school.  Student refused to enter the building.  Security was called about 8:45 a.m. and AP responded.  AP sat

with Student, tried to talk to him. AP stopped talking because Student continued to scream and began kicking. Mother left the school before Student calmed down. AP called Mother. Mother refused to return to the school stating that school doesn't know how to do the job. PRIN determined that they had to call the police. Mother called back say she did not want the police called and she returned to school, but the police had already been called. Student was removed from school by emergency service and brought to the hospital due to being very dysregulated. (Testimony of AP.)

59.     Mother had to go to the hospital for Student. Hospital explained to her that the normal process is to send Student to rehab without parents. The hospital could see that Student was under psychiatric care and had not missed an appointment so they discharged Student to his parents. (Testimony of Mother.)

60.     On October 3, 2016, Mother requested, in writing, a Functional Behavior Assessment and change of schools after several episodes of aggression. Mother's letter addressed to CCM and CSW, discussed her concerns that CES did not have the resources needed to support Student's behavioral concerns. (Testimony of Mother, JE 27.)

61.     Upon receipt of the letter CCM gave it to CSW and Student's IEP team met to review and consider the request. (Testimony of CCM.) No action was taken on this request and the District did not provide Parent with prior written notice.

62.     Student continued to experience dysregulation during the morning and throughout the school day during transitions, CES staff continued to call Mother to pick up Student due to his behavior after she dropped him off in the morning or later in the school day. (Testimony of Mother, AP, and PARA.)

63.     CCM's service log entry on January 10, 2017 indicates that a notice was generated for a meeting scheduled on February 15, 2017 by mutual agreement communicated by home phone for meeting scheduled on February 15, 2017. (R2-4.)

64.     CCM gave the Notice of Conference (JE 25) and Consent for Evaluation (JE 23) papers to the classroom teacher to send home with the Student in his backpack. (Testimony of CCM.)

65.     CCM asked a paraprofessional staff member to talk with Mother about the forms when the forms were not returned the next day. (Testimony of CCM.)

66.     Mother signed the Consent for Reevaluation Form on January 13, 2017 and returned it to school on January 18, 2017. (Testimony of CCS, JE 23-002, and JE 23-005.)

14

67.     On January 24, 2017, CSW spoke with Mother and set up an interview to complete Student's reevaluation on January 27, 2017.  This interview did not occur, Student was absent and parent did not attend meeting.  (Testimony of CSW and JE 40-17 to 40-18.)

68.     On January 31, 2017, CSW left a voice mail on Mother's telephone rescheduling her interview for Student's reevaluation. (Testimony of CSW and JE 40-18.)

69.     On February 14, 2017, CSW spoke with Mother at pick-up time, who insisted on Spanish communications.  (JE 40-19, R1-39.)

70.     On February 15, 2017, the CES staff members of Student's IEP team assembled for the IEP and reevaluation conference, but it was rescheduled due to unavailability of parent.  Asst. PRIN called Mother concerning the IEP conference and need to reschedule (JE 40-20 and Testimony of AP and CSW and CCM.)

71.     On February 16, 2017, Student arrived at school in a state of dysregulation.  (Testimony of Mother and AP.)

72.     At about 8:45 a.m. security was called to assist due to Student being outside and refusing to enter the building (Testimony of AP.)

73.     The AP responded to the playground where Mother was parked.  Student broke away from school, ran to Mother.  Mother brought Student back to AP and left the school grounds. (Testimony of AP and Mother.)

74.     AP stood outside with Student for 1.5 hours.  Student entered the school after 1 hour and 45 minutes.  (Testimony of AP.)

75.     AP called Mother, informed her of the situation and the need for assistance from Mother or emergency services.  Emergency services were called at the directions of PRIN.  (Testimony of AP.)

76.     Mother arrived and found emergency services taking Student away. (Testimony of Mother.)  Student left with Mother. (Testimony of CSW.)

77.     Student did not return to school after February 16, 2017 to complete the 2016-2017 school year due to the trauma of the experience at CES that included a call to emergency services.  (Testimony of Mother, PRIN, and AP.)

78.     Mother states that Student experienced trauma from the ambulance.  Student wouldn't leave her room.  She tried to take him to the park, movies, zoo, etc. and he would become

aggressive, pushing, hitting his head against the wall, kicking the wall and hitting the doors. (Testimony of Mother.)

79.     On February 21, 2017, CSW requested assistance of Spanish speaking school staff to reach out to Mother about Student's emotional and behavioral concerns and the rescheduled IEP meeting.  (Testimony of CSW, JE 40 -23, and R1-44.)

80.     On March 1, 2017, the Student's IEP team assembled for the IEP meeting scheduled for that date.  The meeting did not occur due to unavailability of parents.  (Testimony of CCM, CSW, JE 40-23, and R1-45.)

81.     On March 7, 2017, CSW made arrangements for Spanish speaking staff assistance the next day to complete a home visit to Student's home.  (Testimony of CSW, JE 40-24, and R1-46.)

82.     On March 7, 2017, Mother sent a letter, addressed to CCM requesting an IEP meeting. (Mother's testimony and JE 14.)

83.     On March 7, 2017, Mother sent a second letter, addressed to the CES records custodian, requesting student records.  (Testimony of Mother and JE 13.)

84.     The home visit completed on March 8, 2017 was unsuccessful.  CSW was told by neighbors that the family had recently returned to the home, however no one answered the door. (Testimony of CSW, JE 40-24,  R1-47)

85.     On March 10, 2017, CSW contacted DCFS to request a well-being check for Student. (Testimony of CSW, JE 40 – 25, and R1-48.)

86.     On March 24, 2017, District event logs indicate that Student was removed from roster and cluster indicator as UNABLE TO LOCATE.  (R2-2)

87.     On April 5, 2017, with authorization of Mother, Equip for Equality attorneys sent a letter to CCM and CDR requesting an IEP, FBA and BIP for Student.  (Testimony of Mother, and JE 11.)

88.     On April 28, 2017, Parent's attorney follow-up with DR due to the District's lack of a response.  DR responded that Student was not enrolled and there would be no IEP meeting.  (JE 10.)

89.     Student attended school 60 days and was absent 37 days for the 2016-2017 school year. (IHO R-2.)

**2017-2018 School Year**

90.     Student began attending TES in the cluster program in SET1's classroom on September 5, 2017. (Testimony of SET1, and Mother.)

91.     Student experienced three incidents of significant dysregulation resulting in physical aggression this year, September 7, 22, and October 5, 2107.  (Testimony of SET1 and JE 3.)

92.     NM gets a copy of the reports each time they occur.  (Testimony of SET1.)

93.     SEC1 is not implementing the BIP found in the March 28, 2016 IEP . (Testimony of SEC1 and JE 31-30 to 21.)

94.     TSW has been working with Student since the beginning of the school year. Student has friends in his class and is beginning to interact with general education student. TSW believes Student would benefit from developing more social skills.  TSW has just established rapport in the past few weeks.  Student recently has initiated speaking to her and summoned her to join him.   She has been attempting to implement the March 28, 2016 IEP, she was not successful because Student would not speak to her.  She feels that the social work goal is too complicated for Student.  (Testimony of TSW and Je 31-23 to 24.)

95.     Student refused to enter the building on November 13, 2017 from 7:50 a.m. to 10:00 a.m. Student became more dysregulated each time staff members spoke with him.  He responded by throwing chairs in the classroom.  This was the fourth incident of school refusal this year. (Testimony of Mother.)

96.     From September 5, 2017 to November 14, 2017, Student was present 32 days, absent excused 5 days and 11 unexcused absences (66%). (IHO R145-146.)

97.     CSW and Mother discussed difficulty transitioning from home to school.  CSW did not develop a goal to address the problems because the school did not have control over the implementation of the goal at home, where the problems started.  (Testimony of CSW.)

**Private Evaluations**

98.     Mr. M completed a Psychological evaluation of Student.  Mr. M. charged $4,000.00 for the evaluation. (P -10.)

99.     Student has been receiving behavioral therapy services from SM, BCBA for about three years.  (Testimony of Mother.)

100.    SM, a certified BCBA, conducted a Functional Behavioral Assessment Behavior Intervention Recommendation of Student based on available information obtained primarily

from a review of records. SM made several recommendations but was unable to develop a BIP due to the lack of a FBA with data. Her conclusions were that base line data, including date, time, setting operational definition be collected at least 10 days or until three (3) data point establish a trend, after stability is found in the data, a behavior intervention plan can be developed. In addition, SM recommended that a reinforcement assessment be completed to assist in determining motivational techniques for Student. SM also recommended 6 months of ABA (applied behavioral analysis) direct services for 3 hours per week. (Testimony of SM and JE 2)

101.    SM charged $3,433.30 for her evaluation.

102.    DH completed a speech language evaluation of Student which she changed $3,074.02. (P-9.)

## DISCUSSION AND CONCLUSIONS OF LAW

The IDEA and its implementing regulations were enacted to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") and that the rights of children with disabilities and their parents are protected. 20 U.S.C. 1400(d)(1)(A), 34 C.F.R. §300.1 and *Bd. of Educ. v. Rowley,* 458 U.S. 176, 179-91 (1982). FAPE is defined as special education or related services, designed to meet their unique needs, that are provided at public expense, meet the standards of the state, include preschool, elementary, or secondary school and are provided in conformity with an Individualized Education Program (IEP) that meets the requirements of 34 C.R.F. §§ 300.320-324 and must be educated to the maximum extent appropriate with children who are not handicapped. *Id.* Illinois School Code and its implementing regulations require the provision of FAPE to students with disabilities in the least restrictive environment as well. 105 ILCS 5/14-1.01 *et seq.* and 23 Ill. Admin. Code §226.10 *et seq.* The IDEA includes substantive requirements, discussed below, and procedural requirements which are designed to ensure that children with disabilities and their parents provided the guaranteed procedural safeguards with respect to the provision of a FAPE. 20 U.S. C. 1415(a) and 34 C.F.R. §300.121.

