# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

H.P., E.V., G.G., R.L., J.B., J.M., O.L., and )
M.P., by their parents and next friends, )
VICTORIA G., HECTOR P., AIXIA H., )
CARLOS V., ASENCION G., MIREYA L., )
MIRIAM B., ROSALBA C., XI LONG L., and )
IZABELA P., for themselves and all others )
similarly situated; )
                                                   )
VICTORIA G., HECTOR P., AIXIA H., )
CARLOS V., ASENCION G., MIREYA L., )
MIRIAM B., ROSALBA C., XI LONG L., and )
IZABELA P., for themselves and all others )
similarly situated; )
                                                   )
                    Plaintiffs, )
                                                   )          No. 18 C 621
      v. )
                                                     )          Judge Sara L. Ellis
BOARD OF EDUCATION OF THE CITY OF )
CHICAGO; DR. JANICE JACKSON, Chief )
Executive Officer of Chicago Public Schools, )
in her official capacity; ILLINOIS STATE )
BOARD OF EDUCATION; and DR. TONY )
SMITH, State Superintendent of Education, in )
his official capacity, )
                                                     )
                    Defendants. )

## OPINION AND ORDER

Plaintiffs, eight Chicago Public School ("CPS") students and their parents, have filed this putative class action against Defendants the Board of Education of the City of Chicago and Dr. Janice Jackson, the Chief Executive Officer of CPS (collectively, the "CPS Defendants"), and the Illinois State Board of Education ("ISBE") and Dr. Tony Smith, the State Superintendent of Education (collectively, the "ISBE Defendants"). Plaintiffs claim that the CPS and ISBE Defendants systematically fail to provide CPS students with disabilities, whose parents are

Limited English Proficient ("LEP"), with a free appropriate public education ("FAPE") as required by federal law because the CPS and ISBE Defendants do not provide translations of documents or competent interpretation services for the LEP parents during the individualized education program ("IEP") process. Specifically, in the first amended complaint ("FAC"), Plaintiffs allege violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (count I against the CPS and ISBE Defendants and count II against the ISBE Defendants); Title VI of the Civil Rights Acts of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.* (count III against the CPS and ISBE Defendants and count IV against the ISBE Defendants); the Equal Educational Opportunities Act, 20 U.S.C. § 1701 *et seq.*(count V against the CPS and ISBE Defendants and count VI against the ISBE Defendants, with both counts solely on behalf of the Student Plaintiffs); and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (count VII against the CPS Defendants).

The CPS Defendants have moved for dismissal of all the claims against them (Counts I, III, V, and VII).[1] Although the Court concludes that no exception exists to the exhaustion requirement, because E.V. and his parents exhausted their claims and they are not moot, the remaining Plaintiffs need not pursue the administrative process before proceeding on similar claims here. H.P. and his parents, however, cannot proceed on their claims against the CPS Defendants because they received the relief requested in this lawsuit through the administrative process. Although further development may prove otherwise, the Court finds that, at this stage, the remaining Plaintiffs have sufficiently alleged a claim under the IDEA and for intentional discrimination in violation of Title VI.

---

[1] The ISBE Defendants have answered the FAC. Although the CPS Defendants filed their motion to dismiss with respect to Plaintiffs' initial complaint, the FAC only removes two of the named Plaintiffs and does not affect the CPS Defendants' arguments. Therefore, the Court considers the motion to dismiss in light of the FAC.

## I.     The IDEA

The IDEA requires local educational authorities, like CPS, to provide a FAPE to eligible children with disabilities between ages three and twenty-one.  Under the IDEA, CPS "must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP."  *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, --- U.S. ----, 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017) (quoting 20 U.S.C. § 1401(9)(D)).  The IEP is a "comprehensive plan" prepared by CPS officials, teachers, and the child's parents.  *Id.*  Certain procedural safeguards exist to ensure a parent's meaningful participation in the IEP process.  As relevant here, CPS must obtain informed written parental consent to provide special education services, initial evaluations, and reevaluations.  Consent means that "[t]he parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication."  34 C.F.R. § 300.9(a).  Additionally, CPS must provide certain notices to parents and ensure that such notice "is in the native language of the parents, unless it clearly is not feasible to do so."  20 U.S.C. § 1415(b)(4), (d)(2); 34 C.F.R. § 300.503(c).  And, for IEP meetings, CPS "must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English."  34 C.F.R. § 300.322(e).