A parent or public agency may file a due process complaint on any matter relating to the identification, evaluation, or educational placement of a child with disabilities or the provision of

FAPE to the child. 20 U.S.C. 11415(b)(6), 34 C.F.R. §300.507 (a)(1). The due process complaint must allege a violation of IDEA (34 C.F.R. §300.507 (a)(1)) relating to any matter related to the proposed initiation or change in identification, evaluation, or educational placement or the provision of a FAPE to a child or the refusal to do the same (34 C.F.R. §300.503(a)). When the provision of a FAPE is at issue, allegations of procedural violations may arise to a denial of a FAPE to a child with a disability only if the alleged violations are found to have impeded the child's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process or caused a deprivation of educational benefit. 20 U.S.C. 1415(e)(3)(E)(ii), 34 C.F.R. §300.513(a)(2). In this matter, Parents raise several procedural matters, including allegations that the district failed to convene an IEP meeting and that parent were denied meaningful participation in the IEP process due to the District's failure to provide them with Spanish language translation of documents and interpreter services at meetings.

**Issue One:**
**Whether the District violated Student's Right to a FAPE by Failing To**
**Convene an IEP Meeting From October 3, 2016 To Present?**

Parents' due process complaint alleges that the District failed to convene an IEP meeting from October 3, 2016 to the present which resulted in a denial of a FAPE to Student. Mother assert that she requested on IEP for Student on October 3, 2016, and March 7, 2017. District did not respond to her requests. Mother believed that an annual review of the IEP meeting would take place prior to March 28, 2017, the due date of the annual review. Mother asserts that she did not receive any notices after the February 16, 2017 behavior incident. A final written request for an IEP meeting was made by her attorneys on April 5, 2017. The District's has not convened the requested IEP to the date of the hearing. (IHO A.)

District's response to this allegation is that after Parents requested a meeting, it made several attempts to contact the parents, hold meetings and schedule evaluations. The Parents were unresponsive to the school. (IHO D.)

The Parents argue that it is undisputed that the District has not convened an IEP for Student since at least October 2, 2016. IDEA requires that the District convene an IEP meeting for students with disabilities at least annually and at the request of the parent. Parents assert that

this procedural violation has denied parents the opportunity to participate in the educational decision-making for their child.

District's defense is the failure to conduct an IEP meeting was due to the unavailability of the parents. District argues and asserts that the staff at CES attempted to convene IEP meetings on at least two different occasions in March, 2017. IDEA requires that districts take steps to ensure that one or both parents of a child with disabilities are present at each IEP meeting or are afforded an opportunity to participate. District asserts that various CES staff made multiple attempts to secure Parents attendance at several meetings. Parents never attended the meetings at school and Student did not complete the 2016-2017 school year. District argues that after Student was reenrolled for the 2017-2018 school year they became aware that outside evaluations of Student were being conducted and they wanted to consider the results of the outside evaluations, take time to get to know Student before writing an IEP for him. The District currently has an evaluation scheduled for November 27, 2017 to consider the results of all evaluations, CPS and outside, and to draft a new IEP for Student.

**Discussion:**

<u>The October 3, 2016 IEP Request and Response.</u>

Mother's October 3, 2016 written request was received by CES. (Testimony of CCM and JE 27.) CCM testified that upon receipt of the letter she gave it to CSW and Student's IEP team met to review and consider the request. Contrary to the District's assertion, the evidence presented at hearing, including service logs (R1-25 TO R1-33) and event logs (R2-4) covering the period between October 2, 2016 and January 10, 2017, do not show any attempts by CES staff to schedule the IEP as requested on October, 2016. No action was taken on the request until January 2017. Accordingly, I find that the District failed to schedule an IEP meeting in response to the Mother's October 3, 2016.

<u>Student's Annual Review of the IEP due March 28, 2017.</u>

On January 10, 2017, CCM's service log entry indicates that a notice was generated for a meeting scheduled on February 15, 2017 by mutual agreement communicated by home phone for

20

meeting scheduled on February 15, 2017. (R2-4.) CCM this notice (JE 25) and the consent forms for the reevaluation were given to the classroom teacher or to a paraprofessional to send home in Student's backpack. (Testimony of CCM**.)** Mother signed the Consent for Reevaluation on January 13, 2017 and returned it to school on January 18, 2017. Mother's testimony that she did not receive notice of the conference scheduled on February 15, 2017 is not credible in light of the fact that she signed and returned the consent that was sent home on the same date and in the same manner as the notice she claimed she did not receive. I find that Parent was notified of the February 15, 2017 IEP meeting but did not attend.

A new Notice of Conference was generated by CCM for a meeting rescheduled on March 1, 2017 (R2-3) and to be sent home with the student. However, the notice was not sent home with student because that morning the Student became dysregulated (FF #58-59 ) and did not attend school for the remainder of the school year.

On February 21, 2017, CSW service notes indicate that she "attempted" to reach out to parent with the assistance of Spanish speaking staff concerning the new IEP meeting and other matters. (JE 40-23) This attempt was not successful in providing Mother with notice of the March 1, 2017 IEP meeting.

On February 22, 2017, CCM's service record logs indicate that a copy of a Notice of Conference proposing an IEP meeting on March 2, 2017. (R2-3) CCM testified that the notice found at JE 24 is the notice that she printed out and sent from the District's system and she does not know why the date she did sent it did not populate at the top of the letter. (Testimony of CCM and JE 24.) I do not find this testimony credible because the documentary evidence presented in this matter does not contain of copy of this notice or any documentation related to the certified mailing indicating that the parents actually received the notice. On March 2, 2017 Student's IEP team assembled, but due to parents not attending, the meeting did not occur. Accordingly, I find that the Parents did not receive notice of the IEP meeting scheduled on March 1 or 2, 2017.

On March 1, 2017, after the aborted IEP meeting, CCM event log note states that she had a Spanish speaking office staff  member call the parent concerning rescheduling the IEP meeting on March 8, 2017. The same entry indicates that a notice setting the conference date in both Spanish and English was sent by certified mail. (R2-3) I do not find this testimony credible because the documentary evidence presented in this matter does not contain of copy of this

21

notice or any documentation related to the certified mailing indicating that the parents actually received the notice. Accordingly, I find that the Parents did not receive notice of the IEP meeting scheduled on March 8, 2017.

### The March 7, 2017 IEP Request and Response.

CCM received Mother's letter requesting, in Spanish, an IEP meeting. CCM testified that she brought the letter to AP to have it translated and AP attempted to contact Mother by phone to schedule meeting as requested. AP was not successful in reaching Mother by phone. CCM did not log this phone call as an event. CCM did not record any other actions related to scheduling the IEP meeting as requested by Mother in March 7, 2017. Accordingly, I find that the District did not respond to Mother's March 7, 2017 request for an IEP meeting.

### The April 5, 2017 Request and Response.

On April 5, 2017, Equip for Equality, representing Student at the request of Parents, sent a letter to CCM and CDR requesting, among other things, an IEP meeting. (FF # 68.) CCM testified that she did not recall receiving the letter and the events log does not show any action by her in Student's file after March 3, 2017. (Testimony of CCS and R2-2 to 3.) CDR testified that she doesn't remember exactly what she received, but she assumes that she received the letter because it was addressed to her. CDR testified that when she receives a request for an IEP from an attorney she normally calls the school to see who the student was and what was going on. CDR said that the school reported that they could not find student and that they had sent out a 5 day and 10 day letter, called the home and made a home visit. Student was unenrolled (FF # 86) and had not reenrolled. There was an email exchange between CDR and Parent's attorney wherein she informed the Parent's attorney that Student was not enrolled in CES. (Testimony of CDR and JE 10.)

Student did not return to CES. The District did not present evidence demonstrating that the Parents had or should have had knowledge of Student's status as unenrolled.[5] Parents took

---

[5] PRIN testified that he was familiar with the District's attendance policy, but had not seen exhibit P20, a copy of The Districts Absenteeism and Truancy Policy. He stated that he directed the attendance clerk to un-enroll Student because Student hadn't been in school for over a month and he had spoken with Mother who told him that she was not going to send Student. PRIN testified that he withdrew Student with the knowledge that if he showed up he

no action to reenroll him at CES. (FF # 59.) No IEP meeting was scheduled or convened in response to the April 5, 2017 request.

**Conclusion**:

IEP meetings are required at least once per year and may be held at the request of a parent.[6] However, the District is not able to convene an IEP meeting without the presence of at least one parent[7] and must take steps to parents are afforded the opportunity to participate in the meeting.[8]

The testimony and documentary evidence clearly indicates that the District did not convene an IEP during the period beginning October 3, 2016 to the present. (FF #3.) The District failed to respond in any meaningful manner to the Parent's October 3, 2016 request for an IEP and as a result Parents were denied the opportunity to be involved in an IEP meeting to review student's needs, adjust his goals, services and BIP during a time when he was frequently engaged in multiple maladaptive behaviors and episodes of increasingly aggressive periods of dysregulation.

The annual review of Student's IEP was due on or before March 25, 2017. As discussed above, I find that between January 10, 2017 and February 15, 2017 CES attempted to schedule and convene the annual review of the IEP and to complete a triennial evaluation of Student, however, Parents did not respond or cooperate with the process. After February 15, 2017, I find that the District did not provide evidence that it took steps to ensure that the parents were afforded the opportunity to participate in the IEP process due to failure to provide them with adequate Notice of Conference.

I find that the District did not respond to Parents March 7, 2017 or April 5, 2017 requests for IEPs. I find due to these failures, Parents were not afforded an opportunity to participate in IEP meetings and as discussed below, IEP meetings were needed at the times parent requested to

---

could be instantly enrolled. PRIN testified that five and ten day letters are automatically sent to the last known address of students after five and ten days of absence. PRIN indicated that if the letters were sent, they should be in the Student's file. No evidence was presented that demonstrates that CES followed the District attendance policy concerning Student and as a result, Parents did not have notice that Student was un-enrolled until their attorney learned through email communication with CDR. (Testimony of PRIN.)

[6] 20 U.S.C. 1414(d)(4)(A)(1), 34 C.F.R. §300.324(b)(1)(i),

[7] 4 C.F.R. §300.321(a)

[8] 34 C.F.R. §300.322(a)

review and adjust Student's IEP and address his changing needs. Accordingly, these violations significantly impeded Student's right to a FAPE and significantly impeded the parent's opportunity to participate in the decision-making process for Student.

### Issue Two:
### Whether District 299 violated Student's right to a FAPE by Failing to Conduct Appropriate Evaluations from October 3, 2016 to Present?

Parents' allege in their DPCN that District failed to conduct appropriate evaluations of Student despite Mother's requests for assistance and Student's significant behavioral issues, including physical outbursts resulting in danger to him and others. In addition, District failed to complete Student's triennial evaluation that was due in May of 2017.