Parents have the right to file a due process hearing complaint and participate in mediation under the IDEA.  The due process hearing system is the primary way to challenge decisions

---

[2] The facts in the background section are taken from Plaintiffs' FAC and exhibits attached thereto and are presumed true for the purpose of resolving the CPS Defendants' motion to dismiss.  *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

3

made with respect to the IEP process and the provision of a FAPE to a child with disabilities. The ISBE is responsible for establishing and administering this administrative review process.

## II.  CPS' Provision of Services Required Under the IDEA

For the 2016-2017 school year, CPS reported that 52,093 students enrolled in CPS had IEPs. Of those students, forty-two percent have LEP parents. Over 19,000 LEP households communicate in Spanish, over 300 in Polish, almost 300 in Arabic, and almost 200 in Chinese. CPS collets information regarding the household language of all CPS students through a Home Language Survey. Every IEP notes the parents' primary language and whether an interpreter is needed to communicate with the parents.

Despite having such information, CPS does not have a policy or practice of providing written translations of IEP process documents to LEP parents.[3] CPS does not provide independent interpreters for LEP parents at IEP and other special education meetings. It sometimes uses CPS personnel as interpreters on an ad hoc basis, but CPS has no policy to determine their competence, including their proficiency and knowledge of specialized IEP terms and vocabulary in both languages and their ability to adhere to their roles as interpreters without deviating to another role. CPS also does not provide training or guidance on the standards of interpretation. As a result, CPS personnel acting as interpreters have often summarized reports instead of providing them in full, editorialized reports, failed to fully and accurately interpret parents' statements, and failed to properly convey technical vocabulary to the parents.

_____

[3] The process documents that Plaintiffs claim should be translated include the IEP, Notification of Conference, Conference Recommendations, Procedural Safeguards Notice, Consent for Initial Evaluation, Consent for Reevaluation, Evaluation Reports, Eligibility Determination, Manifestation Determination, IEP Progress Reports, and Medicaid Consent Forms.

**III.    Individual Plaintiffs' Experiences**

**A.    H.P., Victoria G., and Hector P.**

H.P., a twelve-year-old seventh grade student at Finkl Elementary School, qualifies for special education services.  His parents, Victoria G. and Hector P., are native Spanish speakers. H.P.'s IEPs indicate that his household mainly speaks Spanish and that his parents need an interpreter.

On May 11, 2016, Victoria G. and Hector P. attended H.P.'s IEP meeting to discuss plans for the following school year.  H.P.'s school social worker, who has no interpretation training, served as the interpreter in addition to providing input for the IEP.  The IEP team discussed transferring H.P. to his neighborhood school and removing his bus transportation.  Victoria G. and Hector P. believed they voiced their disagreement with these recommendations, but the IEP team adopted them.  At the end of the meeting, Hector P. signed an Agreement to Proceed with IEP Meeting, which was only in English.  Hector P. did not understand the document, which gave consent to CPS to complete the IEP and provide a copy to H.P.'s parents the following day. H.P.'s parents did not receive the IEP the following day, and, when they did, it was only in English.  The IEP removed H.P.'s transportation and behavioral support services and returned H.P. to his neighborhood school.  H.P.'s parents did not understand the IEP's conclusions and instead returned to Finkl several days before the 2016-2017 school year's start to obtain a supply list for H.P.  Finkl reported that H.P. was not enrolled there.  On September 3, 2016, Victoria G. and Hector P. requested mediation, and H.P. missed the first week of school while CPS considered their complaint.  Ultimately, H.P. returned to Finkl but without bus transportation or behavioral support services.

On April 5, 2017, Victoria G. and Hector P. filed a due process complaint notice contending that CPS' failure to provide translated IEP process documents and competent interpreters denied H.P. a FAPE. In a pre-hearing ruling on their complaint, the hearing officer struck all systemic requests for relief for lack of jurisdiction. After the filing of the due process complaint, CPS continued to send Victoria G. and Hector P. documents only in English, including a document seeking consent for psychological and other evaluations of H.P., which Hector P. signed despite not understanding its content. On June 9 and June 19, 2017, Victoria G. and Hector P. participated in eligibility and IEP meetings for H.P. The bilingual specialist at H.P.'s school served as an interpreter, but she did not have any interpretation training and indicated confusion with special education terminology. Victoria G. and Hector P. requested the IEP process documents in Spanish but did not receive them. They also did not fully understand the discussions that took place at these meetings.