District asserts that in January, 2017, it obtained parental consent, which District asserts was informed consent, for the evaluation but were unable to complete the evaluations due to the student not being available to staff. The evaluations were being conducted in all areas of suspected disability, academic, social-emotional, health, medical and speech/language. District asserts their evaluations were sufficiently comprehensive and that parent should not be entitled to compensation for private evaluations.

Discussion and Analysis.

IDEA requires a reevaluation of a student is completed when there is a substantial change in the student's academic performance or disabling condition that may warrant a reevaluation of the student of if the parent or a teacher request a reevaluation. 34 C.F.R. 300.303(a).

IDEA requires that the District completes evaluation of a student with disabilities that is sufficiently complete to identify all of the child's special education and related service needs, whether or not the specific needs are commonly linked to the disability category. 34 C.F.R. 300.304(c)(6). The evaluation process should include the review of past evaluations and new evaluations to identify what additional data is needed to determine the continued eligibility and educational needs of the student. 34 C.F.R. 300.305(a). The review is to be completed by a group that includes the IEP team and must include other qualified professionals, as necessary to determine eligibility and determine the student's educational needs. *Analysis and Comments to the Regulations,* Federal Register, Vol. 71, No. 156, Page 46644 (August 14, 2016). Before the

24

evaluations can be conducted, the district must provide the parent with prior written notice. 34 C.F.R. 300.300(a).

The notice must be written in language understandable to the general public and provide in the native language of the parents or other mode of communication, unless it is clearly not feasible to do so. 34 C.F.R. 300.503(c)(1)(i) and (ii). It must describe the action proposed by the district (34 C.F.R. 300.503(b)(1)) , explain the reason for the propose or rejected action (34 C.F.R. 300.503(b)(2)), and describe what other options the IEP team considered and the reasons why those options were rejected, (34 C.F.R. 300.503(b)(6)), describe each evaluation procedure, assessment, record or report the district used as the basis for the proposed or refused action (34 C.F.R. 300.503(b)(3)), explain how the procedural safeguards can be obtained (34 C.F.R. 300.503(b)(4) and 34 C.F.R. 300.504(a(1)) , and provide a list of resources available to the parents to assist the parents with understanding the written notice (34 C.F.R. 300.503(b)(5).

Districts must obtain informed parent consent prior to conducting a reevaluation of a student with disabilities. 34 C.F.R. 300.300(c). However, parental consent is not required before reviewing existing data as part of a reevaluation. 34 C.F.R. 300.300(d)(1).

Evaluations must use a variety of tools and strategies to collect relevant information concerning the functional, developmental, and academic  information about the student, including information from the parent to assess the child in all areas of suspected disability. 34 C.F.R. 300.304(b)(1) and 34 C.F.R. 300.304(c)(4). The use of a single measure or assessment is prohibited. 34 C.F.R. 300.304(b)(2). The instruments used must be technically sound. 34 C.F.R. 300.304(b)(3). Cultural and racial bias or discrimination should be avoided and administration of evaluations must be in the child's native language and form likely to yield the most accurate information. 34 C.F.R. 300.304(c).

### Parent's October 3, 2016 Request

Parent requested an FBA and change of placement for Student on October 3, 2016. (FF #60.) Parent's request was based in concerns about Student's escalating aggressive behaviors, the ineffectiveness of the IEP and BIP as implemented by CES staff and the need for an assessment to develop new goals and strategies to support Student's behavior needs. District failed to provide the prior written notice (34 C.F.R. 300.503(b) within the fourteen days as required by 23 Ill. Admin. Code 226.110. (FF #61.) District did not take any action until

25

January 2017, as the date for Student's triennial evaluation was approaching. Accordingly, the District failed to assess Student's social emotional and behavioral needs as requested by the Parent on October 3, 2016.

### Triennial Evaluation

On January 10, 2017, the District initiated the reevaluation process for Student. (FF # 63.) CCM initiated a computer process to "open the domains," a process that required the evaluation team to open and review past evaluations and current data to determine what assessments should be discussed at the evaluation planning meeting. (Testimony of CCM). Mother was contacted to schedule this meeting and a notice was sent. The meeting was scheduled for February 15, 2017. (FF # 63.) Notices of Conference, a Domain Planning Sheet and Consent for Evaluation form (JE 23 and JE25) were sent home with Student and the consent was signed and returned to CES. (FF# 64.) These notices substantially complied with the notice requirements, in that they informed the parent of the District's assessment plan, describing the domains to be assessed, the existing information about the child, the additional evaluation data needed and the sources from which the data will be obtained, it states that several items are not applicable. The team had not met to team considered other options and therefore the forms sent did not yet contain the reasons why any options were rejected. The notice did not describe each evaluation procedure, assessment, record or report the district, but it did contain a general statement of the types of assessments being considered. The notice explain how the procedural safeguards can be obtained by asking the District for a copy. The notices were not in Spanish, but English.

Parent signed and returned the consent form. (FF # 66.) Mother testified that she did not have a full understanding of the testing, but that she did know that she was consenting to testing so that her son could receive services. The February 15th meeting did not occur due to parent's unavailability. (FF #70.) The purpose of this meeting was to gather more information concerning Student needs, to answer her questions and to finalize the assessment plan. (Testimony of CCM.)

After receipt of consent Student's evaluation team began to evaluate Student, but not all components of the evaluation were completed due to Student's unavailability before and after

February 15, 2017. (FF#70.) Student became completely unavailable to the evaluation team from February 16, 2017 to September 5, 2017. (Testimony of SPsyc, CSW, CSpL and CCM.)

In spite of Student and Parent's unavailability, District evaluations reports were compiled for the March 1, 2017 Eligibility IEP Meeting. (JE 18, JE 19, JE and JE 21.) Parents argue that the District's evaluation plan did not project a comprehensive evaluation for Student. SPsyc testified that he thought that a complete evaluation for Student needed to include adaptive testing, the BASC social-emotional rating scales and a parent interview. (Testimony of SPsyc.) CSW requested assistance from the District's Autism and Behavioral Health Team and District staff planned to complete a new FBA, but due to the unavailability of Student data could not be collected and a new BIP could not be developed. This was confirmed by the testimony of KK, the District's Autism and Behavioral Health Team District Manager. (Testimony of CSW and KK.)

District argues that it is not required to be "overly intrusive" in pursuing parents who "opt out of the public school system. After February 16, 2017, Student did not return to school. (FF #77.) After multiple attempts by various CES staff to re-engage the Parents with the school, the District abandoned its efforts and un-enrolled Student. (FF# 86.) District argues that its IEP evaluation team evaluation team completed most, but not all of the evaluations of Student in his areas of need, specifically academic, social emotional concerns, health and medical concerns, and speech/language concerns.

District Psychological Evaluations

SPsyc testified that his evaluation was not complete, due to the inability to complete it when Student did not return to school and parents did not respond to schools attempts to reach them. "If any needed portion of the evaluation cannot be completed due to lack of parental involvement……the district shall note the missing portions in the child's evaluation report and state the reasons why those portions could not be completed." 23 Ill. Admin. Code §226.110(i) SPsyc did not do this, however he testified that the report contained in JE 21 was not finalized, it was a draft report. (Testimony of SPsyc.)

SPsyc testified that he was familiar with Student through his collaboration in the classroom to develop a social skills group to discuss weather and had worked on Student's team at times since 2015. SPsyc tested Student, but had no contact with his parents To gain an

27

understanding of Student's disability, SPsyc reviewed the current IEP (JE 31) and the most recent psychological evaluation (JE 49) and discussed Student with the team. According to SPsyc the team had concerns that Student did not fit the typical profile for autism. SPsyc determined to administer the ADOS-2. He found that Student is a high functioning student with autism who has very troubling behaviors that impact his functioning. (Testimony of SPsyc. and JE 21.)

SPsyc indicated that administration of the BASC was needed for in Student's case to assess his social emotional functioning. SPsyc with the assistance of the office clerk (Spanish speaker) left messages for Parent. Parent did not return the calls or otherwise respond. He was unable to complete the BASC due to Parent's lack of response. (Testimony of SPsyc and JE 21)

SPsyc determined not to administer a new psychological evaluation after reviewing the two prior evaluations and concluding Student has average intelligence which is sufficient information for evaluation purposes to identify needs and for educational planning. SPsyc also reviewed the prior evaluations academic assessments. Based on this review, current IEP and current classroom performance reports, SPsyc determined that the Wechsler Individualized Achievement test 3rd edition (WIAT- III) would be given to Student to measure academic achievement, which he did. Student's academic skills are well below grade expectancy levels. His relative strength is in math reasoning, with his computation skills less well developed and inconsistent. Student's reading skills are in the deficit range, where his limited decoding skills and vocabulary are impacting his reading comprehension. (Testimony of SPsyc. and JE 21)

SPsyc noted that Student's behaviors as assessed on the ADOS-2, are consistent to that of a student with Autism Spectrum Disorder. Student deficits in the areas of communication, reciprocal interactions and play skills all negatively impact Student's functioning in school. As a result, Student struggles to communicate effectively, has trouble with abstract reasoning and is a very concrete thinker. Finally, SPsyc indicated that Student's excessive absences are having a negative impact on his progress. SPsyc indicated that for 2 years in a row Student's absences have been about the equivalence of missing a quarter of each school year. This level of absence would be expected to have a severe impact on Student's academic and behavior growth. (Testimony of SPsyc. and JE 21)

SPsyc's report contains recommendations including possible classroom accommodations if found eligible for special education services. These recommendations included a plan to

28

improve attendance, use of visual supports and schedules, use of "first, then" language, additional time to process information and respond to questions, test one concept at a time, selective embed answers for tests assessing reading comprehension, and focus on improving math calculation skills. (JE 21)

### District Social Work Assessment

CSW testified that her portion of the reevaluation included a review of records, current level of functioning, student interview and completion of the Social Skills Improvement System (SSIS). CSW was unable to complete the parent interview due to parent unavailability, which she recorded in her report (JE 18). (FF #s 67, 68, 69, and 79.)

The SSIS assesses the areas of social skills; including communication, cooperation, assertion, empathy, engagement, self-control, and responsibility, and problematic behavior, academics and autism characteristics. Student's overall score fell in the below average range. Student is below average in the areas of empathy, assertion, responsibility, communication, self-control, engagement and cooperation. Problem behaviors were above average, indicating that there are social emotional concerns with Student's behaviors. Student's scores indicate above average functioning for autism characteristics, indicating Student demonstrates typical behaviors of Autism. (JE 18.)