A hearing officer held a four-day hearing in September 2017 on H.P.'s parents' due process complaint. She ruled in H.P.'s favor, concluding that CPS' failure to provide qualified translators and translated documents violated H.P. and his parents' rights under the IDEA. The hearing officer ordered CPS to provide qualified interpreter services to H.P.'s parents at all future IEP meetings and required those interpreters to undergo specific training and have certain certifications. The hearing officer indicated that the interpreters were not to play any other role at IEP meetings to ensure neutrality and impartiality. The hearing officer also required CPS to translate H.P.'s vital IEP process documents into Spanish. As of the filing of the FAC, CPS had not complied with the order, failing to provide a translated IEP document from a November 7, 2017, IEP meeting and H.P.'s IEP progress report. Victoria G. and Hector P. also did not receive

a copy of the hearing officer's October 2, 2017, order or any other documents related to the due process hearing in Spanish.

Hector P. participated in additional state-sponsored mediation on January 9, 2018, to address another issue with H.P.'s placement. The initial interpreter was a CPS aide who had not received training in interpretation and did not interpret significant portions of the initial statements and summarized key information. Hector P. requested a new interpreter. Subsequently, H.P.'s case manager, who has not received interpretation training, translated for Hector P. The parties did not reach a resolution during the mediation.

### B. E.V., Aixia H., and Carlos V.

E.V., a twelve-year-old seventh grade student in the cluster program at Talcott Elementary, qualifies for special education services. His parents, Aixia H. and Carlos V., are native Spanish speakers. E.V.'s IEPs indicate that the family primarily speaks Spanish at home and that his parents need an interpreter. Despite this knowledge, CPS did not provide Aixia H. and Carlos V. with vital IEP process documents in Spanish, causing Aixia H. to use web-based translation services, such as Google Translate, in an attempt to understand the documents.

Both Aixia H. and Carlos V. attended an IEP meeting on March 7, 2016, at which CPS did not provide an interpreter. Aixia H. and Carlos V. did not understand much of the meeting and could not convey information to the IEP team about E.V.'s behavior and transition difficulties. CPS provided the IEP to E.V.'s parents only in English, with Aixia H. again spending several hours using Google Translate to understand the IEP. Aixia H. then wrote a letter to CPS in Spanish, using Google Translate to translate it into English, expressing her concerns about services not included in E.V.'s IEP. CPS thereafter asked Aixia H. to sign an IEP Revision, which Aixia H. did not understand but signed because she believed that E.V.

would not get the IEP services unless she signed it. The IEP did not address Aixia H. and Carlos V.'s concerns about E.V.'s behavior and instead reduced E.V.'s social work support and kept in place the same behavior intervention plan. Aixia H. spoke with E.V.'s social worker on February 14, 2017, to request that further communications occur only in Spanish. Because CPS continued sending documents only in English, Aixia H. and Carlos V. did not understand that CPS was reevaluating E.V. and trying to schedule an IEP meeting in March 2017. Aixia H. wrote a letter in Spanish asking for an IEP meeting on March 7, 2017, but CPS never responded. No IEP meeting took place in March 2017.

On June 29, 2017, Aixia H. and Carlos V. filed a due process complaint notice, claiming that E.V. did not receive a FAPE because CPS failed to translate vital IEP process documents and interpreters for special education meetings. The hearing officer struck E.V.'s systemic requests for relief for lack of jurisdiction in a prehearing ruling. On November 24, 2017, after a five-day hearing, the hearing officer concluded that CPS' failure to provide interpreters or translated documents did not deny E.V. a FAPE. E.V. and his parents received a copy of the hearing officer's decision in Spanish on January 3, 2018. But ISBE has not provided them with any of the other documents related to the due process hearing in Spanish.

After receiving the hearing officer's order, CPS held a meeting on November 27, 2017, to plan for E.V.'s reevaluation. Aixia H. and Carlos V. asked for written translations of the documents discussed, which CPS did not provide them before or at the meeting. The principal served as the interpreter and failed to interpret large parts of the meeting. On December 4, 2017, CPS held an eligibility and IEP meeting to discuss the evaluation reports. CPS again did not provide these reports in Spanish to Aixia H. and Carlos V. Both the principal and assistant principal acted as interpreters and again did not interpret significant parts of the meeting.

### C. R.L. and Mireya L.

R.L., a nineteen-year old post-twelfth grade student at Whitney Young High School, qualifies for special education services. Mireya L., R.L.'s mother, is a native Spanish speaker. R.L.'s IEPs indicate that his household primarily speaks Spanish and that parent communications require an interpreter. Despite knowing this, CPS did not provide Mireya L. with translated vital IEP process documents or competent interpretation services. To the extent an interpreter was present during IEP meetings, the translator inaccurately summarized information, added her own opinions, answered questions herself, and misinterpreted technical terms.