CSW completed an observation of and an interview with Student. CSW noted that on the day of her observation there had been a fire drill earlier in the school day. Student was observed to be sitting alone, not engaged in activity, uninterested in or willing to participate in the class activity. Student was preoccupied with an object, throwing and catching it. Student was observed to transition to Music class with some redirection from staff. (JE 18)

CSW was able to interview Student. Her report of the interview clearly demonstrates that she has established rapport with Student and that he willing to engage in communication with her, expressing some likes and dislikes and preferred activities. CSW noted concerns about his excessive absences and emotional regulation concerns, especially in the morning. (JE 18) CSW testified that she requested the assistance of the Autism and Behavioral Health team to collect data for a FBA and develop a BIP in March 2017, but data collection did not occur due to Student's failure to return to school in February. (Testimony CSW.)

CSW's report also contained a review of Student's history, noting a history of high intensity emotional distress that results in aggressive behaviors. The report identifies rewards and motivators for Student and notes his strengths in independent functioning. (JE 18.)

CSW's report also contains recommendations to address Student's needs. Recommendations include use of visual cue and guides, structured learning environment, clear expectations, rewards, incentives and consequences, use social stories, model social and academic appropriate behaviors/expectations, use of first, then charts, and use of a behavioral chart for school and communication home. (JE 18.)

### District Speech/Language

CSpL completed a speech language assessment as part of the triennial evaluation of Student in February, 2017. CSpL reviewed records, history, completed a classroom observation and interview and conducted the CASL, a formal assessment. (Testimony of CSpL and JE 19.)

According to CSpL, Student experiences communication breakdowns when he is upset. At other times, he is able to communicate verbally with small, multiple word utterances for a variety of purposes. Student made good progress toward therapy goals while in direct services, so in spring of 2016 indirect services speech/language services were recommended for Student to provide consultation services to provide support for communication needs in the classroom. (Testimony of CSpL.)

During the assessment and interviews was given visual schedules and written cues, which enabled him to complete the evaluation tasks. During the observation, Student did not speak in class. He spoke in single words or short utterances, but when prompted to do so, was able to speak in grammatical sentences. Student had decreased eye contact, tending to avoid eye contact, but it increased over the testing sessions. Student has adequate oral tone and no motor concerns at this time. He speaks in a soft voice, but is able to speak with adequate vocal level when he chooses. Student's articulation allow for intelligible speech, although at times he has difficulty with /r/, but this does not impact his intelligibility. (JE 19)

CSpL gave Student the CASL (Comprehensive Assessment of Spoken Language) to provide measure Student's use and understanding of language, however due to Student's behavior and absence it was not completed. The CASL revealed that Student's receptive and expressive language abilities are scattered, ranging from the average to significantly below

average range. Subtests that were completed included antonyms, sentence completion, grammatical morphemes, sentence comprehension, non-literal language and pragmatic judgment. Student was moderately below average in antonyms, sentence completion, sentence comprehension, and significantly below average in the non-literal language and pragmatic judgment subtests. Student's speech is fluent. CSpL concluded that Student has a communication impairment that adversely impacts educational performance. CSpL recommended consultation services and classroom accommodations, including prompting to speak with adequate voice level, prompt participation in class activities and discussions, model use of language in social settings and have Student repeat as appropriate, prompt to indicate verbally or with written choices when he needs help, if he is thinking or if he needs a question repeated. (Testimony of CSpL and JE 19.)

CSpL testified that in 2015 before IEP moved from direct to indirect services, Student had met his goals and observed have the communication skills needed in the classroom. He was observed to be using his communication skills in class, office, in the hall and other settings at that time, unless behavior was a problem. Student's attendance causes him to miss services and communication opportunities with peers and in the educational setting. In class with a modified curriculum, when emotionally and physically regulated, Student has the speech/language ability needed to access the modified curriculum. If Student's only impairment was language, he would be able to access the general education setting, but it is not his only impairment. (Testimony of CSpL.)

TSpL testified that she had reviewed Student's IEP and the most recent Speech Language Evaluation completed by the District in the course of her work with him. She indicated that Student has significant language deficits that are causing significant difficulties in communication. TSpL indicated that she recommends the addition of a language sample and classroom observation to the most recent assessment. TSpL does not agree that Student's communication needs in school can be met with only consultative services. She would recommend direct services due to Student showing significant need on testing and in the classroom. TSpL indicated during her testimony that in consulting with Student's teacher, she learned that Student is having difficulties in the mornings, but no other problems were noted throughout the day. TSpL indicated that the outside speech evaluation is a clinical evaluation. (Testimony of TSpL.)

31

District Occupational Therapy Domain Determination

COT testified that to prepare for a domain meeting for a Student that was not on her caseload, she would complete a file review to determine if there was evidence of need in the motor section. If no evidence of need was found in the record review, no pending request for an occupational therapy ("OT") assessment, then she would complete the domain assessment need on the planning sheet and after consent was obtained, complete the necessary assessments base on the referral and suspected needs. In January, 2017, COT did not find any evidence of need for OT assessment during a review of Student's records and there was no OT referral. COT did not assess Student or complete a OT assessment report. COT further testified that OT as a related service was focused on goals connected to school environment and academic goals, which is different from the clinical model which focuses on motor function and sensory integration. (Testimony of COT,)

TOT testified that she recently reviewed Student's records and based on the recommendations of the outside psychologist and outside FBA she determined that an OT evaluation is needed. TOT did not complete any screenings because there was a referral, making screenings unnecessary. TOT testified that OT services, if needed by Student, could be provided in all school settings that Student access as a participant in the District cluster program. TOT testified concerning the difference between school based and clinical OT service model stating that school based services are related to access to student's curriculum while clinical services address deficits in all areas of life. (Testimony of TOT.)

Private Evaluations

Private Psychological Evaluation

Dr. M, Parent's expert witness and outside evaluator, is a clinical psychologist with an extensive background and experience (JE 60) , testified that the District's psychological completed in February 2017 was not comprehensive or appropriate for Student. Dr. M, completed an evaluation of Student at the request of Parents. (Testimony of Dr. M.)

Both psychological evaluations (JE 4 and JE 21) included a review of records including an academic history, previous psychological evaluations, teacher interview, student observation, achievement assessment, the ADOS-2, and summaries, conclusions and recommendations. Dr.

M's evaluation included an intelligence assessments, family history, health/medical history and summaries of assessments completed by the District. Parents did not respond to CES attempts to conduct parent interviews. The components included in Dr. M.'s evaluation such as family history and health history are normally contained in social work and school nursing assessment in the school setting. Dr. M. and SPsyc reached the same conclusions concerning Student concerning his cognitive and academic development, social communication and his overall behavioral and social-emotional functioning. (Testimony of SPsyc and Dr. M. and JE 4 and JE 21.)

Both psychologists concluded that Student has average intelligence. Both concluded that he has deficits in language abilities that impact his functional communication, language comprehension, socialization and learning. Both reported that Student displays Autism Spectrum characteristics, Dr. M gave a diagnosis, SPsyc properly differed educational diagnosis to the IEP eligibility team. (Testimony of SPsyc and Dr. M. and JE 4 and JE 21.)

Both psychologists made recommendations that were similar. Both recommended that Student receives visual supports for academics and behavioral concerns. Both included recommendations to provide structure to academic instruction. (Testimony of SPsyc and Dr. M. and JE 4 and JE 21.)

Dr. M's report does not indicate that he had any information concerning Student's excessive absences over the past few years. He testified at hearing that irregular attendance and missing several months of school can impact a child's performance. In addition, the information concerning how Student communicates at school and at home was inconsistent with information provided at hearing and in the private speech evaluation (JE1). The representations given in the report indicate a nearly non-verbal student and the testimony of CES and TES staff indicates that when emotionally regulated, Student communicates with his peers while at school and according to TSW is beginning to show interest in interacting with age level peers in gym (also observed by DH and described in detail at JE 1-8 to 9).

Psychological Evaluation Finding

I find that the District psychological evaluation used a variety of tools and strategies to collect relevant and sufficiently comprehensive information concerning the functional, developmental, and academic information about Student. The District psychological evaluation

33

did not include current information from the parent due to the Parents failure to cooperate with the evaluation process and respond to the District's attempts to gain their cooperation. I find that the District psychological evaluation was appropriate and sufficiently comprehensive to identify student's needs and for educational planning purposes.

Private Speech/Language Evaluation

HD is a bilingual private speech language pathologist with an extensive background in clinical and school speech language pathology. (JE 57.) HD was offered by Parents as an expert in bilingual speech language and her testimony was accepted as an expert as requested.

HD's report was based on a records review, a teacher report, a language exposure and least biased assessment, behavioral observations, formal and informal assessments of receptive and expressive language, language formation skills, pragmatic language and social communication skills, speech/sound production, voice, fluency, oral mechanism and hearing. HD found that Student experiences delays in expressive language, receptive language, and pragmatic language/social communication skills. Student's speech sound production, voice and fluency all fall within normal limits. Student's delays result in difficulty following multi-step directions, difficulty expressing him in complete sentences and using language skills to initiate and maintain conversations and to socialize with peers and less familiar adults. Student demonstrates the ability to understand and use both Spanish and English. Student demonstrated a preference for expressing himself in English. His comprehension skills were delayed in both languages. DH made specific recommendations for specialized instruction in receptive, expressive and pragmatic language including possible goals. She made recommendations, based on ISBE Eligibility Communication Matrix and her assessment, for direct speech/language services 1:1 and in a group setting for 30 minutes per week and 10 minutes per week of consultation for collaboration with service providers to support communication across school environments. (Testimony of DH and JE 1.)

DH's review of Student records and her assessments demonstrate that Student has significant speech language needs and that speech language services were decreased at a time when he was demonstrating significant behaviors and was unable to effectively communicate with others his needs and wants. DH asserts that Student's behavior and communication needs are related to each other. DH states that Student is unable to express his feelings and make

34

requests. She found her testing to be valid and the results were consistent with her observations in multiple settings. DH believes that because Student doesn't have a communication modality to use across settings and he is interested in technology, an AAC evaluation is warranted. DH believes that Student has a more effective communication system available to him, his behavior could decrease. (Testimony of DH and JE 1.)