On January 12, 2017, Mireya L. attended an IEP meeting. Although CPS indicated a school staff member would act as an interpreter, no interpreter attended. Mireya L. did not understand the substance of the meeting, which took place in English, and she received an English copy of R.L.'s IEP. She believed R.L. would continue attending Whitney Young and receiving vision itinerant services, transportation, speech therapy, and orientation and mobility services for the next school year. But instead, R.L. was scheduled to graduate, terminating his special education eligibility. Mireya L. only learned of this at the start of the 2017-2018 school year. Ultimately, CPS reversed R.L.'s graduation and reinstated him three months into the school year.

### D. O.L. and Xi Long L.

O.L., a nine-year-old fourth grade student at Finkl, qualifies for special education services. O.L.'s father, Xi Long L., is a native Mandarin speaker and reads and writes Chinese Simplified. Xi Long L. completed CPS' Home Language Survey and believed he requested to receive documents in Chinese Simplified and Mandarin interpretation services. O.L.'s IEPs indicate that her family primarily speaks Mandarin at home and that parent communications

require an interpreter. But CPS did not provide translated IEP process documents or an interpreter to Xi Long L.

At O.L.'s October 3, 2017, IEP meeting, Xi Long L. requested at least a teleinterpreter, but CPS denied the request, indicated it could not find a Mandarin interpreter, and used Google Translate to communicate with Xi Long L. Xi Long L. attempted to request additional speech and occupational therapy services and use of an augmentative communication device for O.L. He also wanted to ask more about O.L's academic program, her lack of progress, and what he could do to support O.L.'s progress at home, but the lack of an interpreter hindered his ability to do so. Upon receiving O.L.'s IEP, Xi Long L. took it to O.L.'s private speech pathologist, who informed him that the IEP did not incorporate changes recommended by O.L.'s private therapists. In December 2017, Xi Long L. found an assistive technology referral in English in O.L.'s backpack, which O.L.'s private speech pathologist explained to him. Xi Long L. sought to discuss the referral more fully with O.L.'s IEP team, but no such meeting was held.

### E.    J.M. and Rosalba C.

J.M., a seven-year-old second grade student at Octavio Paz charter school, qualifies for special education services. Rosalba C., J.M.'s mother, is a native Spanish speaker. J.M.'s IEPs indicate that his household primarily speaks Spanish and that his mother needs an interpreter.

At a November 10, 2016, eligibility meeting to discuss J.M.'s speech evaluation, CPS did not provide an interpreter, and Rosalba C. did not receive a copy of the evaluation report in Spanish. The IEP team told Rosalba C., in English, that J.M. would be exited fully from special education services. Rosalba C. could not properly respond to this decision. She requested additional evaluations on November 16, 2016, and January 10, 2017, but CPS, in English, denied

these requests.  CPS did reevaluate J.M. after he obtained legal representation and again found him eligible for special education services on December 7, 2017.

### F.     J.B. and Miriam B.

J.B., an eight-year-old third grade student at Mozart Elementary School, qualifies for special education services.  Her mother, Miriam B., is a native Spanish speaker.  J.B.'s IEPs indicate that the household primarily speaks Spanish and that her mother needs an interpreter.

On March 24, 2016, during a meeting to discuss a reevaluation, the school special education case manager served in the dual roles of interpreter and case manager.  The case manager did not interpret the entire discussion or fully explain the evaluation process to Miriam B.  Miriam B. also did not receive Spanish translations of documents describing the assessments CPS intended to conduct.  Nonetheless, Miriam B. signed the Consent for Reevaluation form.  The plan did not provide for assessments required to determine whether J.B. would receive certain services that Miriam B. requested at the meeting.  On June 9, 2016, CPS held an eligibility meeting to discuss the results of J.B.'s evaluations.  Miriam B. again did not receive Spanish translations of the evaluation reports.  The IEP team determined J.B. did not qualify for social work services because she had not had a social work evaluation.  The IEP team agreed to conduct this additional assessment and, on December 15, 2016, ultimately determined that J.B. qualified for social work services.

### G.     G.G. and Asencion G.

G.G., a sixteen-year-old tenth grade student at Acacia Academy, qualifies for special education services.  Her mother, Asencion G., is a native Spanish speaker.  G.G.'s IEPs indicate that her household primarily speaks Spanish and that her mother needs an interpreter.  Despite multiple requests from Asencion G. to receive written translations of IEP documents, CPS did

not provide her with such Spanish translations, except for IEP progress reports in G.G.'s sixth grade year.  Asencion G. has turned to a bilingual advocate or attorney outside of CPS to understand the IEP documents she receives.