Ruling on Objection to AW as Expert Witness in AT/ACC

Parents offered AW as an expert in speech language pathology and AT/ACC. AW is trained and certified as a speech pathologist and holds Illinois licenses in the same. She is employed by Shirley Ryan Ability Lab and in the course of her employment, she conducts assistive technology and augmentative communication evaluations as a speech pathologist. She does not hold certification from the Rehabilitation Engineering and Assistive Technology Society of North America. District did not object to the witnesses testimony being offered as an expert in speech pathology, but objects to her testimony as an AT/ACC expert due to her lack of certification in this area. The Federal Rules of Evidence Rule 702 states that an expert witness is someone who is qualified by knowledge, skill, experience training or education." By analogy applying this standard to AW, I find the lack of certification in AT/ACC to disqualify AW as an expert in the AT/ACC field, for like a paraprofessional in education is frequently involved in the completion of many of the same activities and tasks as a certified teacher, the certification is not meaningless, it in fact communicates to the world that the one certified as reached a minimum standard of knowledge, skill, experience training or education in the specific area/field of certification. Accordingly, I find that AW is not qualified as an AT/ACC expert. AW is accepted as an expert witness in the area of speech pathology.

ACC Evaluation

AW completed an informal assessment of Students needs for AT/ACC. Her assessment was completed in one hour and was based upon his diagnosis, parent interview and a current communications in home, school and community setting. No formal assessments were given, which is a typical practice for ACC.

During the assessment, Student was oriented to a Tobii Dynavox III, an ACC device. He was quickly able to understand and follow multi-step directions and typed out comments joining in the conversation. Student was motivated by the device and was very excited. Tobii Dynavox

35

III has the ability to write, word prediction and a keyboard. After demonstration and modeling on a core page and a keyboard page, EV was immediately able to use. During the session, Nova Chat and Indi, two other ACC devices were ruled out because due to his behaviors Student requires a more robust and easy to access keyboard and more topics and phrases. AW recommended that Student complete a 30 day trial of the Tobii Dynavox III in all settings. AW believes that Student needs this device to increase his communications.

Notably, AW did not review any school records or reports for her assessment. She did not speak to any school staff that works with Student. She did not review any of the outside evaluations either. She was not aware that Student participates verbally in school. TSpL testified that due to Student's ability to communicate verbally, she would not recommend AT/ACC for Student. (Testimony of TSpL.) The undersigned IHO must give deference to the opinions of professional educators in regards to educational issues. *Heather S. v. State of Wis.,* 125 F.3d 1045, 1057 (7th Cir. 1997). AW believes that Student's speech deficits are motor speech deficits. Accordingly, I find AW's findings lack and conclusions credibility and are unpersuasive.

Speech/Language Evaluation Findings

I find that the District speech language evaluation did not use a sufficient variety of tools and strategies to collect relevant and sufficiently comprehensive information concerning the levels of communication of Student and his needs. Although, the District speech language evaluation did not include current information from the parent ,due to the Parents failure to cooperate with the evaluation process and respond to the District's attempts to gain their cooperation and the CASL was not completed due to Student's behavior and absence, I find that the District speech and language evaluation plan was not appropriate in that it was not sufficiently comprehensive to identify student's needs and for educational planning purposes. I find that DH's evaluation of student was appropriate and comprehensive.

District Social Work Assessment Findings

I find that the District social work assessment used a sufficient variety of tools and strategies to collect relevant and sufficiently comprehensive information concerning the functional, social and emotional information about Student. The District social work assessment

did not include current information from the parent due to the Parents failure to cooperate with the evaluation process and respond to the District's attempts to gain their cooperation. I find that the District social work assessment was appropriate and sufficiently comprehensive to identify student's needs and for educational planning purposes.

### Issue Three:
### Whether District 299 violated E.V.'s right to a FAPE by failing to provide E.V. with an appropriate behavior intervention plan with appropriate positive behavioral interventions and supports, including a systematic data-driven behavior program from March 28, 2016 to the present?

Parents claim that the District failed to conduct a functional behavior assessment (FBA) and create a behavioral intervention plan (BIP) to address Student's aggressive behaviors during transitions to school and his work refusal behaviors. Student's transition to school behaviors had not improved, they were extreme and worsening. The District failed to collect data, evaluate behavior to determine their function and change their approach to address the behaviors at school. The District's response it that there is not enough data to create an effective BIP for Student.

Discussion

IDEA and the Illinois School Code requires that the IEPs of children whose behavior impedes learning (themselves or others) to provide positive behavioral interventions and supports, and other strategies to address that behavior. 20 USC §1415(k)(1), 34 C.F.R. 300.324(a)(2)(i), 23 Ill. Admin. Code 226.230(b), and 23 Ill. Admin. Code 226.400. Because the IDEA did not identify the specific components of the BIP that gap is left for the states to fill. (*See Alex r. v. Forrestville Valley Comm. Unit Sch. Dist.t #221,* 41 IDELR (7th Cir. 2004.)*citing Mason City Comm. Sch. Dist.,* 36 IDELR 193 (Dec. 13, 2001).) Illinois filled that gap. The Illinois regulations require the BIP to summarize the findings of the FBA, summarize prior interventions, describe any behavioral interventions to be used, including those aimed at developing or strengthening alternative or more appropriate behaviors, identify measurable behavioral changes expected and methods of evaluation, identify a schedule of review of the

37

interventions effectiveness and identify provisions for communicating with the parents about their child's behavior and coordinating school-based and home-based interventions. 23 Ill. Admin. Code 226.230(b).

Failure to conduct an appropriate FBA prevents the IEP team from having "sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors." *Harris v. D.C.,* 561 F.Supp. 2d 63, 68, (D.D.C. 2008). There is overwhelming evidence in this matter that Student has demonstrated frequent aggressive behaviors impedes his ability to access education in the mornings for a long period of time and therefore needed a FBA and BIP. Testimony presented in this matter by Student's parents, CES and TES staff members and outside evaluators indicate that Student also demonstrates refusal behaviors on a regular basis. (FF #4, 29, 30, 31, 51, 52, 53, and 91.) The March 28, 2016 IEP is the most recent IEP (FF # 45 and 80.)

The March 28, 2016 IEP contains a FBA and BIP. (JE 31-029 to 031.) SM, a certified BCBA reviewed the March 28, 2017, and previous FBA/BIP as a part of her private assessment. SM testified that the March 28, 2017 lacked clarity, contained the same target behavior as the prior FBA/BIPs, contained no changes in the intervention, demonstrating no behavioral progress and there was no supporting data. The current FBA/ BIP contains the same interventions that have been tried over the years and have not been successful because the problem behavior appears to be increasing in severity with the interventions increasing in restrictiveness. (Testimony of SM.) However, the BIP is not being implemented in the classroom at this time. (FF #93.) Therefore, the Student is not being provided with any type of behavior plan, his behaviors are being addressed ad hoc which has resulted in the need for a number of crisis intervention situations this year as well as in the past. An IEP that does not address disability-related actions of misbehavior and disruption in the classroom is not "reasonably calculated to enable the child to receive educational benefits" thereby denies the student a FAPE. *Alex R v. Forrestville Valley Community Unit School District No. 221,* 41 IDELR 146 (7th Cir. 2004.) Unfortunately, that is the situation for Student in this matter.

## Issue Four

## Whether District 299 violated Student's right to a FAPE by failing to provide Student with an appropriate individualized education program reasonably calculated to make meaningful progress from March 28, 2016 to the present, including specific goals, accommodations, related services and behavioral supports?

Parents argue that the District failed to draft IEPs that addressed Student's academic and functional needs from March 26, 2016 to the present. Student's IEP did not have a speech language goal to address his communication deficits. Student's IEP did not have a social emotional goal in the classroom, despite well documented difficulties with emotional-regulation. Student did not have a goal for writing. Parents argue that District's IEP did not have specific goals and did not include accurate present levels of performance (PLOP). Parents assert that District did not provide any evidence on how the goals were implemented and or tracked. Parents assert that the District filed to provide an IEP with appropriate related services, including appropriate speech therapy, social work, and augmentative communication.

District argues that it has provided Student with an educational program that has been appropriately ambitious in light of his unique circumstances and has allowed him to make meaningful progress. District points to the fact that Student has never been disciplined for his behaviors at school, and that he has made academic progress, as evidence by his reading of a 7th grade novel in class, answering comprehension questions about the book and his ability to work on 7th grade math concepts such as ordered pairs. District reminds us that Student has been enrolled in a cluster program because he requires a significantly modified curriculum in all core academic areas.

### Discussion:

The IDEA defines an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with 34 C.F.R. 300.320 through 34 C.F.R. 300.324." 34 C.F.R. 300.22. In addition to other requirements, an IEP must include a statement of the child's present levels of academic achievement and functional performance, articulate measureable educational goals, including academic and functional goals designed to meet the

39

child's needs that result from the child's disability, and specify the nature of the special service that the district will provide. 34 C.F.R.300.22 and 34 C.F.R. 300.320(a). An IEP must be tailored to the unique needs of that particular child. *Bd. of Educ. v. Rowley,* 458 U.S.at 81. "An IEP must respond to all significant facets of the student's disability, both academic and behavioral" to meet the substantive criterion of *Rowley. Alex R v. Forrestville Valley School,* 375 F.3d 603 (7th Circ. 2004).

The IDEA does not provide a separate definition for "appropriate."[9] *See 20 U.S.C. §1401.* The IEP must be reasonably calculated to provide more than trivial educational benefits and "likely to produce progress, not regression." *Alex R. v. Forestville Valley County Sch. Dist.*, 375 F.3d 603, 41 IDELR 146 (7th Cir. 2004). The 7th Circuit has expressly rejected the "substantial or meaningful progress" test that other circuits use and has held that a student who makes some or more than just trivial progress has received a FAPE. *Todd v. Duneland Sch. Corp,* 299 F.3d. 899, "Factors to consider in making such a determination include: '(1) the child's potential; (2) whether his IEPs were tailored to his unique needs; (3) whether his IEPs provided access to specialized services; (4) whether they addressed disability-related disruptive acts; and (5) whether the child achieved progress during the relevant time period.'" *Brad K. at 739, quoting Jaccari J. v. Board of Education of City of Chicago, District No. 299,* 690 F. Supp.2d. 687, 701-02 (N.D.Ill. 2010).