At a February 16, 2016, IEP meeting, CPS changed G.G.'s placement to a therapeutic day school.  CPS provided an interpreter who served in another role at the meeting as well and did not accurately interpret the conversation.  CPS also denied Asencion G.'s request to translate the IEP into Spanish and her request for information on therapeutic day schools in Spanish. Around March 23, 2016, Asencion G. received a letter assigning G.G. to Acacia, a therapeutic day school with which CPS contracts.  After she obtained a translation of the letter, on April 4, 2016, Asencion G. visited Acacia and began the intake process.

### H.    M.P. and Izabela P.

M.P., an eighteen-year-old student at New Horizon Center for the Developmentally Delayed, qualifies for special education services.  M.P.'s mother, Izabela P., is a native Polish speaker.  M.P.'s IEPs indicate that the household speaks primarily Polish and that parent communications require an interpreter.

At a March 1, 2017, IEP meeting, CPS did not provide Izabela P. with a written translation of M.P.'s progress reports.  Izabela P. also did not receive a written translation of the IEP that resulted from that meeting.  Izabela P. defers many educational decisions to her daughter, who speaks English, and relies on her daughter to understand the IEP documents.

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-

pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.    Exhaustion of Administrative Remedies

The CPS Defendants argue that because Plaintiffs have not properly exhausted their administrative remedies under the IDEA or, for those who did, the administrative process mooted their claims, the Court should dismiss all of Plaintiffs' claims against the CPS Defendants. The IDEA requires a plaintiff to first exhaust available administrative remedies before filing suit under the statute. *See* 20 U.S.C. § 1415; *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 494 (7th Cir. 2012). The exhaustion requirement extends to claims under other statutes to the extent those claims "seek[ ] relief that is also available" under the IDEA. 20 U.S.C. § 1415(l); *Fry v. Napoleon Cmty. Schs.*, --- U.S. ----, 137 S. Ct. 743, 752, 197 L. Ed. 2d 46 (2017) (clarifying that, for IDEA exhaustion to apply to other statutory claims, "a suit must seek relief for the denial of a FAPE"). The parties do not dispute that the exhaustion requirement extends to all of Plaintiffs' claims.

Only H.P., E.V., and their parents sought relief through the administrative process prior to filing this suit. The hearing officers in H.P. and E.V.'s cases determined that they did not

have jurisdiction under the IDEA to address CPS' failure to provide all Spanish-speaking LEP parents with children with disabilities with qualified interpreters and translation of documents or to grant relief to all Spanish-speaking LEP parents with children with disabilities. However, both hearing officers did provide some individual relief to H.P. and E.V. and their parents with respect to translation and interpretation services. In H.P.'s case, the hearing officer concluded that CPS denied H.P. a FAPE because it significantly impeded his parents' opportunity to participate in the IEP process by failing to provide trained and certified interpreters and translations of vital documents. The hearing officer ordered that CPS provide qualified interpretation services at all future IEP meetings and translations of key special education documents to H.P.'s parents. In E.V.'s case, the hearing officer did not find that E.V. was denied a FAPE because CPS did not provide his parents with translations and did not have competent interpreters, where Aixia H. demonstrated sufficient understanding of her rights under the IDEA and she meaningfully participated in IEP meetings. The hearing officer did order CPS to provide translations of various documents concerning special education but denied relief with respect to interpretation services.

The CPS Defendants argue that the results of these proceedings have rendered H.P., E.V., and their parents' claims moot. Before addressing these Plaintiffs' claims, the Court must consider Plaintiffs' argument that they only seek systemic relief, for which exhaustion would be futile or inadequate. *See, e.g.*, *Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80, 88 (3d Cir. 1996) ("In the IDEA § 1415 context, plaintiffs may thus be excused from the pursuit of administrative remedies where they allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process."). The Seventh Circuit has questioned whether allegations of systemic violations automatically

exempt an IDEA claim from exhaustion requirements, stating that "[w]hile some IDEA violations may implicate the structure of a school district's special-education program and may not be remediable through ordinary administrative review, it does not necessarily follow that administrative review is futile or inadequate for *all* violations that are alleged to be 'systemic.'" *Jamie S.*, 668 F.3d at 494 n.3. *Jamie S.* did not foreclose an exception to exhaustion for systemic violations, however. *Id.* (noting that the court did not need to decide issues related to the futility of exhaustion of systemic violations). But the Court must determine whether Plaintiffs' claims qualify as systemic violations before any such exception to exhaustion becomes relevant.