In addition, Illinois School Code requires that in the development of the IEP for a student who has a disability on the autism spectrum, the IEP team shall consider all of the following factors: (1) the verbal and non-verbal communication needs of the child, (2) the need to develop social interaction skills and proficiencies, (3) the needs resulting from the child's unusual responses to sensory experiences, (4) the needs resulting from resistance to environmental change or change in daily routines, (5) the needs resulting from engagement in repetitive activities and stereotyped movements, (6) the need for any positive behavioral interventions, strategies, and supports to address any behavioral difficulties resulting from autism spectrum disorder, (7) other needs resulting from the child's disability that impact progress in the general

---

[9] Recently, the Supreme Court in *Endrew F.* rejected the meaningful progress standard and instructed that an IEP must be reasonably calculated to enable a student with a disability to make progress appropriately ambitious in light of the child's circumstances. *Endrew F. V Douglas County Sch. Distr. RE-1,* 69 IDELR 174 (U.S. 2917). However, the IEP in question was developed and implementation began in this matter well in March of 2016, well before the *Endrew F.* decision. Application of *Endrew F.* in this matter would be ex post facto and which is not authorized by the IDEA.

education curriculum, including social and emotional development. 105 ILCS 5/14-8.02 (b) and 23 Il. Admin. Code §226.220(c).

"An IEP must respond to all significant facets of the student's disability, both academic and behavioral." *Alex R. ex rel. Beth R. v. Forrestville Valley Community Unit School District no. 221*, 375 F.3d 603, 613(7th Cir. 2004). Goals and short term objectives must be specific and capable of measurement because they contain accurate present levels of performance. *James v. Bd. of Educ. of Aptakisic-Tripp comm. Consolidated Sch. Dist.,* 642 F. Supp. 2d. 804, 833 (N.D. Ill. 2009). Goals must be measurable, based on present levels of performance, and include short-term objectives or benchmarks. 23 Ill. Admin. Code §226.230(a)(1) .

Following is a review and discussion of the District's March 28, 2016 IEP for Student.

(1) The Child's Potential

Student's has average intelligence, but due to his deficits in communication and behavioral deficits as demonstrated by poor eye contact, limited expressive language and delayed social abilities he has been determined eligible under the disability category of autism. (JE 21 and JE 60) SPsyc testified that a higher functioning student with autism, like Student, would likely be predict to have reading comprehension skills plateau at the 3rd or 4th grade level with decoding skills at about grade level. In addition, there would be an expectation that the student would be at about 3rd grade in math reasoning and higher in computation. It is not reasonable to expect a higher functioning student with autism to be at grade level in academic areas. Student such as this would also be expected to be comfortable in the school building, transition comfortably , but shut down outside of special education with one-two "meltdowns" per year. (Testimony of SPsyc.)

(2) Whether His IEPS Were Tailored To His Unique Needs

"An IEP must respond to all significant facets of the student's disability, both academic and behavioral." *Alex R. ex rel. Beth R. v. Forrestville Valley Community Unit School District no. 221*, 375 F.3d 603, 613(7th Cir. 2004), 20 USC §1414(d)(1)(A)(i)(II)  and 34 CFR §300.320(a)(2)(i)(A) – (B) .  Assessments of Student reveal that he has educational needs in the areas of communication, social-emotional, behavioral, and academic areas. (JE 1, 2, 4, 18, 19, and 21.)

Communication

Student spoke in single words or short utterances, but when prompted to do so, was able to speak in grammatical sentences. Student had decreased eye contact and tended to avoid eye contact. (JE 19.) Student also demonstrates scattered receptive and expressive language abilities are scattered, ranging from the average to significantly below average range. CSpL concluded that Student has a communication impairment that adversely impacts educational performance. CSpL recommended consultation services and classroom accommodations. TSpL indicated that Student has significant language deficits that are causing significant difficulties in communication. TSpL does not agree that Student's communication needs in school can be met with only consultative services. (Testimony of CSpL, TSpl and JE 19.) Despite evidence that Student experiences significant communication difficulties, the district did not provide him with a speech/language goal.

Behavioral

The evidence presented indicates that Student has behavioral problems related to work refusal and non-preferred activities ( i.e. when he doesn't want to do what is required of him) in the classroom and at home. (Testimony of Mother, Father, SET2, SET1, PARA, CSW and CSpL.) The IEP does not have a goal related to this area of need. The FBA/BIP mentions this behavior as a trigger to the problem behaviors, but fails to provide meaningful definition of the behavior or provide a baseline, or clear positive techniques to develop target or replacement behaviors as a result the FBA/BIP is not measurable and it cannot be assessed as required under IDEA and Illinois law.

Social/Emotional

Student is below average in the areas of empathy, assertion, responsibility, communication, self-control, engagement and cooperation. (JE 18.) The social-emotional goal provided for Student is to identify and manage his emotions and behaviors. This goal also fails to provide a clear definition of the behavior or provide a baseline data/PLOP. The goal fails to set forth how Student will identify his emotions or what constitutes an attempt. Therefore, it is not measurable and cannot be assess to track improvement or identify lack of success.

Academic

Student's reading and math goals display the same deficiencies at the goals above. They fail to identify PLOP, so there is no baseline, they are not clearly defined so that desired outcome

42

is vague as is the level of performance,( i.e. what is appropriate level?) The goal does not define attempts with any clarity so only the writer of the goal knows what it means.

(3) Whether His IEPs Provided Access To Specialized Services

Student's IEP provided him with access to social work services for 15 minutes per week, which is insufficient to provide Student with the level of structure, predictability, and practice necessary for students requiring a modified curriculum to acquire, master and generalize new skills of any type. Student's IEP does not provide him with any direct speech language therapy. The IEP provides for minimal indirect services for speech (30 minutes/quarter) and social work consultation (15 minutes/month), which is unlikely to provide sufficient time for regular collaboration to benefit Student who has significant deficits in these areas that impede Student's access to his modified curriculum.

(4) Whether They Addressed Disability-Related Disruptive Acts

As discussed in Issue Three above, the District did not appropriately address Student's dysregulation during transitions through the FBA/BIP or social/emotional goals.

(5) Whether The Child Achieved Progress During The Relevant Time Period.

In 2015, the IEP gave test scores and other data which could be used to compare with the same or similar scores or data. The 2016 IEP does not report and test scores or data, there are no levels indicated to determine the grade level or other measurement of instruction levels. (JE 49 and Je 31) and no IEP report card or other instrument reporting status or progress was presented as evidence of improvement. "A hearing officer need not accept school district claims as true regarding the reasonableness of IEP design." *Sch. Dist. of the Wisconsin Dells v. ZS*, 37 IDELR 34.

School districts must develop IEPs that provides a student with disabilities specially designed instruction that meet his or her needs" *Letter to Chambers,* 59 IDELR 170 (OSEP 2012)[10] Failure to do so would result in the denial of a FAPE to the student. The District's March 26, 2016 IEP was not tailored to his unique needs, did not provide him with access to the specialized service that he needed, did not address his disability-related disruptive acts and there

---

[10] *Letter to Chambers,* 59 IDELR 170 (OSEP 2012)

is no measurable indication that Student was able to process in his education since beginning this IEP. Accordingly, I find that the District's March 28, 2016 IEP was not designed to provide Student with a FAPE.

## Issue Five

## Whether District 299 violated E.V.'s right to a FAPE by failing to provide E.V. with any educational services from February 16, 2017 to the present?

Parents allege in their DPCN that the District failed to provide Student with any educational services from February 16, 2017 to present. Parents stated that Student has refused to attend school due to extreme anxiety and the potential hospitalization to occur again due to his difficulties at school. Parents requested an IEP meeting, and allege that the District did nothing to address the incident and provide educational services to meet Students behavioral needs. Parents further allege that the district response to the request for an IEP was to drop Student from its roles. Parent requested Student be assigned to an alternate cluster program. Parents allege that District failed to address its obligation to provide appropriate special education services to Student, who lives within the District and resolve any enrollment issues in order to provide the appropriate educational services at any District placement.

District's response to these allegations contained in the DPCN is that District made several attempts to contact the Parents and to hold meetings and schedule evaluations, but the Parents were unresponsive to the school. After February 16, 2017, the Parents refused to return the Student to school.

Parents argue that Student did not return to school after February 16, 2017 due to anxiety about returning school. Parents argue that the District's dropping Student from the roles was inappropriate and that as a result of being unenrolled, Student was denied a FAPE. Parents argue that the District used Student's not being enrolled as the basis to deny him an IEP or FAPE, developing an IEP is a necessary requirement for the provision of a FAPE. Parents argued that District used Student's un-enrollment as an excuse for its failure to complete an evaluation. Parents argue that they were attempting to advocate for Student and obtain an IEP meeting, but the District refused to conduct an IEP meeting and as a result Student did not receive educational services from February 16, 2017 to September 5, 2017.

District argues that it is obligated to make a FAPE available to a student with disabilities. District argues that any failure to provide services to Student was due to Parents failure to make Student available, not the District's failure to offer a FAPE. District argues that after February 16, 2107, Student's Parents refused to return Student to school, and refused to respond to the schools efforts to locate Student.

Discussion and Analysis:

School districts are required to make available to all children, including children with disabilities. 20 U.S.C. §1412(a)(1) and 34 C.F.R. §300.101(a)(1). The child find provision of the IDEA requires that districts identify, locate, evaluate and develop and implement a practical method to determine which children with disabilities are receiving needed special education and related services. 20 U.S.C. §1412(a)(3) and 34 C.F.R. §300.111. Illinois law mirrors federal law in this respect. 23 Ill. Admin. Code §226.200, and 23 Ill. Admin. Code §226.100.

There is no dispute in this matter that Student did not receive educational services between February 16, 2017 and September 5, 2017. The dispute in this matter centers on the reason(s) he did not receive educational services, specifically whether the District 299 failed to provide Student with educational services or whether the educational services were available to him but Parents did not make him available for the educational services.

Mother testified that Student refused to attend school after February 16, 2107 was due to extreme anxiety and fear of potential hospitalization. This assertion is not supported by other evidence in the record. Review of the student records entered into evidence in this matter did not yield a reference to a diagnosis of anxiety from any source. Records show that Student is under the care of a pediatrician, psychiatrist, and behavioral therapist, however no reports from any of these treatment providers were offered into evidence to support the claim Student suffers from anxiety of any type. Dr. M. mentions in his report that Mother "believes" Student overeats when anxious (JE 4-003) is the only reference to anxiety the undersigned located in the record. Dr. M.'s extensive review records provided to him by parents and his diagnostic impressions did not include any other reference to anxiety, but did include autism spectrum disorder and intermittent explosive disorder. (JE 4- 2 to 6 and 18 to 19.) It appears that it is Mother's belief that Student suffered from anxiety due to the incident at school.