In an unpublished decision before *Jamie S.*, the Seventh Circuit discussed systemic claims under the IDEA and adopted the Ninth Circuit's definition:

> [A] claim is "systemic" if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with the dictates of the Act; but that it is not "systemic" if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem.

*Waters v. S. Bend Cmty. Sch. Corp.*, 191 F.3d 457 (Table), 1999 WL 528173, at *4 (7th Cir. 1999) (quoting *Doe v. Az. Dep't of Educ.*, 111 F.3d 678, 681 (9th Cir. 1997)). Plaintiffs allege that CPS has no policy or practice to ensure that LEP parents receive competent interpretation or translation services. They claim to seek systemic, not individual, relief, specifically that CPS: (1) "institute an express policy and consistent practice of providing interpretation services by impartial and competent interpreters at IEP meetings and written translations of vital IEP process documents to LEP parents," (2) "develop a protocol to identify LEP parents who may need translation and interpretation services," (3) "timely translate all vital IEP process documents for LEP parents," and (4) "notify all LEP parents of children with disabilities enrolled in CPS

schools in writing in their native language of their right to receive translated vital IEP process documents and competent interpretation services." Doc. 72 at 59.

"[P]laintiffs cannot simply assert that their allegations are systemic in order to survive the exhaustion requirement, and courts have not excused claims that are merely couched as allegations of systemic violations." *M.O. ex rel. Ondrovic v. Ind. Dep't of Educ.*, No. 2:07-CV-175-TS, 2008 WL 4056562, at *10 (N.D. Ind. Aug. 29, 2008) (collecting cases). Plaintiffs' allegations of systemic violations ignore the fact that, under the IDEA, CPS need only provide translation and interpretation services to the extent necessary to ensure meaningful parent participation. *See T.R. v. Sch. Dist. of Philadelphia*, No. 15-4782, 2019 WL 1745737, at *14–15 (E.D. Pa. Apr. 18, 2019). And under the IDEA, meaningful participation "does not proscribe a certain course of conduct by a school district, but rather requires a fact-intensive inquiry into the individual circumstances." *Id.* at *15; *see also* 20 U.S.C. § 1415(f)(3)(E)(ii) (procedural inadequacies amount to a FAPE denial where they "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child"). Even in this case, the FAC demonstrates the individualized nature of the inquiry because the hearing officers in H.P. and E.V.'s cases came to different conclusions when assessing the extent to which the lack of interpretation and translation services affected the parents' ability to meaningfully participate in the decisionmaking process for their children. *See T.R.*, 2019 WL 1745737, at *17 ("[W]hile the School District's provision of translation or interpretation services might, in some cases, deny a parent the right of meaningful participation, that same conduct may, in other cases, sufficiently allow a parent to meaningfully participate in their child's IEP process."). Plaintiffs contend that because of the inconsistent results, they need systemic relief, but, considering Plaintiffs' claims against the IDEA's requirements, they require

a case-by-case inquiry into how CPS' policies or practices regarding translation and interpretation services affect each student and his or her parents individually. *See Blackman v. District of Columbia*, 633 F.3d 1088, 1094 (D.C. Cir. 2011) ("IDEA's singular focus on an individualized, cooperative educational approach providing customized remedies makes Congress's neglect of broad-based actions understandable and renders IDEA action ill-suited to class-wide relief.").

This conclusion is bolstered by the fact that, in H.P. and E.V.'s cases, the hearing officers in the due process hearings addressed their individual requests for relief related to translation and interpretation services, suggesting that structural relief is not the only solution to the alleged violations. *See Doe*, 111 F.3d at 682 (holding that a claim is not systemic "if the administrative process is capable of correcting the problem," with exhaustion required where a plaintiff "does not challenge a Departmental policy that cannot be changed, so far as he and other class members are concerned, absent structural relief that only a court can order"). And even systemic relief, which the hearing officers determined they could not grant, would only lead to individualized determinations related to each parent's ability to meaningfully participate in the IEP decisionmaking process. *See T.R.*, 2019 WL 1745737, at *22 ("Ultimately, ordering the relief that Plaintiffs seek—that the School District 'adopt and implement a new written special education plan and District policy to provide legally mandated translation and sufficient interpretation services to members of the Parent Class and the Student Class'—simply initiates a process through which highly-individualized determinations of liability and remedy are to be made."). Therefore, the Court finds that the alleged systemic nature of Plaintiffs' claims does not render exhaustion futile or inadequate.