45

Parents did not learn that the Student was no longer enrolled at CES until they were informed by their attorney after April 28, 2017. Before that date, Parents were unaware that Student had been un-enrolled, therefore, it did not have any effect on their decision to keep Student out of school. After learning that Student needed to be enrolled, Parents did not go to the school to enroll him.

The CDR and CCM did nothing to address the Parent's April 5, 2017 requests. The Parent's request and the un-enrolled status of the Student triggered the District's child find obligation. But, CDR and CCM did not follow-up with the Parents or their attorney concerning the need to enroll student. They did not offer to any assistance with the process or agree to schedule the IEP upon his enrollment. In short, District failed to meet its child find obligation from April 5, 2017 to September 5, 2017, when Student was enrolled and attended TES and failed to provide Student with a FAPE during this period.

In addition, the District stipulated that Student's teacher was on maternity leave from September 4, 2016 through April 28, 2017. (FF# 48 and 49.) There was no regular substitute teacher during that time period. An IEP that requires instruction by a special education teacher must be implemented by a teacher who meets the credentialing requirements of the state of Illinois School Code. Failure to provide one amounts to a denial of a FAPE. *Universal Academy Charter School ISD#4225-07,* 70 IDELR 84 (SEA MN 2017). This failure is not *de minimus. N.J.B. v. Murfreesboro City Sch.*, 67 IDELR 117(M.D. Tenn. 2016).

### Issues Six and Seven

**Whether District 299 violated Student's right to a FAPE by failing to allow Student's parents to meaningfully participate in the IEP process by failing to provide them with qualified interpreters from March 28, 2016 to present?**

**Whether District 299 violated Student's right to a FAPE by failing to allow Student's parents to meaningfully participate in the IEP process by failing to provide them with translated special education documents, including IEPs, evaluation reports,notices, consents, and excusal forms form March 28,2017 to the present?**

The IDEA guarantees the rights of parents to participate in, and receive notice of meetings concerning the identification, evaluation, and educational placement of the child and the provision of a FAPE to the child. 34 C.F.R. §300 501(b) and (c). "[T]he informed involvement of parents" is central to the IEP process. *Winkleman .v Parma City School Dist.,* 550 U.S. 516, 524, 127 S. Ct. School districts are also required to take whatever action is necessary to ensure that the parent understands the proceedings of the IEP team, including use of interpreters for parents whose native language is other than English. 34 C.F.R. §300.322(e). IDEA defines native language when used with respect to an individual who is limited English proficient as the language normally used by that individual. 34 C.F.R. §300.29.

Illinois School Code provides in relevant part that "[a]ny parent who is deaf, or does not normally communicate using spoken English, who participates in a meeting with a representative of a local educational agency for the purpose of developing an individualized educational program, shall be entitled to the services of an interpreter." 105 ILCS 5/14-8.02(G) . The Illinois Regulations for Special Education direct that the district shall take whatever action is necessary to facilitate the parent's understanding of and participation in the proceedings at the meetings, including arranging for and covering the expense of an interpreter for parents whose native language is other than English." 23 Ill. Admin. Code §226.530.

IDEA notices are required whenever a District proposes to initiate or change and whenever a District refuses to initial or change Student's the identification, evaluation, and educational placement of the child and the provision of a FAPE to the child. 34 C.F.R. §300.503(a). In addition, parents are to be provided with a copy of the procedural safeguards at least one time per year and upon the request for an evaluation, after receipt of a state complaint or due process complaint, during IDEA discipline procedures, or upon request of the parent. 34 C.F.R. §300.504(a). These notices must be provided to parents in an "understandable language" as defined by written language understandable by to the general public and provided in the native language of the parent. 34 C.F.R. §300.321(a)(1). There is no requirement that all IEP documents be translated in the IDEA, OSEP advises that doing so could provide benefits to the District and could aid districts in proving that parent have been fully informed about their child's educational program. *Letter to Boswell*, 49 IDELR 196 (OSEP 2007).

Illinois requires that the notice shall inform the parents of their rights and all procedures available pursuant to the IDEA and Illinois School Code concerning special education in the parents' native language, unless it is clearly not feasible to do so. 105 ILCS 5/14- 8.02(g) and 23 Ill. Admin. Code §226.500.

Discussion.

Parents assert in their DPCN that the District denied Student's parents the opportunity to fully participate in developing Student's educational program due to its failure to provide a "qualified interpreter" at the March 28, 2016 IEP meeting and its failure to provide translation of education documents. Parents assert that these resulted in inappropriate behavioral supports, the failure to conduct appropriate functional behavioral assessments, an inappropriate placement, un-

Parents argue that the District's failure to hold an IEP meeting as requested is the cause of Student's absence. Despite the provision in Student's IEP for transportation as a related service, Parents transported Student to school when he was in attendance. Evidence in this matter demonstrates that Student frequently was absent from school. (FF #    .) Prior to February 16, 2017, Student had already missed a substantial portion the school year, 37 of the 97 days he was enrolled in sixth grade. In fact, Student missed a substantial portion of each school year: 28 days in first grade, 30.5 in second, 36.5 in third grade, 27 in fourth grade, 48 days in fifth grade, 37 of the 97 days he was enrolled in sixth grade and at the last day of hearing 15 of 47 day in seventh grade. (IHO R 144.) District's failure to convene an IEP meeting at the request of Mother is not excused, but it does not appear to be the cause of his absence from school after February 16, 2017.

Further, Mother did not present Student at the school or make any contact with the school concerning Student's absence and she did not respond to the schools phone calls or letters sent concerning Student's absence. (Testimony of PRIN and CSW.) Mother testified that her phone had died around February 16, 2017 and that she did not replace it until July or August so she could not call. Finally, when she learned through her attorney that Student was no longer enrolled, she did not go to the school or any District office to enroll him.

Parents argue that District did nothing to address the incident and provide educational services to meet Students behavioral needs. Evidence shows that CES staff members called the numbers on file for Student concerning his absence. (FF #) In addition, the five and 10 day attendance letters were generated by the District computers and mailed to parents by the attendance clerk pursuant to building procedures. (FF #) Other staff members made calls but were unsuccessful in reaching Parents. (FF # ) CSW made a home visit, which was also unsuccessful. In addition, on March 1, 2017 CSW and CCM completed a request for assistance from the Autism Behavioral Health Team to address Student's behavior concerns. (Testimony of CCM, CSW, and JE 15) Parents were unresponsive to the school and did not actively pursue advocacy for Student until April, 2017. Consistent with District policy, Student was un-enrolled, however his placement at CES remained available for him at all times. District was willing and able to provide Student with the special education and related services contained in the March 28, 2016 IEP.

46

enrollment from CES, and the denial of educational services from February 16, 2017 to present (DCPN filed on June 30, 2017). (IHO A-5.)

District first asserts that parent's claims regarding the translation of IEP documents and/or interpreter services are actionable or that the hearing officer has the authority to order a remedy. District argues that the IDEA requires that a public agency must take steps to ensure that parents of a child with a disability are present at each IEP team meeting or are afforded the opportunity to participate.[11] District asserts that IDEA specifically addresses the use of interpreters by requiring that it "takes whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English."[12] District points out that the IDEA did not define this term or provide qualification beyond the common meaning of "interpreter." The District asserts that the purpose of the interpreter is to provide the Parents access to the conversation, in their own language which can be done through oral translation.

Parents argue that the interpreter must be someone "qualified" to provide accurate interpretation services to ensure that the parent understands the proceedings. The District argues that the IDEA (and its implementing regulations) does not provide a definition of the word "interpreter" and as a result, the ordinary meaning of the term must be used. The ordinary meaning of the interpreting involves the oral translation for parties conversing in different languages.

**Conclusions:**

### Translation

The evidence in this matter supports the finding that the District did not provide Parents with notice of their rights and procedures available to the IDEA and the Illinois School Code concerning special education in Spanish, the parents' native language as required by Illinois law. This failure did not result in a denial of FAPE as the Mother demonstrated sufficient understanding of those rights when she requested an FBA, change of placement, and an IEP for Student. (JE 12, JE 13, JE 14, and JE 27.) In addition, Mother has filed the instant due process complaint as an exercise of her rights. Accordingly, I find this violation did not result in the denial of a FAPE to Student. However, the District is ordered to provide Student's parents with a copy of the notice of the parents of their rights and all procedures available pursuant to the IDEA and Illinois School Code concerning special education in Spanish.

---

[11] 34 C.F.R. §300.322(a)
[12] 34 C.F.R. §300.322(e).

<u>Interpretation Services</u>

The State of Illinois does not have certification or licensure for interpreters or translators. In Illinois private interpretation/translation service agencies provide interpreters and translators with training and assessment of their language proficiency before they "certify" individuals as interpreters. The U.S. Department of Education advises SEAs (*state educational agencies*) and LEAs (*local educational agencies*) need to provide language assistance to parents effectively, with appropriate, competent staff or appropriate and competent outside resources. https://www2.ed.gov/about/offices/list/oela/english-learner-toolkit/chap10.pdf. The goal is successful communication. According to the U.S. Department of Education , "successful communication provides LEP  parent the school-related information that they need to make informed decisions about and be helpful participants in, their child's education." *Id.* A goal of the IDEA is for parents of students with disabilities to be meaningfully involved in the educational decision-making process for their children.

First, Parents' assertion that the District's failure to provide them with "qualified" interpreters and translation of documents from March 28, 2016 to present has prevented their meaningful participation in the IEP process appears on its face to be without merit. The evidence presented shows that the District has not convened an IEP meeting for Student since March 7, 2017.  This hearing officer finds that the District's failure to convene a meeting was not caused by its failure to provide interpreters or translated documents to Parents.

Next, evidence in this matter also shows Mother was a meaningful participant who successfully communicated with the IEP team concerning Student.  At the March 7, 2017 IEP meeting, Mother successfully communicated parents' concerns for Student.  Mother testified that due to the lack of interpreters at March 7, 2016 IEP meeting it was difficult for her to participate, she could not fully understand the communications, express her concerns for Student and she was never listened to by the IEP team.  (Testimony of Mother.)  After testifying she was not able to express her concerns for Student, she later testified that she was able to express her concerns about Student's behaviors, need for speech therapy, attendance problems, and her interest in Student being educated in his home, but she wasn't listened to by the team.  Mother testified that at the March meeting the team discussed speech therapy and decreasing Student's speech therapy services because he is able to talk.  But the IEP team did listen to her and recorded in the draft IEP notes parent's concerns about Students' inability to manage his

emotions, his physical aggression, his future, his communication abilities and self-expression. The IEP draft also notes that Parents reported Student's sensitivity to illness and interest in homebound services. (JE 33-004.) Further evidence of Mother's active and informed involvement in the IEP meeting is found in the fact that after the meeting, Mother reviewed the draft IEP and requested specific and substantial revisions to the IEP at some time between the March 7, 2016 meeting and the March 21, 2016 Waiver of IEP Revision Meeting form being signed. (JE 32.) The District adopted and incorporated the revisions requested by Mother. (Testimony of Mother, JE 31, JE 32, and JE 33.) Mother was fully informed and afforded meaningful participation in the IEP process that began at the March 7, 2016 meeting and continued to the March 28, 2016 revisions of the IEP. Absence of an interpreter and translated documents at the meeting or thereafter did not result in language barriers that caused the denial of meaningful participation by Mother. On the contrary, Mother was an active and a major contributor in the decision-making process for Student in the IEP process the developed the March 28, 2016 IEP.