Having found exhaustion necessary in this case, the Court turns to whether H.P., E.V., and their parents' pursuit of administrative remedies suffices to allow all Plaintiffs to proceed. The CPS Defendants argue that H.P., E.V., and their parents' claims are moot because the hearing officers provided both families with the relief they request in this case, which would also mean that the other Plaintiffs cannot piggyback on their compliance with the administrative process. Plaintiffs first argue that H.P.'s claim remains viable because CPS has not complied with the hearing officer's order. But to the extent that H.P. and his parents have issues with CPS' compliance with the ordered relief, their recourse lies in an action to enforce the hearing officer's decision, not in this action raising the same issues addressed by the hearing officer in a favorable manner. *See Robinson v. Pinderhughes*, 810 F.2d 1270, 1272–75 (4th Cir. 1987) (concluding that school district's failure to comply with hearing officer's decision in favor of plaintiffs gives rise to a § 1983 claim to enforce compliance); *A.T. v. N.Y. State Educ. Dep't*, No. 98-CV-4166(JG), 1998 WL 765371, at *6–7 (E.D.N.Y. Aug. 4, 1998) ("[P]arties seeking to enforce favorable decisions under the IDEA have 'neither the responsibility nor the right to appeal the favorable decision by the local hearing officer since they were not aggrieved by [her] decision.' . . . [P]arties seeking to enforce favorable administrative decisions are precluded from doing so under the IDEA because they are not aggrieved parties, but . . . these same parties may seek to enforce their claims under § 1983." (second alteration in original) (citation omitted)). The Court therefore dismisses H.P. and his parents' claims against the CPS Defendants.[4]

As for E.V. and his parents, the hearing officer determined that the lack of translation and interpretation services did not deny E.V. a FAPE and so did not provide them with all the relief

---

[4] The ISBE Defendants have not made an argument that H.P. and his parents' claims against them are moot. The Court allows these claims to proceed, where a conceivable basis for a valid controversy exists.

they seek here.[5]  This, then, allows E.V. to challenge the hearing officer's decision concerning

the provision of interpretation and translation services.  And because E.V. and his parents

exhausted their claims, the remaining Plaintiffs may also pursue their similar claims without

going through the administrative process.[6]  *See Ass'n for Cmty. Living v. Romer*, 992 F.2d 1040,

1045 (10th Cir 1993) ("[W]e do not hold that every plaintiff in a class action must exhaust the

IDEA's administrative remedies. . . . Even where exhaustion is necessary, the exhaustion of a

few representative claims may be sufficient to secure statutory compliance and, if not, would at

least serve the purposes of the exhaustion requirement and properly frame the issues for judicial

review."); *DL v. District of Columbia*, 450 F. Supp. 2d 11, 17 n.2 (D.D.C. 2006) (collecting

cases concerning vicarious exhaustion and extending the concept to IDEA claims to conclude

that only one plaintiff need have exhausted his claims to meet the IDEA's exhaustion

requirement).  Therefore, the Court proceeds to address the CPS Defendants' remaining

arguments for dismissal.

## II.    IDEA Claim

With respect to their IDEA claim, Plaintiffs allege that, because of CPS' refusal to

translate vital IEP process documents and to provide competent and impartial interpreters to LEP

parents, CPS denied the Student Plaintiffs a FAPE.  The CPS Defendants first argue that

Plaintiffs have failed to state an actionable IDEA claim because their allegations confirm that

---

[5] Although the hearing officer did indicate that certain documents should be provided to E.V.'s parents in Spanish, the decision does not specify whether these translated documents encompass those requested in this lawsuit.  Further, the hearing officer did not include the translation order in the concluding summary of the relief she granted to E.V. and his parents.

[6] The Court acknowledges that this may require the use of different standards of review for the exhausted and non-exhausted Plaintiffs but leaves discussion of this issue for another day.  *See Heather S. v. Wisconsin*, 125 F.3d 1045, 1052–53 (7th Cir. 1997) (describing the standard of review for an administrative decision under the IDEA where the parties have not asked the court to hear additional evidence).

CPS' policies and practices did not deny any of the Student Plaintiffs a FAPE or any of the Parent Plaintiffs denied meaningful participation in the IEP process.