For the reasons stated above, Parents have failed to provide a preponderance of evidence that the District's failure to provide interpreters and translated documents prevented them from meaningfully participating in the IEP process from March 28, 2016 to the present. Accordingly, Parents request for an order requiring the District to provide specifically trained interpreters and translated documents is denied. [13]

## Eight:

### Districts' Burden Of Production

The District has a statutory duty to produce evidence; however, it has not established that Student's educational services were "adequate, appropriate and available."

---

[13] *This order should not be interpreted to in any way limit either party in requesting or responding to any future requests for the same services.*

51

## Whether the District's Above Failures Denied Student a Free Appropriate Public Education?

As stated above, when the provision of a FAPE is at issue, allegations of procedural violations may arise to a denial of a FAPE to a child with a disability only if the alleged violations are found to have impeded the child's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process or caused a deprivation of educational benefit. 20 U.S.C. 1415(e)(3)(E)(ii), 34 C.F.R. §300.513(a)(2). District must comply with both procedural and substantive requirements to provide students with a FAPE. *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. Westchester Cnty v . Rowley,* 458 U.S. 176 (182). The district has made procedural and substantive errors: 1) failing to respond to two parental requests for IEPs which prevented their participation in Student's education and resulted in educational loss to him; 2) failing to conduct appropriate, comprehensive speech language evaluation; 3) failing to provide student with the Student an appropriate FBA and BIP; 4) failing to Student with an IEP designed to provide a FAPE; 5) failing to meet its child find obligation from April 5, 2017 to September 5,2017 and failed to provide Student with a FAPE during this period; and 6)    failing to provide a special education teacher for Student from September 4, 2016 through February 16, 2016.

Parents have requested reimbursement and compensatory education. Compensatory education is a prospective denial for a past denial of FAPE. *Reid v. District of Columbia,* 43 IDELR 32 (D.D.C. 2008). The Seventh Circuit has not adopted a standard for awarding compensatory education, but the Northern District has used a flexible individualized approach to determine how much compensatory education, if any is necessary to restore the student to a point how would have been in if the he had not been denied a FAPE. *Petrina W. v City of Chicago Pub. Sch. Dist. 299,* 53 IDELR 259 (N.D. Ill. 2009)

The parent has requested an independent educational evaluation (lEE) at public expense. After a determination that a district's re-evaluation is inappropriate, a student is entitled to an lEE at public expense as a matter of law. M.Z. v. Bethlehem Area School District, 60 IDELR 273, p.3 (3rd Cir. 2013).

52

## ORDER

### IT IS ORDERED THAT:

1.    That the District shall reimburse the parents for the amounts they have paid for DH's speech/language evaluation ($3,074.30) and for SM Functional Behavior Assessment ($3,433.30).

1.    The District shall convene an IEP meeting within 14 days of this order to revise the student's IEP to include:

      a.    30 minutes per day of ABA school based behavior therapy in the special education setting for the remainder of the 2017-18 school year including ESY;

      b.    30 minutes/two times per week of direct speech services in the special education setting, working 1:1 or in a small group setting to provide services consistent with DH's recommendations;

      c.    30 minutes per week of social work services and social work goal for emotional regulation;

      c.    to include goals for social skills acquisition;.

      d.    to include speech/language goals in receptive, expressive and pragmatic language consist with the recommendations contained in DH's report;

      e.    to include all the accommodations and modifications contained in DH's report;

      f    to include academic goals that are specific and measurable.

2.    The District to provide Student with an appropriate behavior intervention plan consistent with the independent functional behavioral analysis ("FBA") prepared with the assistance of a BCBA, consistent with the standard articulated in SM's report, including a provision to data review not less than once per week, with a provision to provide parents with a weekly written report of the review results within 21 days of this order.

3.    The District shall provide in-home Applied Behavior Analysis ("ABA") therapy for three (3) hours per week for six months to be completed by the end of the 2017-2018 school year.

    In accordance with 105 ILCS 5/14-8.02a(h), within 45 school days of receipt of this Order, the District shall submit proof of compliance to:

        Illinois State Board of Education
        Program Compliance Division
        100 North First Street
        Springfield, IL 62777-0001

## NOTICE OF RIGHT TO REQUEST CLARIFICATION

Pursuant to 105 ILSC 5/14-8.02a(h) either party may request clarification of this decision by submitting a written request to the Hearing Officer within five (5) days of receipt of the decision. The request for clarification shall specify the portions of the decision for which clarification is sought. A copy of the request shall be mailed to all other parties and the Illinois State Board of Education, Program Compliance Division, 100 North First Street, Springfield, IL 62777. The right to request clarification does not permit a party to request reconsideration of the decision itself and the Hearing Officer is not authorized to entertain a request for reconsideration.

## NOTICE OF RIGHT TO APPEAL

This is the final administrative decision in this matter. Pursuant to 105 ILCS 5/14-8.02a(i), any party aggrieved by this Hearing Officer Determination may bring a civil action in any state court of competent jurisdiction or in a District Court of the United States without regard to the amount in controversy within one hundred and twenty (120) days from the date the decision is mailed to the party.

Dated: November 24, 2017                    _____,

           Impartial Hearing Officer
           1163 Fawn Circle
           Manteno, IL 60950
           815-468-8419
           kathleenfuhrmann@kfuhrmannlaw.com

## NOTICE OF RIGHT TO REQUEST CLARIFICATION

Pursuant to 105 ILSC 5/14-8.02a(h) either party may request clarification of this decision by submitting a written request to the Hearing Officer within five (5) days of receipt of the decision. The request for clarification shall specify the portions of the decision for which clarification is sought. A copy of the request shall be mailed to all other parties and the Illinois State Board of Education, Program Compliance Division, 100 North First Street, Springfield, IL 62777. The right to request clarification does not permit a party to request reconsideration of the decision itself and the Hearing Officer is not authorized to entertain a request for reconsideration.

## NOTICE OF RIGHT TO APPEAL

This is the final administrative decision in this matter. Pursuant to 105 ILCS 5/14-8.02a(i), any party aggrieved by this Hearing Officer Determination may bring a civil action in any state court of competent jurisdiction or in a District Court of the United States without regard to the amount in controversy within one hundred and twenty (120) days from the date the decision is mailed to the party.

Dated: November 24, 2017

Impartial Hearing Officer
1163 Fawn Circle
Manteno, IL 60950
815-468-8419
kathleenfuhrmann@kfuhrmannlaw.com

54

**APPENDIX A**

E        V        v. City of Chicago School District 299
Case No: 2017-0501

| Student | E        V        (Student) |
|---|---|
| Attending School | Talcott Elementary School (TES) |
| Former School | Chopin Elementary School (CES) |
| Mother/Petitioner | Aixia H        (Mother) |
| Father/Petitioner | Carlos V        (Father) |
| Talcott Special Education Teacher (2017-2018 SY) | Susan Willeford (SET1) |
| Chopin Special Education Teacher (2016-2017 SY) | Suzanne Sabbia (SET3) |
| Chopin Special Education Teacher (2015-2016 SY) | Bridget Squitieri (SET2) |
| Chopin Paraprofessional | Calvin Hardy (PARA) |
| Chopin Case Manager | Georgine Giankopoulos |
| Talcott School Social Worker | Leticia Hernandez (TSW) |
| Chopin School Social Worker | Nicole Preucil (CSW) |
| Talcott Speech/Language Pathologist | Vasiliki Bilitsis (TSpL) |
| Chopin Speech/Language Pathologist | Stephanie Thompson (CSpL) |
| Private Speech/Language Pathologist | Anna Ware (PSpL1) |
| Private Bilingual Speech/Language Pathologist | Holly Delgada (HD) |
| Talcott Occupational Therapist | Rachel Raymond (TOT) |
| Chopin Occupational Therapist | Margaret Montejano (COT) |
| Chopin Principal | Frederick Williams (PRIN) |
| Chopin Assistant Principal/Bilingual Lead Teacher | John McNulty (AP) |
| School Psychologist | Noel Schecter (SPsyc) |
| Talcott District Representative | Megan Wallace (TDR) |
| Chopin District Representative | Della Richards (CDR) |
| District Manager, Autism and Behavioral Health Team | Kylie Kosmacek (KK) |
| Clinical Psychologist | Dr. Hector Machabanski (Dr. M.) |
| Private BCBA | Selma Martinez, BCBA (SM) |
| Interpreter Service Provider | Lourdes Lonergan (LL) |

CERTIFICATE OF SERVICE VIA EMAIL

I, the undersigned Kathleen C. Fuhrmann, certify that on November 24, 2017, a copy of FINAL DETERMINATION AND ORDER was/were served upon the following persons via email transmission by attached said document(s) in pdf format to the email addresses set forth below:

**Margie Wakelin**
**Melanie Grant**
**Equip For Equality**
**20 N. Michigan Ave., Suite 300**
**Chicago, IL 60602**
**melanie@equipforequality.org**
**Margie@ equipforequality.org**

**Katie Ilijic**
**Chicago Public Schools - Due Process & Mediation**
**42 W Madison Street, 2Nd Floor**
**Chicago, IL 60602**
**kilijic@cps.edu**

**Andrew Eulass**
**Due Process Coordinator**
**Illinois State Board of Education**
**Division of Special Education Services**
**100 N. 1st Street**
**Springfield, IL 62777**

Date: November 24, 2017          Signed: _Kathleen C. Fuhrmann_
                                 Kathleen C. Fuhrmann
                                 1163 Fawn Circle
                                 Manteno, IL 60950
                                 815-468-8419
                                 kathleenfuhrmann@kfuhrmannlaw.com

56