Procedural flaws in the IEP process do not automatically rise to the level of a denial of a FAPE. *See Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065 (7th Cir. 2007). Procedural inadequacies in the IEP process rise to the level of a FAPE denial where the procedural inadequacies (1) impeded the student's right to a FAPE; (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or (3) "caused a deprivation of educational benefits."[7] 20 U.S.C. § 1415(f)(3)(E)(ii). The CPS Defendants argue that Plaintiffs' allegations demonstrate that each parent meaningfully participated in the IEP process and obtained substantive relief for their child through that participation. But the Court cannot make this determination at the motion to dismiss stage, where it must take Plaintiffs' allegations as true and draw all reasonable inferences in their favor. Plaintiffs have sufficiently alleged that the Parent Plaintiffs faced significant difficulties in their attempts to participate in the IEP process because CPS did not provide translations of vital documents or competent interpreters. The allegations do suggest that many of the Parent Plaintiffs ultimately obtained modifications to their children's IEPs, and the Court acknowledges that "delay in itself" does not amount to a violation. *Heather S.*, 125 F.3d at 1059. But here, Plaintiffs do not rely solely on the delay in receipt of services to support a violation, and the allegations suggest that the lack of translation and interpretation significantly impeded the Parent Plaintiffs' participation in the IEP process and caused additional harms to the Student Plaintiffs.

---

[7] The Seventh Circuit refers to those procedural inadequacies that result in the denial of a FAPE as those "that result in the loss of educational opportunity." *Hjortness*, 507 F.3d at 1065. The parties rely on the categories outlined in the IDEA statute, and so the Court does the same for purposes of this motion to dismiss.

While the evidence may ultimately undermine Plaintiffs' claim, at this stage, the Court finds Plaintiffs have sufficiently stated an IDEA claim to proceed.

## III.    Title VI Claim

Finally, the Court considers Plaintiffs' Title VI claim, in which they allege that the CPS Defendants have engaged in language-based, and therefore national origin, discrimination prohibited by Title VI by failing to translate vital IEP process documents and to provide competent interpretation services for LEP parents of children with disabilities.[8]  This failure, according to Plaintiffs, has denied the Parent Plaintiffs the right to meaningfully participate in the IEP process to the same extent as parents who read and speak English proficiently.  The parties agree that Title VI provides a private cause of action only for intentional discrimination and not for disparate impact.  *Alexander v. Sandoval*, 532 U.S. 275, 281, 293, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) (holding that, although "regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601," no private right of action exists to enforce those regulations).  Although a failure to comply with regulations promulgated under § 602 may be actionable to the extent that failure also amounts to a failure to comply with § 601, this requires intentional discrimination because § 601 only reaches intentional discrimination.  *Id.* at 280, 286.

---

[8] The CPS Defendants argue in reply that language-based discrimination does not equate to national origin discrimination.  *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) ("While Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable.").  But the Seventh Circuit has not taken a definitive stance on the issue, noting instead that the question is unsettled and that "[i]t may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Kikumura v. Turner*, 28 F.3d 592, 599–600 (7th Cir. 1994) (quoting *Hernandez v. New York*, 500 U.S. 352, 369–70, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)).  The Court at this stage treats language as a surrogate for national origin with respect to Plaintiffs' claims.  *See EEOC v. Wis. Plastics, Inc.*, 186 F Supp. 3d 945, 948 (E.D. Wis. 2016) ("It is true that language ability *per se* is not the legal equivalent to a protected class like race or national origin, but language can sometimes serve as a proxy, or stalking horse, for discrimination against a protected class.").

The CPS Defendants argue that Plaintiffs only allege a disparate impact on the Parent Plaintiffs, with CPS' alleged failure to provide translation and interpretation services potentially disproportionately impacting parents whose country of national origin does not speak English as a native language. Plaintiffs, on the other hand, contend that they have alleged intentional discrimination, specifically that CPS knows of the Parent Plaintiffs' need for competent interpretation and translation services but nonetheless intentionally and systematically fails to provide these services. They provide specific instances where CPS has denied requests for such services. According to Plaintiffs, these actions, done with knowledge of the LEP parents' need for services, deny the Parent Plaintiffs the ability to meaningfully participate in the LEP process. At this stage, this is all Plaintiffs must allege to suggest intentional discrimination. *See Marcial v. Rush Univ. Med. Ctr.*, No. 16-cv-6109, 2017 WL 2180503, at *4 (N.D. Ill. May 18, 2017) (finding plaintiff stated Title VI claim where she alleged "she was treated differently than other students because of her race or national origin, and has provided specific examples of the ways in which she was treated differently"). To the extent discovery reveals that Plaintiffs' Title VI claim amounts only to one for disparate impact, or that language-based discrimination should not be considered a proxy for protected national origin discrimination, the CPS Defendants can make these arguments to the Court based on a more complete record.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the CPS Defendants' motion to dismiss [53]. The Court dismisses H.P., Victoria G., and Hector P.'s claims against the CPS Defendants.

Dated: May 13, 2019

_____
SARA L. ELLIS
United States District Judge